1                  IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
2                        Newport News Division

3    - - - - - - - - - - - - - - - - - -
                                        )
4      UNITED STATES OF AMERICA,        )
                                        )
5              Plaintiff,               )    CRIMINAL ACTION
                                        )    NO. 4:17cr45
6      v.                               )
                                        )
7      JOSEPH JAMES CAIN BENSON, et     )
       al.,                             )
8                                       )
               Defendants.             )
9    - - - - - - - - - - - - - - - - - -

10                    TRANSCRIPT OF PROCEEDINGS
     (Jury Trial - Day 4 - TESTIMONY & EVIDENCE - Pages 454 - 694)
11                     Norfolk, Virginia

12                      April 13, 2018

13   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
             United States District Judge
14
     APPEARANCES:
15
                OFFICE OF THE UNITED STATES ATTORNEY
16              By:  Howard J. Zlotnick, AUSA
                     Lisa R. McKeel, AUSA
17              Counsel for the Plaintiff

18              RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD PC
                By:  Lawrence H. Woodward, Jr., Esq.
19              Counsel for the Defendant Benson

20              SACKS & SACKS
                By:  Andrew M. Sacks, Esq.
21              Counsel for Defendant Wallace

22              KELLETER LAW, PC
                By:  Trey R. Kelleter, Esq.
23              Counsel for the Defendant Brown

24              RASBERRY LAW, PC
                By:  Jamison P. Rasberry, Esq.
25              Counsel for the Defendant Kindell

455

```
1                           I N D E X

2      GOVERNMENT'S
3      WITNESSES                                        PAGE

4       PAUL SWARTZ
            Cont'd Direct Examination By Mr. Zlotnick    464
5           Cross-Examination By Mr. Woodward            484
            Cross-Examination By Mr. Kelleter            510
6           Cross-Examination By Mr. Sacks               526
            Cross-Examination By Mr. Rasberry             547
7           Redirect Examination By Mr.  Zlotnick        556
        PENNY WEAVER-SANCHIZ
8           Direct Examination By Mr. Zlotnick           566
            Cross-Examination By Mr. Woodward            587
9       ERIK KEMPF
            Direct Examination By Ms. McKeel             595
10          Cross-Examination By Mr. Sacks               604
        LIZA LUDOVICO
11          Direct Examination By Ms. McKeel             620
            Cross-Examination By Mr. Sacks               621
12      BRANDON DOUGLAS
            Direct Examination By Mr. Zlotnick           633
13          Cross-Examination By Mr. Kelleter            652
            Cross-Examination By Mr. Kelleter            675
14          Redirect Examination By Mr. Zlotnick         688

15
                            E X H I B I T S
16
       GOVERNMENT'S
17     NO.              DESCRIPTION                      PAGE

18      144                   Document                    465
        145                   Document                    476
19      146                   Document                    478
        147                   Document                    482
20      148                   Document                    484
        200                   Document                    585
21      110                   Document                    635
        121                   Document                    640
22      152                   Document                    641
        151                   Document                    642
23      153                   Document                    643

24

25
```

Janet Collins, Official Court Reporter

456

```
 1   DEFENDANT'S
     NO.                 DESCRIPTION                          PAGE
 2
      148A  Benson           Document                          487
 3    300   Brown            Document                          515
      201   Wallace          Document                          609
 4    301   Brown            Document                          654
      302   Brown            Document                          658
 5    303   Brown            Document                          665
      304   Brown            Document                          676
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Janet Collins, Official Court Reporter

```
1                        P-R-O-C-E-E-D-I-N-G-S

2              (Whereupon, the proceedings commence, 9:21 a.m.)

3              THE COURT:  Good morning.

4              (All present respond, "Good morning.")

5              THE COURT:  Last night y'all gave me some homework

6    here, or at least I asked for it, and I had a chance to read

7    through these transcripts that you gave me last night on

8    these forthcoming witnesses.  I realized that counsel had

9    some concern about the ability of the informants to come in

10   here and to testify.

11             Court looked at the cases that you gave me,

12   Mr. Sacks.  The Court doesn't believe that these cases were

13   helpful at all.  As a matter of fact, I don't even think they

14   even addressed the issue that the Court is confronted with

15   here.

16             The best guidance the Court has found so far is in

17   the Fourth Circuit case, United States versus Dargan, that

18   was raised the first day.  And that's a case where the same

19   basic issue came up, except that the declarant in that case

20   didn't name the co-conspirator, didn't give the actual names

21   of the co-conspirators.

22             The Court's of the view that all the cases certainly

23   indicate that this is non-testimonial evidence, so it's not

24   covered by Bruton, but it is covered by Rule 804(b)(3), which

25   has three components:
```

Janet Collins, Official Court Reporter

458

1            The unavailability of the declarant;.

2            The scope and nature of the culpability of the

3    speaker;.

4            And corroboration.

5            And the Court continues to have this concern about

6    how much corroboration there is for what the informants have

7    to say.  And I must say, at this juncture in the case, the

8    Court hasn't heard a lot, and so we will see how it continues

9    to unfold.

10           But the Court's analyzed this issue, looking at all

11   the evidence, putting it in context on this issue of

12   corroboration and trustworthiness.  And I will give you an

13   example.

14           For example, I note that I read the transcript

15   regarding Mr. Brown's reference to Mr. Wallace's involvement,

16   but then if that's what the informant has to say, the

17   question becomes of what's in the record at this point that

18   shows the scope of Mr. Wallace's involvement.  And the Court

19   hadn't heard a lot.

20           And so the Court continues to be concerned about the

21   corroboration prong on admitting evidence under 804(b)(3).

22   And so I will permit the government to keep putting its case

23   on, but that's the Court's concern is about this 804(b)(3)

24   evidence that stands before us.

25           The other think that the Court had some concern

459

1    about, I don't know what counsel has done.  Ms. McKeel, I
2    know you were in Grand Jury, but on some critical areas there
3    you clearly led the informants on some critical areas here,
4    and the Court has some concern about that.
5            Other than that, that's where the Court is, and we
6    will keep moving along.
7            MR. KELLETER:  Your Honor, may I bring one thing to
8    Your Honor's attention?
9            THE COURT:  From the podium.
10           MR. KELLETER:  Your Honor, as this issue sort of
11   evolves as we hear more evidence, the one other thing I
12   wanted to bring to Your Honor's attention is we are also
13   dealing with the statement of Wayne Turner who says that
14   Mr. Benson made a comment.
15           And in terms of the leading questions in the Grand
16   Jury, if Your Honor had an opportunity to look at that
17   transcript?
18           THE COURT:  Read all three of them, including
19   Mr. Turner, and made notes on all of them.
20           MR. KELLETER:  And, Your Honor, the one other thing
21   I wanted to bring to your attention to help inform that.
22           There is a 302, and there's one sentence from the
23   302 that I think also helps inform it, that before they put
24   him in front of the Grand Jury and they talked to Turner at
25   length about this supposed jailhouse conversation, there

460

1    comes a point where the agent writing the 302 writes, "Turner

2    knew" -- this is what Turner claims he knew -- "that AU, who

3    is Kenny Jones, and Beezy, who is Mr. Brown.

4          "Turner knew that they had a street reputation for

5    home invasions, burglaries, and guns, and assumed that since

6    Boston, Mr. Benson, was associated with them, that his

7    incarceration stemmed from a robbery of some sort."

8          So I'm suggesting that even the statement that he

9    makes in the Grand Jury, it's not quite clear what his

10   personal knowledge is, what his reputation is, because he's

11   led into it.  And so my real concern is that he may then say

12   something on the stand about Mr. Brown, which really is him

13   piecing together various conversations.

14         THE COURT:  Well, I think we are going to have to

15   deal with that as we go along.  I can understand exactly what

16   the concern is.  The Court made some notations of some pages

17   here, some other issues.  But we will deal with that as we go

18   along here.

19         MR. SACKS:  And, Your Honor, may I say one thing?

20         I understand that the Court looked at those cases.

21   The only reason -- I understand the context is somewhat

22   different, but there were quotes in the cases that I brought

23   to your attention.

24         THE COURT:  Right.

25         MR. SACKS:  That's all I wanted.  I wasn't

1  representing that these things are --

2       THE COURT:  Dispositive.

3       MR. SACKS:  Absolutely.  Just to give some guidance

4  to His Honor.

5       THE COURT:  I will note that the cases you gave to

6  me did deal with joint trials.

7       MR. SACKS:  And then one of them dealt with the fact

8  that you had evidence coming in against one defendant that

9  shouldn't be admissible against another defendant if it was a

10 separate trial, and how they deal with that.  That was really

11 what I was trying to give you some assistance on.  But we

12 will, I think, have some time to address it again.

13      THE COURT:  We will have some off-the-record

14 conferences to resolve all of these issues as we go along.

15      MR. SACKS:  Yes, sir.  Thank you again, Your Honor.

16      THE COURT:  And I'm sure that the United States is

17 aware of the Court's concerns and will certainly take a

18 surgical approach to obtaining the information from these

19 informants.

20      You know -- anything else, otherwise we are

21 prepared -- how many more witnesses do you have,

22 Mr. Zlotnick?  You called about 14 here.  Did you eliminate

23 about five of those you have left?

24      MR. ZLOTNICK:  We're reducing some, Judge.  We've

25 got -- we've taken off George Piggot from the list, we've

462

1    taken off Chris Luckie from the list, we've taken off Angel

2    Alliers from the list.

3           So when we finish up Mr. Swartz, then we've got

4    Brandon Douglas, Wayne Turner, we've got a Newport News jail

5    custodian, Lieutenant Preyer, be very very brief.

6           Then Mr. Berry, and then the rest of the witness --

7    Penny Sanchiz will probably testify today as well.

8           THE COURT:  So we might finish next week?

9           MR. ZLOTNICK:  I think we will probably finish

10   Monday, that's sort of my -- we'll rest.  I think we will get

11   most of it on, though, today, is my hope.

12          MR. WOODWARD:  Mr. Zlotnick approached me.  The

13   jailhouse custodian, I forget his name, all he is going to

14   say is that, during a certain time frame, Mr. Benson and

15   Mr. Turner were in the same cellblock.  They didn't put that

16   in the written stipulation.

17          I told Mr. Zlotnick, I've got the records,

18   Mr. Benson doesn't deny he was in the cellblock with him.  If

19   we can reach an oral stipulation on that, may take longer to

20   reach the stipulation than just put -- but that's really very

21   brief and I'm happy to stipulate to the time frames.  I don't

22   know if they are going to get to him before lunch, but

23   perhaps we can cut him as well, because that's really a

24   foundational issue.

25          THE COURT:  If y'all can work that out, that's just

Janet Collins, Official Court Reporter

```
 1    fine with the Court.

 2              MR. WOODWARD:  Yes, sir.  I will talk to the rest of

 3    defense counsel, Your Honor.

 4              THE COURT:  Y'all can stipulate or work out

 5    whatever.

 6              MR. WOODWARD:  Yes, sir.

 7              THE COURT:  All right, bring the jury in by the way,

 8    Mr. Swartz.  Are we coming to the end of Mr. Swartz?

 9              MR. ZLOTNICK:  We are getting toward the end, yes,

10    sir.

11              MR. WOODWARD:  Your Honor, maybe we are getting near

12    the end of direct.

13              THE COURT:  That's what I'm talking about, the

14    direct, not the cross.

15              (Jury in, 9:30 a.m.)

16              THE COURT:  You may be seated.

17              Good morning, ladies and gentlemen.

18              (All jurors respond, "Good morning.")

19              The record reflect that all jurors are in attendance

20    this morning.  Does counsel agree?

21              (All counsel respond in the affirmative.)

22              THE COURT:  All right, then, Mr. Zlotnick, you may

23    resume.

24              MR. ZLOTNICK:  Thank you, Your Honor.

25              PAUL SWARTZ, called by the Government, having been
```

P. SWARTZ - DIRECT CONT'D.                                          464

1    previously sworn, was examined and continued to testify as

2    follows:

3                        DIRECT EXAMINATION

4    BY MR. ZLOTNICK:

5    Q.  Mr. Swartz, yesterday we had completed the time frame

6    that the Louis Joseph phone had gone dark; had we not?

7    A.  Yes, sir.

8    Q.  And we had shown you, and you had also gone through when

9    Tequilla had called 9-1-1; did we not?

10   A.  Yes.

11   Q.  I want to ask you now about the phone activity and the

12   location of the Wallace phone on the day of the Louis Joseph

13   murder.

14          And I'd like to have the witness shown Exhibit 144,

15   if we could.

16          And it's your summary; is it not?

17   A.  It is.

18   Q.  And it's a summary of what?

19   A.  Exhibits 127, which are the call detail records for the

20   Wallace telephone, and Exhibit 138, which is the cell site

21   location list for nTelos.

22   Q.  What was your purpose in putting together the summary

23   of -- that you got as Exhibit Number 144?

24   A.  To show the telephone activity and the location of the

25   telephone on March 13th, 2009.

P. SWARTZ - DIRECT CONT'D.                                    465

```
 1              MR. ZLOTNICK:  I'd offer Exhibit 144 into evidence.

 2              (No objection from defense.)

 3              THE COURT:  Exhibit 144 will be admitted.

 4              (The document was received in evidence as

 5    Government's Exhibit No. 144.)

 6    BY MR. ZLOTNICK:

 7    Q.  Now, having reviewed Exhibit 127B, were you able to

 8    determine the home tower for the Wallace phone?

 9              MR. SACKS:  I object to "home tower," unless he has

10    personal knowledge.  He can just talk about tower locations,

11    but "home" is a characterization.

12              MR. ZLOTNICK:  Well, actually, he testified

13    yesterday about that's part of his analysis to find what he

14    calls a "home tower" where the concentration is.

15              MR. SACKS:  I didn't object to it because it didn't

16    have to deal with my claims.

17              THE COURT:  Well, as the Court heard the testimony,

18    the Court overrules the objection.

19              THE WITNESS:  I'm sorry, could you repeat?

20    BY MR. ZLOTNICK:

21    Q.  Yes.  Could you tell us, were you able to determine from

22    your analysis the home of the Wallace telephone?

23    A.  Yes, sir.

24    Q.  And tell us what that was.

25    A.  So there are two towers that come into play for the
```

P. SWARTZ - DIRECT CONT'D.                                    466

1    Wallace telephone.

2          The first one is designated as the Waller Mill tower

3    by nTelos.  That is represented on the map with the arrow

4    pointing to the location of the tower.

5          For that tower, during the time frame of the records

6    that we have cell site information, which is January 1, 2009

7    until April 22nd of 2009, there were 2,273 activations where

8    telephone calls were made using that tower.

9          There is a second tower that comes into play, which

10   is the Williamsburg tower.  And for that tower, there was a

11   total of 1,644 activations.  These are the two most

12   frequently used towers in the Wallace telephone records, and

13   so that's for the entire set of data.

14         I then made a determination as to when the telephone

15   would -- when the last calls would normally occur at the end

16   of the day and when the calls would normally begin.  And then

17   in focusing in on those, it's the same analysis where the

18   most frequently used tower is the Waller Mill tower, followed

19   by the Williamsburg tower.

20         As I testified yesterday with the nTelos records, we

21   do not get sector information.  So we're looking at a

22   360-degree radius around that tower and, in this case here,

23   you can see where there's an overlay.

24         These circles represent just a two-mile radius

25   around each of the tower locations, so it appears that

P. SWARTZ - DIRECT CONT'D.                                        467

1    there's one side of the Waller Mill tower that intersects

2    with the other side of the Williamsburg tower.

3    Q.  Now, so the tower was -- the tower -- the dominant towers

4    were in which city?

5    A.  Williamsburg, Virginia.

6    Q.  In the early morning, were there any calls to Mr. Brown?

7    A.  There were.

8    Q.  When was the first call?

9    A.  At 9:41 a.m.

10   Q.  And they continued during that period until what time?

11   A.  There were three calls that morning; at 9:41, 9:45, and

12   9:56.

13   Q.  Now, did the phone start to move?

14   A.  It did.

15   Q.  And where did it move to next?

16   A.  At 9:59, there was one telephone call, and the activation

17   was at the Queen's Creek tower, which is located at

18   Interstate 64.

19   Q.  Again, in Williamsburg?

20   A.  In Williamsburg.

21   Q.  Does the move -- does the phone move from the Queen's

22   Creek tower?

23   A.  It does.

24   Q.  And where does it go next?

25   A.  At 10:02 and 10:04, there were two telephone calls that

P. SWARTZ - DIRECT CONT'D.                                      468

1   were at the Water Country tower, which is also located in

2   Williamsburg.   This tower is located at the intersection

3   there at I-64.

4   Q.   This takes us to what time?

5   A.   10:04 a.m.

6   Q.   Does the phone continue to move?

7   A.   It does.

8   Q.   Where does it move next?

9   A.   Between 10:15 a.m. and 10:35 a.m., it is making -- there

10  are five telephone calls at what nTelos designates as the

11  Newport News Airport tower, which is located at 393 Denbigh

12  Boulevard in Newport News.

13  Q.   From the Water Country tower towards the Newport News

14  Airport tower, what direction -- where's that phone moving,

15  from Williamsburg to where?

16  A.   It's moving eastbound from Williamsburg towards Newport

17  News, and is now in Newport News.

18  Q.   So the Newport News tower that you've referred to, is

19  that the same or a different tower as the Louis Joseph, Jr.

20  phone?

21  A.   It's the same tower that I designated the home tower for

22  the Louis Joseph telephone.

23  Q.   And on your summary on that map, do you have designated

24  or shown the Clipper Drive location in relation to the tower?

25  A.   I do.

P. SWARTZ - DIRECT CONT'D.                                    469

1    Q.   And how would we -- we are looking at that, what would
2    represent the Clipper Drive?
3    A.   There's a yellow pin on the map there.
4    Q.   This takes us from 10:15 to 10:35 a.m.?
5    A.   That is correct.
6    Q.   How long does that phone stay in this Newport News tower
7    location?
8    A.   From 10:15 to 10:35, when telephone calls were actually
9    being made.
10   Q.   Now, is this the same period or different period that you
11   talked about on the Louis Joseph phone where you talked about
12   when it went into the dark zone?
13   A.   It's in the same time frame.
14   Q.   Now -- so it stays in the vicinity of that tower for what
15   period of time, or the Louis Joseph phone event?
16   A.   From 10:15 a.m. to at least 10:35 a.m.
17   Q.   Where's the next location the phone moves to?
18   A.   So at 11:18 and 11:19, there were two telephone calls,
19   and the telephone is now utilizing the tower designated as
20   Big Bethel, which is located on Big Bethel Road in Hampton,
21   Virginia.
22   Q.   So it's now moved out of the area of Newport News and
23   Clipper Drive?
24   A.   That's correct.
25        On this map on the screen right now in the upper

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT CONT'D.                                    470

1    left-hand corner, the pin for -- that designates the address
2    of 217 Clipper Drive is shown there.
3    Q.   Where does the phone go next?
4    A.   So from 1:28 a.m. until 12:35 p.m., there were 17
5    telephone calls and all of these calls were utilizing the
6    tower that is designated by nTelos as Newmarket Mall tower
7    with a street address of 6060 Jefferson Avenue.
8            That's not actually the mall.  The mall is across
9    the street.  That address is Roush Towers, which is a tall
10   building there at the intersection of Mercury Boulevard and
11   Jefferson Avenue.
12   Q.   In that particular area, did you also plot a location or
13   an address on there?
14   A.   I did.
15   Q.   And what address was that?
16   A.   8645 Orcutt Avenue, Hampton, Virginia.
17   Q.   Now, while at that tower, were there any calls to the
18   Brown phone?
19   A.   There was one telephone call from the Brown phone to the
20   Wallace phone at 12:34 p.m.
21   Q.   Now, does the Wallace phone, after 12:35, move to another
22   location?
23   A.   It does.
24   Q.   And what time is that?
25   A.   Between 12:42 p.m. and 12:44 p.m., the phone has now

P. SWARTZ - DIRECT CONT'D.                                          471

1    moved away from the Newmarket Mall tower, and is now

2    utilizing the tower located on Executive Drive in Hampton.

3    Q.  And what part of Hampton is that?

4    A.  It's the Coliseum Mall area.

5    Q.  And can you tell us, while the phone -- does the phone

6    then, at 12:44, go to another location?

7    A.  Beginning at 12:51 p.m. until 2:04 p.m. in the afternoon,

8    there are a series of calls while the telephone is in the

9    downtown Hampton area.  The majority of the calls were

10   utilizing the tower located at 1330 Thomas Street in Hampton,

11   but there were also eight calls with the tower that's located

12   at 131 East Queen Street.  Again, towards the downtown

13   Hampton area as designated by the notations on the map.

14   Q.  Between 12:51 and 2:04 p.m., were there calls with the

15   Brown phone?

16   A.  Yes, there were.

17   Q.  And do you have those summarized; can you describe those

18   for us?

19   A.  So there were 13 telephone calls with the Brown phone

20   between 1:04 p.m. and 1:54 p.m.  They're in both directions.

21          And the first call at 1:04 was 5 minutes and

22   44 seconds in duration.

23   Q.  Now, does the -- when these calls are being made, where

24   is the phone, in what area?

25   A.  Downtown Hampton.

P. SWARTZ - DIRECT CONT'D.                                    472

1    Q.  After 2:04, where's the phone go next?

2    A.  The phone starts to move away from the downtown Hampton

3    location and there were two phone calls, one at 2:10 and one

4    at 2:11 p.m., utilizing the tower at 501 Industry Drive in

5    Hampton.

6    Q.  And that's until -- where does it go next?

7    A.  And then, beginning at 2:49 p.m. to 5:39 p.m. there were

8    16 calls at the Newmarket Mall tower.

9    Q.  What city is that in?

10   A.  It's in the City of Newport News, but it's right at the

11   Hampton line.

12   Q.  And does it also -- does that cover the Orcutt address?

13   A.  It does.

14   Q.  And you indicated there were how many calls?

15   A.  There were 16 calls utilizing the Newmarket -- the

16   Newmarket Mall tower, but there were also two calls utilizing

17   the Michael's Woods tower, which is located on Big Bethel

18   Road in Hampton.

19          And then there was also one call during that time

20   frame that utilized a tower located down at the Newport News

21   shipyard.

22   Q.  Did the Wallace phone make calls with the Brown phone and

23   another phone?

24   A.  Yes, sir.

25   Q.  And those are summarized.  Can you go through those for

P. SWARTZ - DIRECT CONT'D.                                        473

1   us.   That's the Kindell phone?

2   A.   There was a call from the Bryan Brown phone at 2:49 p.m.,

3   and then a call back to the Brown phone at 2:51 p.m.

4           And then there was an incoming call to the Wallace

5   phone from the Benson phone at 3:05.

6           And then at 3:18, there was an incoming call from

7   the Kindell phone.

8           And then at 4:02 there's an outgoing call to the

9   Brown phone.

10  Q.   So these -- the phone is located where when these calls

11  are being made?

12  A.   In the area of the Newmarket Mall tower.

13  Q.   And it had been there earlier that day?

14  A.   It had been.

15  Q.   Now, where's the phone go next?

16  A.   Beginning at 5:47 p.m. and then at 5:48 p.m., there were

17  two telephone calls, and these calls were utilizing what has

18  been designated as the Menchville tower, which is located on

19  Nettles Drive in Newport News.

20  Q.   And what direction is the phone going now?

21  A.   Westbound back towards Williamsburg.

22  Q.   Where's the next place the phone moves to?

23  A.   To the Newport News Airport tower.   There were calls at

24  6:10 and 6:11.

25  Q.   Where's it go next?

P. SWARTZ - DIRECT CONT'D.                                    474

1   A.   And then at 6:16, the next call is utilizing the Ft.

2   Eustis tower, which is in the upper part of Newport News.

3   Q.   Does the phone go towards the Water Country tower?

4   A.   It does.   There were seven calls while utilizing the

5   Water Country tower between 6:27 p.m. and 6:44 p.m.

6   Q.   Where's the phone go next?

7   A.   Back to the area in Williamsburg utilizing the Waller

8   Mill tower and the Williamsburg tower.   Between 6:56 p.m. and

9   7:28, there were eight telephone calls.

10  Q.   Were there any calls to the Brown phone?

11  A.   There was a call at 7:27 p.m. to the Brown phone.

12  Q.   Can you tell us, on the -- from where you are, whether or

13  not the -- where the location of the Williamsburg Greyhound

14  Bus station is?

15  A.   Yes, sir.   It's located at 468 North Boundary Street in

16  Williamsburg, as designated on the map with the yellow pin.

17  Q.   So that was within the towers?

18  A.   Yes.

19  Q.   Now, from reviewing the phone records on the Kindell

20  phone, did you determine if there were any phone calls made

21  on March 13th, 2009 to Greyhound Bus?

22  A.   I did.

23  Q.   All right, I'm going to show you next, Exhibit 145.

24        Showing you Exhibit 145, is that a summary of the

25  telephone activity between the Kindell phone and the

P. SWARTZ - DIRECT CONT'D.                                    475

1   Greyhound Bus company?

2   A.   There are calls on this exhibit between the Kindell phone

3   and Greyhound, but there are also a couple of other calls

4   involving the Benson phone, the Wallace phone, and the

5   Kindell phone.

6   Q.   All right, and what exhibits did you use for that?

7   A.   126C and 127.

8   Q.   So 127 would be the Wallace records?

9   A.   Yes.

10  Q.   And can you describe the summary for us?

11  A.   So at 12:25 p.m., the Kindell phone made a telephone call

12  to the 800 toll free number for Greyhound.  It was only three

13  seconds in duration.

14         At 12:39, there was another call from the Kindell

15  phone to the Greyhound toll free number.  That was 1 minute

16  and 44 seconds in duration.

17         And then at 12:41 p.m., the Kindell phone called the

18  Greyhound Bus station, and that call was 6 minutes and

19  11 seconds in duration.

20  Q.   Now, these -- I'm sorry, go ahead then.

21         And what are the other ones you've just added now?

22  A.   Then at 3:05, there is a call from the Benson phone to

23  the Wallace phone.

24         At 3:17, there is another call from the Kindell

25  phone to the Greyhound toll free number.

P. SWARTZ - DIRECT CONT'D.                                476

1           At 3:18, there is a call from the Kindell phone to
2    the Wallace phone.
3           At 3:19, there is a telephone call from the Kindell
4    phone to the Greyhound toll free number that's 3 minutes and
5    51 seconds in duration.
6           At 3:24 p.m., there is a call from the Kindell phone
7    to the Greyhound toll free number that is 2 minutes and
8    14 seconds in duration.
9           At 3:25, there is a call between the Benson phone
10   and the Kindell phone.
11          And then at 3:26 p.m., there is another call from
12   the Kindell phone to the Greyhound toll free number that is 1
13   minute and 6 seconds in duration.
14          MR. ZLOTNICK:  Let me move Exhibit 145 into evidence
15   at this time as well.
16          (No objection from defense.)
17          THE COURT:  Exhibit 145 will be admitted.
18          (The document was received in evidence as
19   Government's Exhibit No. 145.)
20          THE WITNESS:  Then there were four more calls
21   between 6:23 p.m. and 7:25 p.m. from the Kindell phone to the
22   Greyhound toll free number.
23          The last two calls were 2 minutes and 55 seconds in
24   duration, and 7 minutes and 15 seconds in duration.
25   BY MR. ZLOTNICK:

P. SWARTZ - DIRECT CONT'D.                                    477

1    Q.  Were these calls made before or after the Joseph phone

2    went dark?

3    A.  After.

4    Q.  Were these calls made before or after the Wallace phone

5    had been in the same vicinity as the Joseph phone when it

6    went dark?

7    A.  These calls are after the Wallace phone was in the area

8    of the 217 Clipper.

9    Q.  Mr. Swartz, did you also do a summary of telephone

10   activity on March 13th and 14th, 2009, in relation to

11   Greyhound travel from Virginia to Massachusetts, again on

12   those dates, March 13th and 14th?

13   A.  Of 2009?

14   Q.  Of 2009.

15   A.  Yes, sir.

16   Q.  And is that travel before or after these calls?

17   A.  It's after.

18   Q.  And what exhibits did you use to make Exhibit 146, your

19   summary?

20   A.  126C, which are the call detail records for the Kindell

21   telephone.

22        139, which is the Sprint Repoll list, and then

23   Greyhound Exhibits 107 and 108.

24   Q.  All right -- I'd like to offer Exhibit 146 into evidence.

25        THE COURT:  Any objection?

P. SWARTZ - DIRECT CONT'D.                                  478

1              (No objection from defense.)

2              THE COURT:  146 will be admitted.

3              (The document was received in evidence as

4    Government's Exhibit No. 146.)

5    BY MR. ZLOTNICK:

6    Q.  Mr. Swartz, can you tell us when was the last call in the

7    Kindell phone in the Norfolk market?

8    A.  8:36 p.m.

9    Q.  And that's shown -- and the market is shown with the

10   yellow dots?

11   A.  That's correct.

12   Q.  And what's the next market a phone call is made?

13   A.  On March 13th between 9:05 p.m. and 10:43 p.m., the

14   telephone was making calls utilizing the Repoll Number 558,

15   which is the Richmond market.

16   Q.  All right.  And do you know whether or not there was a

17   ticket on 3-13 from Richmond to New York?

18   A.  Yes, sir.

19   Q.  That's Exhibit 107?

20   A.  Yes, sir.

21   Q.  And that shows the date 3-13 and the time?

22   A.  Yes, sir.

23   Q.  And who were the travellers?

24   A.  Joe Benson and Rosuan Kindell.

25   Q.  And that's from what city to what city?

P. SWARTZ - DIRECT CONT'D.                                479

1   A.   From Richmond, Virginia, to New York, New York.

2   Q.   And that's a leg of a trip?

3   A.   Yes.

4   Q.   What's the next place the phone -- the Kindell phone

5   calls?

6   A.   On March 13th, between 11:24 p.m. and 11:28 p.m., there

7   were calls made on the Kindell phone utilizing Repoll number

8   107, which is the DC Beltsville 3 market.

9   Q.   What's the next one -- next place it calls?

10  A.   On March 14th, between 12:06 a.m. and 1:24 a.m., the

11  Kindell telephone was utilizing Repoll number 436, which is

12  the DC Beltsville 2 market.

13  Q.   And this takes us to 1:24 a.m.

14  A.   That's correct.

15  Q.   Is there any call on there between Benson and the Kindell

16  phone, or Kindell and Benson?

17  A.   There is at 12:14 a.m. on March 14th.

18  Q.   What's the next place the phone calls?

19  A.   On March 14th, 2009 at 1:35 a.m., there's a telephone

20  call utilizing Repoll number 91, which is the DC Elkridge 1

21  market.

22  Q.   And does the phone continue to move north?

23  A.   It does.

24  Q.   Where does it go next?

25  A.   On March 14th, 2009 at 1:38 a.m., there's a telephone

P. SWARTZ - DIRECT CONT'D.                                      480

1   call utilizing Repoll 432, which is the DC Beltsville 1

2   market.

3   Q.  And is there a Greyhound ticket that corresponds to that?

4   That's Exhibit 108.

5   A.  Exhibit 108 reflects that the Joe Benson and Rosuan

6   Kindell travelled on March 14th, 2009, and this leg of the

7   trip is from New York to Boston.

8   Q.  Leaving at what time?

9   A.  Leaving at 7:00 a.m.

10  Q.  And those are the ticket stubs?

11  A.  Yes, sir.

12  Q.  Does the phone continue north?

13  A.  Yes.

14  Q.  Where does it go next?

15  A.  On March 14th, between 8:41 a.m. and 9:08 a.m., the

16  Kindell phone was utilizing towers in Repoll Number 420,

17  which is the Wallingford 2 Hartford.  Basically the

18  Connecticut area, north of New York City.

19  Q.  So this is on March 14th?

20  A.  That's correct.

21  Q.  Where does it go next?

22  A.  And then on March 14th, between 9:19 a.m. and 9:39 a.m.,

23  there were telephone calls on the Kindell phone utilizing

24  Repoll Number 240, which is the Wallingford 1 Hartford

25  market, which is just north of the prior market.

P. SWARTZ - DIRECT CONT'D.                                    481

1    Q.  And does it eventually arrive in Boston?

2    A.  It does.

3    Q.  And when is that?

4    A.  The first telephone call that was made on the Kindell

5    phone once it reached Repoll Number 154, the Boston Walburn

6    market, was on March 14th at 11:07 a.m.

7    Q.  And can you tell us about those calls?

8    A.  That first call was a call to the Wallace phone at 11:07

9    that went to voicemail.  And then later in the afternoon,

10   there were a series of calls back and forth between the

11   Kindell phone and the Wallace phone.

12        And then at 1:56, there's a call to the Benson

13   phone.

14   Q.  And these calls to the Wallace phone and the last one to

15   the Benson phone, were made from what city?

16   A.  From Boston.

17   Q.  And the first call to the Benson phone went into what?

18   A.  I'm sorry?

19   Q.  I'm sorry, the first call to the Wallace phone, what

20   happened to that call?

21   A.  It went to voicemail.

22   Q.  And there would be a period where they made connection?

23   A.  There are -- there was a call at --

24        MR. SACKS:  There is an objection to the date that

25   they connected.

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT CONT'D.                                    482

1          THE COURT:  Objection sustained.

2   BY MR. ZLOTNICK:

3   Q.  Was there a period where the two phones made the

4   connections?

5   A.  There were additional calls, yes, that were not routed to

6   voicemail.

7   Q.  I would next like to have the witness shown Exhibit 147.

8          Can you tell us, is 147 a summary of the call volume

9   on the Benson phone?

10  A.  Yes, sir.

11          MR. ZLOTNICK:  I offer Exhibit 147 into evidence.

12          MR. WOODWARD:  No objection, Your Honor.

13          (No objection from defense.)

14          THE COURT:  Exhibit 147 will be admitted.

15          (The document was received in evidence as

16  Government's Exhibit No. 147.)

17  BY MR. ZLOTNICK:

18  Q.  Describe what your chart shows regarding the Benson phone

19  on the dates of March 12th and 13th and 14th.

20  A.  This is a bar chart just showing the call activity for

21  each day during the month of March 2009.

22          And so on March 12th, there were only two outgoing

23  text messages.  And then on March 13th, there was one

24  incoming text message and four outgoing calls.

25  Q.  And you used Exhibit 125A for that?

P. SWARTZ - DIRECT CONT'D.                                           483

1    A.  Yes, sir.

2    Q.  And, finally, I'd like to have the witness shown 148.

3         Can you tell us what Exhibit 148 is?

4    A.  This is a summary of the telephone activity between

5    Rosuan Kindell, Joseph Benson, Mark Wallace.

6         And then activity between Mark Wallace and Bryan

7    Brown, and then Bryan Brown with Corey Odle.

8    Q.  And does the chart show the time frame of those contacts?

9    A.  Yes.

10        MR. ZLOTNICK:  I'd offer that into evidence, Your

11   Honor.

12        MR. WOODWARD:  Your Honor, the 148 that's in my book

13   also has Mr. Alliers and a man named Dwayne Douglas on it.

14        MR. ZLOTNICK:  We took -- we did that one earlier.

15   I gave it to them originally, and then I decided at this

16   point to take those out, but they are free to certainly

17   inquire under those.  But I've taken this somewhat out of

18   order for some legal reasons as well.

19        THE COURT:  So you gave a supplemental chart?

20        MR. ZLOTNICK:  They have the chart, and this is

21   another one.

22        THE COURT:  That was the first one.

23        MR. WOODWARD:  For purposes of it, so this one

24   with -- without Alliers and Douglas is now 148 in the

25   numbering, if that's what we should do.  And if we use this

P. SWARTZ - CROSS                                                      484

1    one, we have to renumber it.  Is that what we should do?

2              THE COURT:  If you want to use it for something.

3              MR. ZLOTNICK:  That's perfectly fine.

4              MR. WOODWARD:  Okay.

5              THE COURT:  Is there any other objection?

6              MR. SACKS:  Your Honor, I have an objection to the

7    Chart 148 contained time periods that both far precede and

8    many following the relevant date in question charged in this

9    case.  And I think that that allows for speculation that's

10   not been tied in.  So I'd object to that, that this chart

11   accumulating all of these different calls over many many

12   different months that are not relevant to this case.  That's

13   my problem.

14             THE COURT:  The Court understands your objection,

15   but the Court doesn't believe that that objection is

16   sufficient to keep this document out, so the Court overrules

17   that objection.

18             MR. SACKS:  Yes, sir.

19             THE COURT:  148 will be admitted.

20             (The document was received in evidence as

21   Government's Exhibit No. 148.)

22             MR. ZLOTNICK:  I have no other questions, Your

23   Honor.

24             THE COURT:  Cross-examination?

25             MR. WOODWARD:  Yes.

P. SWARTZ - CROSS                                                    485

1                          CROSS-EXAMINATION

2     BY MR. WOODWARD:

3     Q.   How are you doing, Mr. Swartz?

4     A.   Just fine, thank you.

5     Q.   Good.

6          Before I start, when I -- I need to use the document

7     camera.  Do you have the ability up there to switch back and

8     forth from the system to the document camera?

9     A.   I do not.

10              THE COURT:  She has.

11              MR. WOODWARD:  She does, okay.

12    BY MR. WOODWARD:

13    Q.   Okay, could we put the document camera on and I will

14    start with that?

15              MR. WOODWARD:  And, Your Honor, for purposes of the

16    record, I'm going to mark this exhibit as, with the

17    government's permission, 141A.  It's the one that I just

18    referenced.

19              THE COURT:  Right.

20              MR. WOODWARD:  So it will be separate from 148.

21              THE COURT:  We will see if he can identify it.

22              MR. WOODWARD:  I will.  Now, can I -- before I show

23    this to the jury, can I just pass it up and let him see it so

24    it's not on the document camera?

25              THE COURT:  The jury can't see it anyway.

P. SWARTZ - CROSS                                                    486

1            MR. WOODWARD:  Oh, when I put it on the document

2    camera, they can't?  Okay.

3            THE COURT:  They can't see it until the Court

4    permits it.

5    BY MR. WOODWARD:

6    Q.  Mr. Swartz, let me show you what I've marked as Exhibit

7    148A for identification at this point.

8            That's a document that you prepared?

9    A.  Yes, sir.

10   Q.  Okay.  And the difference between 148A and 148 that's

11   been admitted, I believe is three things:

12           One, there's now a picture of Corey Odle on 148, as

13   opposed to just a phone; is that correct?

14   A.  That is correct.

15   Q.  And then there's also an indication that during the time

16   frame of July of 2008 to March of 2009, there were 70 calls

17   between Mr. Wallace and an individual named Angel Alliers?

18   A.  Yes, sir.

19   Q.  And during the time frame of March of 2009 to December of

20   2009, there were 244 calls between Mr. Wallace and an

21   individual named Dwayne Douglas?

22   A.  Yes, sir.

23   Q.  And while there's no time frame that I can see, there

24   also appears that on your chart there were 208 calls between

25   Mr. Alliers and Mr. Douglas, or is that 206?  I can't read

P. SWARTZ - CROSS                                                    487

1    it.

2    A.  208.

3    Q.  208.  All right.

4         And you prepared this?

5    A.  Yes, sir.

6    Q.  Based on part of your analysis in this case?

7    A.  I did.

8         MR. WOODWARD:  Your Honor, I would move its

9    admission at this point.

10        MR. SACKS:  No objection.

11        MR. ZLOTNICK:  No objection.

12        THE COURT:  There being no objection, the exhibit is

13   admitted.

14        (The document was received in evidence as

15   Defendant's Exhibit No. 148A.)

16        THE COURT:  That's 148A.

17   BY MR. WOODWARD:

18   Q.  May I show that to the jury?  I have just a couple of

19   questions.

20        THE COURT:  You may.

21   BY MR. WOODWARD:

22   Q.  Mr. Swartz, you were asked originally to analyze phone

23   activity that involved individuals named Dwayne Douglas and

24   Angel Alliers?

25   A.  Yes, sir.

P. SWARTZ - CROSS                                                        488

1    Q.  Okay, and you did that without going through all the --
2    just like you analyze all the other phone activity?
3    A.  Yes, sir.
4    Q.  And let me ask you, did you have a phone that you
5    attributed to Mr. Alliers?
6    A.  Yes, sir.
7    Q.  And do you recall what that phone number was?
8    A.  757-334-3916.
9    Q.  And was that an nTelos or a Sprint, or some other -- or
10   Verizon; do you recall?
11   A.  I believe that one was Verizon.
12   Q.  Okay.
13        And then you were also asked to do some sort of phone
14   analysis on an individual named Dwayne Douglas.  And I guess
15   I could have looked at the chart, the phone number is on
16   there.  The phone number that is under his picture is the
17   number that you used?
18   A.  Yes, sir.
19   Q.  Okay.  Was Mr. Alliers' phone in his name?
20   A.  No, it was not.
21   Q.  What name was it in?
22   A.  It's very difficult to -- I can't spell the first name.
23   I know it begins with a D and -- but the last name was, like
24   Lora, L-O-R-A.
25   Q.  Okay.

1           And what about the phone that you attributed to

2    Dwayne Douglas?  Was that telephone in his name?

3    A.   That was in the name of Nina Elder.

4    Q.   And Nina Elder's records, I think, were one of the

5    stipulations that we previously read?

6    A.   I don't believe they were read.

7    Q.   Okay.  But his phone was in the name of Nina Elders?

8    A.   Yes.

9    Q.   So these were on your original chart that you prepared,

10   but in preference to your testimony today, they were taken

11   off on the exhibit the government offered?

12   A.   Yes.

13   Q.   And that of course wasn't your decision to take them off,

14   that was somebody else's?

15   A.   Correct.

16   Q.   Let me make sure I understand the way the flow of this

17   chart works.

18           If I'm understanding it, I will focus on my client,

19   Mr. Benson, there were a total of three calls -- or three

20   contacts, I think it is, between 3-13-09 and 3-15-09 between

21   Mr. Benson and the phone related to Mr. Wallace?

22   A.   That's correct.

23   Q.   Do you recall whether those were calls or texts?

24   A.   Calls.

25   Q.   And I think it should be apparent; you don't have any

P. SWARTZ - CROSS                                                      490

1    location date on Mr. Benson's phone?

2    A.   No, sir.

3    Q.   Okay, so you don't know where Mr. Benson's phone was at

4    any time that he made any calls to Mr. Wallace in this case?

5    A.   Do not.

6    Q.   And, likewise, you've got a time frame of, looks like a

7    year and a half -- or, excuse me, 15 months up there at the

8    top, 2-11-08 to May of '09, a number of 321, plus 14, about

9    335 contacts between Mr. Benson and Kindell?

10   A.   Yes, sir.

11   Q.   And, likewise, you do not know where Mr. Benson's phone

12   was during any of that time?

13   A.   That's correct.

14   Q.   Okay.  Take that down.

15          MR. WOODWARD:  And, Your Honor, I will go on and

16   pass up Exhibits 148A so the clerk will have it since it's

17   been admitted.

18          THE COURT:  Okay.

19          MR. WOODWARD:  148A, I'm sorry, I misspoke.

20   BY MR. WOODWARD:

21   Q.   Let's now, if we could switch, I think the rest of my

22   questions will relate to the other system, the system that

23   Mr. Swartz is in control of.

24          Let's go to 139, if we could?

25   A.   Could you describe that for me?

1   Q.  That's your chart showing the Repoll Norfolk sector, or

2   Norfolk division, of Sprint.  It's 139B.  And I will try to

3   go through them chronologically, if you need to start over at

4   the front.

5        And my only point in showing this -- and there are a

6   number of these Repoll issues.  When you show Repoll data and

7   say that a phone was in that Repoll, what that means is that

8   the phone could have been connecting to any of those towers

9   that are in that sector, if that's the right word?

10  A.  In that market.

11  Q.  In that market, right.

12  A.  That is correct.

13  Q.  So you can't say anything more than one of those -- if

14  you testified in this case that a phone was in a market, that

15  it was somewhere connecting to one of those towers, those are

16  the yellow dots?

17  A.  Yes, sir.

18  Q.  Okay.

19        If we could now just go to -- this is 142, exhibit --

20  what's been admitted 142, Exhibit Page 2.

21        And just for your information, that's the chart that

22  has the March 12th, '09 data for the Louis Joseph phone.

23        I didn't realize you had them.  I can pull them out

24  if you have to scroll through every one.

25        I can pull them out of the book and put them on the

P. SWARTZ - CROSS                                                     492

1    document camera if it is easier?

2    A.  Once we get caught up.

3    Q.  I'm not going to try to go back, I'm only going to go

4    forwards.

5           Now, this is where you drew to demonstrate to the

6    ladies and gentlemen of the jury what a sector looks like --

7    A.  Yes, sir.

8    Q.  -- on a cell tower?

9           You didn't go in this case and actually plot the

10   coverage of these towers?

11   A.  No, sir.

12   Q.  And, as a matter of fact, the coverage in a tower is not

13   a nice straight line like that (demonstrating)?

14   A.  That's correct.

15   Q.  Let me see if we can switch to the document camera and

16   see if I can draw something that I'm not going to admit that

17   would perhaps show it.

18          So just for demonstrative purposes, if this circle is

19   a cell tower, the coverage area may actually look something

20   like that (demonstrating); might it not?

21   A.  It can.

22   Q.  Okay.  And it's irregular and it could be in one part of

23   the tower, it could go a long distance and another part it

24   could be closer in.  So it's not a straight, perfectly formed

25   line like you have on the exhibit?

P. SWARTZ - CROSS                                                  493

1    A.  Correct.

2    Q.  And to be fair, you weren't representing that, that was

3    just for demonstrative purposes?

4    A.  Correct.  To demonstrate the energy of that tower and the

5    direction of that sector of the tower.

6    Q.  And the same would be true when we get to the exhibits

7    where you drew a nice round circle around the tower.

8         You are not drawing that to indicate that that's

9    actually the coverage area of the tower?

10   A.  No, just it's a 2-mile circle to give a representation

11   for reference.

12   Q.  Right.  Yeah, but the coverage of any of those -- the

13   coverage of towers varies?

14   A.  It does.

15   Q.  And there wasn't even any investigation done where you

16   went out on any of the towers, we will get to that in a

17   minute, and actually tried to determine what the real

18   coverage was?

19   A.  That's correct.

20   Q.  Sometimes a tower can cover an area of a half a mile, and

21   sometimes in rural areas or others, it can cover 3 miles or

22   10 miles?

23   A.  Yes, there is a difference between an urban market and

24   the rural areas, and it can range -- typically in the urban

25   market, there are more towers and sectors and they have

P. SWARTZ - CROSS                                                494

1    overlapping coverage.

2    Q.   Okay.  And, likewise, towers have different strengths?

3    A.   Yes.

4    Q.   Different strengths of signals.

5            And you indicated many times to the jury that when a

6    phone -- when you've got your phone activated and it's

7    searching, it's looking for the strongest tower?

8    A.   Strongest antenna.

9    Q.   Strongest antenna, and the one that is most available?

10   A.   It's looking for the strongest signal.

11   Q.   And the strongest signal may not always be the closest

12   tower?

13   A.   That's correct.

14   Q.   All right.  Now let's go to the next page, which

15   hopefully we can -- can we get that other system?  I'm done.

16           Let's go now to 142-03, which I think is the very

17   next page.

18           And this is the slide that you used with

19   Mr. Zlotnick to talk about Mr. Joseph's phone going dark,

20   meaning that there were only incoming calls or texts?

21   A.   Yes, sir.

22   Q.   And there weren't any answers.  But that really doesn't

23   mean anything other than he wasn't responding to the phone?

24   A.   Correct.

25   Q.   Okay.  So in other words, for example, as an expert, if

P. SWARTZ - CROSS                                                    495

1   my phone -- if I can't bring my phone in the courthouse for

2   ten hours a day and I get out to my car in the under the

3   Scope and there's 27 missed calls and 15 missed text messages

4   for that ten hours that I'm in here, my phone is, under your

5   definition, dark?

6   A.   Yes, sir.

7   Q.   It just means that it's not available to me or if I have

8   it at home on Saturday and I choose not to answer it, it also

9   would be dark?

10  A.   Yes, sir.

11  Q.   Okay.  Now, did you make any -- there was some text

12  messages here at 7:09 to 7:40 from a number.

13         Did you make any inquiry into this case about who

14  that was?

15  A.   I believe we do have subscriber information for those

16  text messages.

17  Q.   They were all the same phone number?

18  A.   Yes.

19  Q.   Do you know who it is, as you sit there today?

20  A.   I can't, off the top of my head, say.

21  Q.   And of course you don't know -- you wouldn't, even if you

22  remembered the name, know what the content of the texts were?

23  A.   I would -- did not find that.

24  Q.   You can't capture -- it's just the fact that a text

25  message was sent?

P. SWARTZ - CROSS                                                496

1    A.   That's correct.

2    Q.   So you don't know if those were text messages to and from

3    somebody saying, Hi, how you doing, or come over and see me,

4    or anything like that?

5    A.   Correct.

6    Q.   Okay.  You just know they were sent and received?

7    A.   Yes.

8    Q.   Okay.

9         The next page I would like to go to, and, again, this

10   is just to get to the right one here.

11        Let's go to -- let's go to Exhibit 144, Page 3.  I'm

12   sorry, maybe it's -- I apologize, go to 144, Page 2.  Is that

13   2 or 3?

14   A.   What's the header on --

15   Q.   It's March 13th -- it's the Mark Wallace phone, it says

16   March 13th '09, 12:19 a.m. to 9:57 a.m.

17   A.   Okay.

18   Q.   I think it's Page 2.

19        Now, you put over here that there's 15 calls and 5

20   calls pinging off of those two towers?

21   A.   Yes, sir.

22   Q.   Of course, that doesn't mean that the phone, whoever was

23   using that phone is stationary, it doesn't mean they are in

24   one place, it just means that the phone's using that tower?

25   A.   Using that tower for a consistent period of time.

P. SWARTZ - CROSS                                                    497

1   Q.  Right, but somebody could be moving around, driving

2   around in the neighborhood, moving through that coverage

3   area.

4          You certainly don't mean to imply on any of these

5   slides where you see a number of calls, that someone was

6   sitting parked in their car or standing in the same place?

7   It just means whatever the coverage area of that tower is,

8   which we don't know for any of these towers, that the phone

9   was hitting off of that tower?

10  A.  That was a --

11  Q.  That was a long question.  Let me ask it, see if I can

12  chop it up.

13         What you registered on these slides is what tower the

14  phone hit off of, correct?

15  A.  For specific calls.

16  Q.  Right.  Not where the phone was?

17  A.  This is not GPS information, which is a more precise way

18  of being able to know where an actual physical telephone is.

19  This is cell site information.

20  Q.  And just for an example to illustrate it.  Not knowing,

21  but if there was -- if there was a tower that covered the

22  front steps of this courthouse, the Baxter's restaurant

23  that's across the corner, up to the federal building, which

24  is four blocks from here and over to the bus station, if I

25  started walking from the bus station and was walking, you

P. SWARTZ - CROSS                                                        498

 1   know, a half a mile or three-quarters of a mile up to 200
 2   Granby Street, which is the federal building and I'm making
 3   calls, it's going to -- my phone's going to be maybe pinging
 4   off of that same tower, but that doesn't mean that I'm
 5   staying in the same place?  That's the point I'm trying to
 6   make.
 7   A.   That is correct.  The more data you have, the -- the more
 8   confidence that you have in what tower or sector a telephone
 9   is located in.
10   Q.   Okay.
11   A.   But you do -- you would have some -- if somebody moved,
12   yes.
13   Q.   Okay.  So, for example -- now let's go to Page 144-06.
14   A.   What's the header on that?
15   Q.   The header on that is the same exhibit.  It's 10:15 a.m.
16   to 10:35?
17   A.   Yes, sir.
18   Q.   You have drawn a big round circle, you said that's a
19   two-mile circumference; is that what you did?
20   A.   Yes.
21   Q.   You don't know for sure whether that tower that's at 393
22   Denbigh Boulevard covers 2 miles, 1 mile, 3 miles; you just
23   don't know?
24   A.   Don't have the signal strength, no.
25   Q.   If we could, just to illustrate this point, I would like

P. SWARTZ - CROSS                                                      499

1    to put this one up on the document camera.  If you could

2    switch to the document camera and let the record reflect that

3    I'm putting up what's been admitted as 144-06 on the document

4    camera.  Can everybody see that?

5           So, for example, this is a 20-minute period of time,

6    correct?

7    A.  Yes, sir.

8    Q.  So if I'm over here -- let me get something that should

9    show up.

10          If I'm over here and I'm driving or moving in this

11   direction and I'm making calls during that period of time,

12   they would all ping off of that tower?

13   A.  Not necessarily.

14   Q.  Okay.  Well, let me ask you a better question.

15          If I'm in the coverage area of that tower, whatever

16   it may be, and I know one of the things that we don't know in

17   this case is what it is.  If I'm moving around within the

18   coverage area and that's the strongest tower, my phone is

19   going to hit off of that tower?

20   A.  There are a couple of other towers in that area such as

21   just above the circle there, top of the screen, the Ft.

22   Eustis tower.  And so if you drew a two-mile circle around

23   that tower, it would overlap in that same range, as well as

24   there's a tower located at Mary Immaculate Hospital, which

25   would be to the right side of the Newport News Airport tower.

P. SWARTZ - CROSS                                          500

```
1   And then there's another tower located below there.
2            These towers are within about two miles of each
3   other, so it would be -- you can't say definitively in your
4   scenario that all these cars would be hitting the Newport
5   News Airport tower.
6   Q.  My point exactly.  You can't say, based on your analysis,
7   based on this ten-minute time period, that the phone that you
8   call the Wallace phone was stationary, was moving around
9   within the coverage area, or perhaps even if one of those
10  other towers that you mentioned has a weaker -- a weaker
11  antenna than the 393 Denbigh tower, he could have actually
12  been not even as close as that; it could have gone to the
13  Denbigh tower?
14  A.  What the records show here is that these five calls
15  during this time frame were all made utilizing the 393
16  Denbigh Boulevard tower.
17  Q.  My point is, Mr. Swartz, that does not mean the phone was
18  in the same place when each call was made?
19  A.  It physically sitting still?  You can't say that.
20  Q.  Right, just like my scenario.  If I'm driving down the
21  street from in front of the Greyhound Bus station going up
22  and I'm on my phone and I'm moving, the record's going to
23  show me on the same tower, but I could be moving through the
24  tower area?
25  A.  Correct.
```

1    Q.   Okay.  That's the only point I'm trying to make, is that

2    shows you what tower is being used, not where the phone is,

3    and not that the phone is stationary?

4    A.   Correct.  But you have to keep in mind that, you know, in

5    that two-mile circle there, if there's movement, there's a

6    high likelihood that a call is going to then get closer to

7    another tower and then we would see that activation.

8    Q.   Well, if that tower is stronger?

9         You just told us that sometimes a phone, it seeks out

10   whatever tower is strongest?

11   A.   The strongest signal.

12   Q.   Right.  And you've not done any research about the

13   strength of the various signals or the coverage area?

14   A.   Correct.

15   Q.   And you also didn't do, as we're on that, what's called a

16   tower dump, correct?

17   A.   There was no tower dump done at that time.

18   Q.   Right.  In other words, and so the ladies and gentlemen

19   of the jury will understand what a tower dump is, that's

20   where you go and you do a dump to see all of the phones that

21   used that tower from a given time frame?

22   A.   That -- or a specific tower.  What we typically would do

23   is we would have a location of a crime and then we would

24   obtain court authorization to get the records for all calls

25   that are made or received through specific towers and/or

1    sectors for all of the phone companies that service a

2    particular area.

3    Q.  And my point is, for example, you know, the -- you had

4    the exhibit, you took Mr. Alliers off.  Do you know if

5    Mr. Alliers' phone was in that area during the ten, whatever

6    it was, that I just showed you, 10:15 to 10:35?

7    A.  Do not know.

8    Q.  What about Brandon Douglas?  Do you know where his phone

9    was at that time?

10   A.  No, sir.

11   Q.  What about his brother, Dwayne, also known as PeeWee?

12   A.  Do not know.

13   Q.  Kenny Jones?

14   A.  Do not know.

15   Q.  You don't know where their phones -- could have been

16   there, could have been anywhere?

17   A.  Don't know.

18   Q.  And you don't know where Mr. Benson's phone was?

19   A.  Do not know.

20   Q.  Okay.

21          The next thing that I want to go to is Exhibit 145,

22   and it's only a one-page exhibit.

23          THE COURT:  Didn't you just question on this

24   exhibit, Mr. Woodward?

25          MR. WOODWARD:  I'm sorry?

1          THE COURT:  On 145?  Didn't you question on 145?

2          MR. WOODWARD:  I don't think I did, Your Honor.  I

3    questioned on 148.  No, I have not questioned on 145.

4          THE COURT:  Okay.

5    BY MR. WOODWARD:

6    Q.  And just so, if I understand what this shows, is that at

7    3:25, Mr. Benson called Mr. Kindell?

8    A.  Yes, sir.

9    Q.  Okay.  And you don't know where Mr. Benson's phone was?

10   A.  That's correct.

11   Q.  Okay.  And 18 seconds, is that, based on your experience

12   and expertise, a call that probably connected?  Could be,

13   could not be?

14   A.  It's difficult to say.

15   Q.  And just so the jury will understand the way the time

16   starts.

17          So when I -- if I were going to call you, when I

18   press your number into my phone and hit send and I hear your

19   phone start ringing, that's when the time starts?

20   A.  There are -- it varies from company to company, but, yes,

21   the person who is initiating the call, typically the time

22   starts once it starts ringing.

23          Then on the other end, the time is going to start

24   once that phone starts ringing on that end, and sometimes

25   there's a --

P. SWARTZ - CROSS                                                    504

1    Q.   There's a little bit of a time delay?

2    A.   Yeah.

3    Q.   And obviously phones are set up to have, you know,

4    different -- you know, some phones ring six times before they

5    go to voicemail or don't answer, some eight times, some ring

6    four.  There's no way to know that?

7    A.   That's correct.

8    Q.   So looking back at this exhibit, the -- all we know is

9    that Mr. Benson, wherever his phone was, tried to call

10   Mr. Kindell and there were 18 seconds.  May have been a

11   connected call, may not?

12   A.   That's correct.

13   Q.   And the reason that it starts keeping time when you start

14   hearing the ring is because the phone company wants to bill

15   you for that time, right?

16   A.   Yes, sir.

17   Q.   And the same on this exhibit.  A little bit above that at

18   3:05, it looks like Mr. Benson's phone tried to call the

19   phones attributed to Mr. Wallace for 9 seconds?

20   A.   Yes, sir.

21   Q.   Let me ask you this.

22        Based on your experience of a long time of doing

23   this, is it likely there was any kind of connection and

24   conversation in a 9-second call?

25   A.   Highly unlikely.

P. SWARTZ - CROSS                                                    505

1    Q.  Highly unlikely.  Thank you.

2         Let's now go to 146-06.

3    A.  And, excuse me, what's that at the top?

4    Q.  I'm sorry.  It's -- it's -- at the top it says Rosuan

5    Kindell Repoll Number 436 DC Beltsville 2.

6         And then down at the bottom -- the exhibit -- oh,

7    there you go, it came up.  So let me make sure, this is what

8    you talked about, sort of when the -- the Kindell phone is

9    moving back north?

10   A.  Yes, sir.

11   Q.  Okay.  And it looks like that Mr. Benson calls

12   Mr. Kindell?

13   A.  Yes, sir.

14   Q.  Okay, for 27 seconds.  Again, more likely now that there

15   was a connection and they needed the phones to talk to each

16   other?

17   A.  Probably, but it wasn't much of a conversation.

18   Q.  Wasn't long -- but if somebody picks up on the first ring

19   or second ring, you could have a 15, here is where I am, I'm

20   going here, I'm coming there, you could have a bit of a

21   conversation in 27 seconds?

22   A.  Yes, sir.

23   Q.  Let's now go to 146-12, which says at the top, Repoll 254

24   BOSWILBURN 1?

25        The last call down there is Mr. Kindell calls

1    Mr. Benson; is that correct?

2    A.   Yes.

3    Q.   And that's for 41 seconds.

4         And do I understand this to be that the last

5    information that you had that Mr. Kindell's phone was in this

6    Repoll 254 was at 11:07 a.m.?

7    A.   That's when it arrived, it's the first call in that.

8    Q.   It's the first call.  Okay.

9         So your analysis, then, would be that when

10   Mr. Kindell made this call to Mr. Benson, or Mr. Kindell's

11   phone -- to be fair, the phone was back into -- back in

12   Boston?

13   A.   Yes, sir.

14   Q.   Or back in the Boston area.  And what you can tell us is,

15   again, one of those yellow dots would have been the tower?

16   A.   Yes, sir.

17   Q.   Okay.

18        Can we now go to Exhibit 147?

19        And just so it is clear, this is just a chart of

20   phone usage, the number of calls and/or text messages during

21   a one-month period of time.  And does that include calls

22   received and sent?

23   A.   Yes, sir.

24   Q.   Okay.  So, just to make sure I understand this, we can go

25   across it on the first of March, there was -- is that 1 or 2?

1   It's 1?

2   A.  I believe it's 1.

3   Q.  And the 2nd of March is 4 or 5 -- it's hard to tell, it's

4   halfway up there.

5   A.  Yes, sir.

6   Q.  Okay.  And just as the chart shows, so what this -- what

7   this chart shows us is that on some days, Mr. Benson uses his

8   phone a lot more than others.

9   A.  Yes, sir.

10  Q.  You know, the 28th, it looks like he used it five or six

11  times.  9th, 10th, and then you obviously highlighted the

12  12th and 13th, and you only did this for the month of March?

13  A.  That's correct.

14  Q.  You certainly don't know if you had done, you know, the

15  month before and the month after, the length of the phone

16  call, whether there's anything abnormal about there being

17  some days where he uses the phone very little and some days

18  where he has a lot of activity?

19  A.  I only looked at the month of March from that

20  perspective.

21  Q.  And the other thing that we don't know from looking at

22  this exhibit, you have a pre -- you said Mr. Benson's phone,

23  I think you told us, was what you call a prepaid phone?

24  A.  Yes, sir.

25  Q.  So he paid some sum of money when he got this phone and

P. SWARTZ - CROSS                                                    508

1    he gets to use the minutes until the time runs out?

2    A.   That's correct.

3    Q.   Unless he re-ups the money?

4    A.   Correct.

5    Q.   So one of the things that can affect this chart is this

6    chart, just so it is clear, this is not minutes of usage?

7    A.   It is not.

8    Q.   It's contact?

9    A.   Correct.

10   Q.   So if somebody is calling him a bunch of times and he's

11   not answering the phone because he's trying not to burn up

12   his minutes, then this chart's going to show a whole bunch of

13   contact?

14   A.   Right.

15   Q.   Let me ask -- whole bunch is -- let me ask a better

16   question.

17         If you had a prepaid phone and I called you 20 times

18   in one day and you saw my number come up and you didn't want

19   to talk to me because you didn't feel like it was worth

20   wasting the minutes talking to me and you just didn't answer,

21   this chart would reflect 20 contacts?

22   A.   It would.

23   Q.   Okay.  So it's not necessarily calls that Mr. Benson made

24   or texts that he sent?

25   A.   Correct.

P. SWARTZ - CROSS                                                    509

1    Q.  Okay.

2           All right, if we can now go back and pull up 148A.

3           We can actually do it with it.  Let's just do 148, we

4    made the point about that.

5           The three calls that you have listed here at the top

6    right?

7    A.  Yes, sir.

8    Q.  Between the Wallace phone and the Benson phone, one of

9    those was 9 seconds?

10   A.  Yes, sir.

11   Q.  What were the other two, what amount of time?

12   A.  Under a minute.

13   Q.  Under a minute, okay.

14          And, again, there's no real way to know whether there

15   was ever any connection or not?

16   A.  Correct.

17   Q.  All right.

18          MR. WOODWARD:  Thank you, Judge, that's all I have

19   for this witness.

20          THE COURT:  Cross?

21          MR. SACKS:  Your Honor, with your permission, I'm

22   going to defer to Mr. Kelleter next, with your permission,

23   and then I follow him --

24          THE COURT:  Any particular reason for that?

25   Otherwise now would be fine.

P. SWARTZ - CROSS                                           510

1          MR. SACKS:  I'm sorry.

2          THE COURT:  Unless it's an unusual reason, you can

3    go now.

4          MR. SACKS:  There is something that he wants to get

5    into that would be a foundation for me --

6          THE COURT:  All right, then.

7          MR. SACKS:  With your permission.

8          THE COURT:  On this occasion.

9          MR. SACKS:  I will cross.

10                        CROSS-EXAMINATION

11   BY MR. KELLETER:

12   Q.  Good morning, sir.

13   A.  Good morning.

14   Q.  First, to be clear, you've been testifying about Mark

15   Wallace's phone, correct?

16   A.  Yes, sir.

17   Q.  And Mr. Kelleter's and Mr. Benson's?

18   A.  And the Brown phone.

19   Q.  Well, okay.  But to be clear, I think you testified that

20   there were some phone calls from Mr. Benson to Mr. Wallace

21   and some -- right?

22   A.  Yes, sir.

23   Q.  And Mr. Kindell to Mr. Wallace?

24   A.  Yes, sir.

25   Q.  Okay.  And Mr. Brown has called Mr. Wallace?

P. SWARTZ - CROSS                                                    511

1    A.   Yes, sir.

2    Q.   Okay.  But there were no calls whatsoever between

3    Mr. Brown and Mr. Kindell?

4    A.   There were not.

5    Q.   And there were no calls between Mr. Brown and Mr. Benson?

6    A.   That's correct.

7    Q.   And that's in your entire analysis?

8    A.   Yes, sir.

9    Q.   Not just on the day of this murder, but ever?

10   A.   That's correct.

11   Q.   No connection whatsoever by cell phone, or in your

12   analysis between Mr. Brown and the other two gentlemen?

13   A.   Yes, sir.

14   Q.   Okay.

15            If we could pull up 148A.  Now, on this, you indicate

16   that there have been 777 calls between, or contacts of some

17   sort, between Mark Wallace and Bryan Brown, correct?

18   A.   Yes, sir.

19   Q.   Now, did the -- Wallace and Mr. Brown.  But the date is

20   12-31-07 to 3-23-09, right?

21   A.   Yes, sir.

22   Q.   So it's basically all of 2008 and the first fourth of

23   2009?

24   A.   Yes, sir.

25   Q.   Which is maybe about 450 days, thereabouts.  I know 365

P. SWARTZ - CROSS                                              512

1    plus about 90, right, the right ballpark?

2    A.   Yes.

3    Q.   Okay.  And so just from that, it would indicate that they

4    know each other?

5    A.   Correct.

6    Q.   And they call each other a lot?

7    A.   Yes, sir.

8    Q.   And if you just take a pure average, they call each

9    other, it sounds like, on average, almost twice a day?

10   A.   There is almost daily contact.

11   Q.   You've seen the records going back and you notice almost

12   daily contact?

13   A.   Yes, sir.

14   Q.   And so that included March 13th of '09?

15   A.   It did.

16   Q.   And Mr. Wallace had contact with a number of people that

17   day, right?  Mr. Wallace.

18   A.   Yes.

19   Q.   Okay.  Not just the three other defendants?

20   A.   That's correct.

21   Q.   Okay.  Because if we look at Exhibit 144, I think when it

22   was first -- this one right here with all your -- with the

23   maps.

24   A.   Yes.

25   Q.   I think when you were first introducing it, I think you

P. SWARTZ - CROSS                                                 513

```
 1    referred to it as a "summary" of Mr. Wallace's phone, right?
 2    A.   Yes.
 3    Q.   But it's a selective summary?
 4    A.   Yes.
 5    Q.   Okay.  So, for example --
 6    A.   It's selective, in that it shows the cell site location
 7    information of the phone from around the midnight hour until
 8    the evening about 7:30.
 9    Q.   Uh-huh.
10    A.   There were additional calls after that.
11            And then it's selective, in that there were only
12    certain telephone calls that were highlighted during the
13    presentation.
14    Q.   Right.  And the certain phone calls that you highlighted
15    were defendants?
16    A.   Yes, sir.
17    Q.   Okay.  There were plenty of other phone calls that day?
18    A.   There were.
19    Q.   And you made choices as to what to include and what not
20    to include based on a theory of a case directed by the
21    government, correct?
22    A.   Not necessarily the theory, but --
23    Q.   Okay.  They certainly haven't had --
24            THE COURT:  Mr. Kelleter, don't mark it.  Let him
25    finish.
```

P. SWARTZ - CROSS                                                        514

1    A.  There were -- the telephone calls that were highlighted

2    in the presentation were, as from the government's

3    perspective, the evidence that would unfold.

4    Q.  And so, for example, going back to 148A, there came a

5    point where you were -- you included in your analysis these

6    two other gentlemen?

7    A.  Yes, sir.

8    Q.  And on 144, that has all of these maps.  There was a

9    previous analysis that you did that included some other phone

10   calls, correct?

11   A.  That is correct.

12   Q.  And those phone calls were taken out of this summary?

13   A.  That's correct.

14   Q.  So, for example, on Page 3 of 144, when it highlights

15   three phone calls with Mr. Brown, those aren't the only three

16   phone calls?

17   A.  That's correct.

18   Q.  Okay.  Now, if I could show you --

19        MR. KELLETER:  Your Honor, I have a document that

20   I'm going to pass up to the witness.  The government has seen

21   it, I've provided copies to each counsel.  I've got it marked

22   Defendant's Exhibit 300, I believe.

23        THE COURT:  Have it marked here first.  Is that

24   document stapled together?

25        THE CLERK:  (Shakes head.)

1    BY MR. KELLETER:

2    Q.  All right, that is -- this document is something that you

3    produced, correct?

4    A.  That is correct.

5    Q.  Okay.  And it is the, I guess you could say, raw data of

6    the day in question of Mark Wallace's phone; is that correct?

7    A.  I wouldn't refer to it as the "raw data."  I would refer

8    to it as a summary of the -- of all of the telephone activity

9    on the Mark Wallace phone for March 13th.

10   Q.  Because, in fact, this information includes some or your

11   conclusions as to who was making the call and then it went

12   onto this chart?

13   A.  Yes, sir.

14   Q.  And it was from essentially this chart, or this data,

15   that then you derived Exhibit 144?

16   A.  Yes, sir.

17          MR. KELLETER:  Your Honor, I would ask that it be

18   moved into evidence as Exhibit 300.

19          THE COURT:  Any objection?

20          MR. ZLOTNICK:  No objection.

21          THE COURT:  It will be admitted as Exhibit 300.

22          (The document was marked as Defendant Brown Exhibit

23   No. 300.)

24   BY MR. KELLETER:

25   Q.  Sir, just to clarify, first on this first page --

P. SWARTZ - CROSS                                                516

1              THE COURT:  Is this Exhibit 300 you are putting up?

2              MR. KELLETER:  Yes, this is Exhibit 300.

3    BY MR. KELLETER:

4    Q.  On this first page, there are some handwritten lines,

5    correct?

6    A.  Yes, sir.

7              MR. KELLETER:  My goodness, Your Honor, I apologize.

8    There is a redaction on it.

9    BY MR. KELLETER:

10   Q.  This is Exhibit 300.  On this exhibit there are some

11   handwritten lines, correct?

12   A.  There are.

13             MR. KELLETER:  If I could just state for the record,

14   Your Honor, I've spoken to the government, we're in agreement

15   that those lines are actually -- were written in on the

16   government's side highlighting a particular time, and they

17   had no objection to it being on the document.

18   BY MR. KELLETER:

19   Q.  Now, looking at this document, this is the data as to

20   what -- who called Mark Wallace and who Mark Wallace called

21   that day, correct?

22   A.  Yes, sir.

23   Q.  So just briefly getting us oriented, that's the date.

24   The date's going to be March 13th for all of them, correct?

25   A.  Yes, sir.

P. SWARTZ - CROSS                                               517

1   Q.  The time -- and the time gets on -- when you get on to
2   Page 2, it's military time, correct?
3   A.  It is military time.
4   Q.  All right.  The duration -- so just taking the top one
5   when it says 0, then 0315.  It's three minutes and
6   15 seconds?
7   A.  That's correct.
8   Q.  And the "from" is the phone number who's making the call?
9   A.  That's correct.
10  Q.  And then it says who it's from?
11  A.  Yes, sir.
12  Q.  The to, or the call type, and then it says to, and then
13  it says to the name and, likewise, who's receiving it,
14  correct?
15  A.  Yes, sir.
16  Q.  So every one of these calls has Mark Wallace in one of
17  those two columns, right, the from or the to?
18  A.  Because this is based upon his records.
19  Q.  Right.
20          And then on the right-hand side it says "beginning
21  location."  That is the list of those cell towers that you've
22  been referring to?
23  A.  Yes, sir.
24  Q.  Okay.
25          So when you indicated that there were three phone

P. SWARTZ - CROSS                                         518

1   calls with Mr. Brown at 9:41, 9:45, and 9:56, those are right

2   here (indicating), correct?

3   A.  Yes, sir.

4   Q.  Here, here, and here (indicating), correct?

5   A.  Yes, sir.

6   Q.  Okay.

7        So at that same time -- oh, and it says

8   "Williamsburg, Ironbound Road," and "Waller Mill," correct?

9   A.  Correct.

10  Q.  Those are two different cell towers?

11  A.  That's that first map where they overlap each other, yes,

12  in Williamsburg.

13  Q.  Okay.

14       So in that first map where you put -- and if I could

15  go back to 144.  On this page where you put that there were

16  three calls to Bryan Brown, those are the calls you are

17  talking about?

18  A.  Yes, sir.

19  Q.  Okay.

20       At the time that Mr. Wallace has these calls with

21  Mr. Brown, there are also two calls with a guy named Kenny

22  Jones, right?

23  A.  Yes, sir.

24  Q.  And it looks like there's a call with a guy named Angel

25  Alliers, correct?

P. SWARTZ - CROSS                                                          519

1    A.   Uh-huh.

2    Q.   And there's a call from somebody named Stacey Day,

3    correct?

4    A.   Correct.

5    Q.   And a little earlier in the day, there are a number of

6    calls with Euniece Samuel; correct?

7    A.   That is correct.

8    Q.   Okay.  So Mr. Wallace is using his phone for a number of

9    reasons.  It looks like calling a number of people, correct?

10   A.   He's -- there are phone calls in and out of the Wallace

11   phone, yes.

12   Q.   And then I think you indicated that the phone -- that

13   Mr. Wallace's phone must be moving in some way because you

14   then move into the Queen's Creek tower, correct?

15   A.   That's correct.

16   Q.   And he, at that point, is calling Javon Wilnick, correct?

17   A.   Yes.

18   Q.   That's how you picked up on that it was moving?

19   A.   Yes, sir.

20   Q.   And then as it moves into the Water Country, right over

21   here, he's getting a call from Kenny Jones, right?

22   A.   Yes, there was a call from Kenny Jones, and then calls to

23   Kenny Jones.

24   Q.   Okay.  Then when we get -- I should go back with

25   Mr. Brown.  The three calls are of what length?

P. SWARTZ - CROSS                                                   520

```
1          They are 38 seconds, and 38 seconds, and 39 seconds,
2     correct?
3     A.  That's correct, yes.
4     Q.  Probably long enough to have some sort of conversation?
5     A.  Probably not very long.
6     Q.  Okay.  And recognizing that sometimes people might
7     accidently dial somebody who is right with them by mistake,
8     chances are they didn't do it three times, correct?
9          So chances are they were apart from one another when
10    they were talking on the phone?
11    A.  Yes.
12    Q.  So anybody puts them together at that time or near that
13    time, this would be inconsistent with them being together?
14    A.  Yes, sir.
15    Q.  Now, you indicated that Mr. Wallace's phone seemed to
16    move east, and there came a point where you said there were
17    five phone calls from 10:15 to 10:35; is that correct?
18    A.  Yes, sir, with the 393 Denbigh Boulevard tower.
19    Q.  Okay.  And that happens to correspond to where these hash
20    marks are, right?
21    A.  Yes.
22    Q.  Okay.
23         And that's when it would indicate that, as you say,
24    the phone is in the same area off the same tower with
25    Mr. Joseph's house?
```

Janet Collins, Official Court Reporter

P. SWARTZ - CROSS                                                      521

1   A.  That's correct.

2   Q.  And you indicated that there were five phone calls at

3   that airport tower which gave you this location, right?

4   A.  Yes, sir.

5   Q.  But you didn't say who those phone calls were with,

6   right; it's not on the chart?

7   A.  That's correct.

8   Q.  Okay.

9       Those phone calls are Kenny Jones and Angel Alliers,

10  right?

11  A.  That is correct.

12  Q.  Now, you indicated -- I think when Mr. Woodward was

13  questioning you, there was some talk about whether or not you

14  could be moving around within a cell tower area, right?

15  A.  Yes.

16  Q.  And I'm just trying to understand this myself.

17      In Exhibit 144, we have a page giving this time

18  period, right, 10:15 to 10:35?

19  A.  Yes, sir.

20  Q.  Okay.  And you seem to be indicating that it's pinging

21  off of the tower right in the middle here, right?

22  A.  The five phone calls were utilizing the Newport News

23  Airport tower, yes.

24  Q.  And I'm just trying to figure out myself.  This is

25  Mr. Wallace's phone, not Mr. Brown's phone, correct?

P. SWARTZ - CROSS                                                522

1    A.  That's correct.

2    Q.  But there's a tower over here, correct?

3    A.  Yes, sir.

4    Q.  This is the interstate coming through here, right?

5    A.  That is correct.

6    Q.  Okay.  So I think you noted that if you are pinging off

7    of this tower, you could be -- you could be in here, and just

8    depending on call volume and whatnot, it could be sending you

9    back to that tower even though you are moving around,

10   correct?  It's possible?

11   A.  It's possible.

12   Q.  Okay.  Or you could be sitting in one spot, right?

13   A.  Could be.

14   Q.  And that one spot could be the interstate?

15   A.  If the traffic was stopped.

16   Q.  Does traffic ever stop around here on the interstate?

17   Right.  So that is a possibility, right?

18   A.  Yes.

19   Q.  Okay.

20        Now, did you -- you indicated how many phone calls

21   Mr. Wallace had with various people that day.  Did you do a

22   count of the phone calls with these other people, or I

23   suppose we could count them up eventually.

24        But he did seem to have phone calls with Jahnel

25   Bocus, right?  And I'm looking, again, at Exhibit 300,

P. SWARTZ - CROSS                                              523

1    Page 1.

2    A.  Yes, sir.

3    Q.  He had calls with her.  He seemed to have a number of

4    calls throughout the day with a Euniece Samuel, correct?

5    A.  Yes.

6    Q.  Number with Kenny Jones, right?

7    A.  Yes, sir.

8    Q.  Others with Angel Alliers, right?

9    A.  Yes, sir.

10   Q.  And you indicated that -- there came a point in your

11   testimony where you said that there were some phone calls in

12   the afternoon, correct?

13   A.  Yes, sir.

14   Q.  And you -- in your testimony, you strung together phone

15   calls -- a phone call with Joseph Benson, correct?  I should

16   say phone call with Joseph Benson, a phone call with Rosuan

17   Kindell, and then a phone call with Bryan Brown, correct?

18   A.  There were.

19   Q.  So if we look at Page 3 of that chart, Exhibit 300, this

20   is the phone call with Mr. Benson, right?

21   A.  Yes, sir.

22   Q.  Okay.  You said it was at 3:05.  And then there's a call

23   with Rosuan Kindell, right?

24   A.  Yes, sir.

25   Q.  And then there's also a phone call with Ms. Bocus, right?

P. SWARTZ - CROSS                                                      524

1    A.   That's correct.

2    Q.   There's also a phone call with George Wallace, right?

3    A.   Yes, sir.

4    Q.   And then there's the call with Bryan Brown, right?

5    A.   Yes, sir.

6    Q.   Okay.  And then somebody "no subscriber."  We don't even

7    know who that was, right?

8    A.   That's correct.

9    Q.   But chances are it's not Bryan Brown, because you have

10   his information, right?

11   A.   Yes, sir.

12   Q.   So -- oh, and then soon thereafter he makes a phone call

13   with Euniece again, right?

14   A.   Yes, sir.

15   Q.   And this was a Friday, wasn't it?  So he is making all

16   kinds of phone calls, right?

17   A.   March 13th, 2009?

18   Q.   I think so.

19   A.   I believe it was a Friday.

20   Q.   And you indicated that you saw yourself that there has

21   been a lot of phone calls between Mr. Brown and Mr. Wallace,

22   you know, over the period of a year, right?

23   A.   Yes, sir.

24           MR. KELLETER:  If I may have a moment, Your Honor?

25   BY MR. KELLETER:

P. SWARTZ - CROSS                                                    525

1    Q.  Sir, on Exhibit 148A, you do have Dwayne Douglas and

2    Angel Alliers in there, right?

3    A.  Yes, sir.

4    Q.  Is Kenny Jones in here?

5    A.  He is not.

6    Q.  Did you do an analysis of how many calls Mr. Wallace had

7    with Kenny Jones?

8    A.  At some point, yes.

9    Q.  But it's -- you don't have the data now?

10   A.  No, I do not.

11          MR. KELLETER:  If I may have one moment, Your Honor.

12          (Pause.)

13          MR. KELLETER:  I have no more questions, Your Honor.

14          THE COURT:  All right, ladies and gentlemen, we are

15   going to take a 15-minute break here.

16          (Jury out, 11:04 a.m.)

17          THE COURT:  Please have a seat.

18          I note, Mr. Sacks, you asked that Mr. Kelleter --

19   you have a seat.

20          MR. SACKS:  Yes, Your Honor.

21          THE COURT:  -- go out of order and, Mr. Kelleter,

22   you spent a lot of time talking about Mr. Sacks' client.  I

23   just want to avoid repetition of the same questions when you

24   get up here for cross-examination, that's all.

25          MR. SACKS:  That's one of the reasons I will stick

P. SWARTZ - CROSS                                                        526

 1    as close to that as possible, Yes, sir.

 2              THE COURT:  Court will be in recess for 15 minutes.

 3              (Off the record, 11:05 a.m., jury out.)

 4              (On the record, 11:24 a.m., jury in.)

 5              THE COURT:  Let the record reflect that all jurors

 6    are present in the courtroom, does counsel agree?

 7              (All counsel answer in the affirmative.)

 8              THE COURT:  All right, cross-examination.

 9              MR. SACKS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11    BY MR. SACKS:

12    Q.  Good morning again, Mr. Swartz.

13    A.  Yes, sir.

14    Q.  The exhibits that you prepared mostly are things that you

15    created using certain data that you got from various phone

16    companies and so forth, correct?

17    A.  That's correct.

18    Q.  But the vast majority of what we saw were things that you

19    created yourself, photographs using Google Map, putting

20    circles on them and accumulating calls and drawing lines and

21    things like that; you did that?

22    A.  That's correct.

23    Q.  Those are not produced by the phone companies?

24    A.  That's correct.

25    Q.  That is your work product based on the things that you

P. SWARTZ - CROSS                                                    527

1    got from them?

2    A.   Yes, sir.

3    Q.   So you decided, as the person creating those documents,

4    how to set them up, correct?

5    A.   Yes, sir.

6    Q.   And how to organize them?

7    A.   In terms of the order of presentation, not necessarily,

8    but --

9    Q.   The contents?

10   A.   The content, yes.

11   Q.   For example, if we could look at Exhibit 148A, that's got

12   to be on the document camera, Madam Clerk.   I'm sorry.

13        So this 148A, you originally prepared this yourself,

14   correct?

15   A.   That's correct.

16   Q.   And this was -- it has a marking, Government Exhibit 148A

17   and the case number.

18        The original intention was to have this as an

19   exhibit, correct?

20   A.   Yes, sir.

21   Q.   And then, for whatever reason, that was removed and it

22   was replaced with Exhibit 148, which we could put that up on

23   the screen.   That comes from the -- I think the barcode.   I

24   believe the government's -- was that also a document camera

25   exhibit?

P. SWARTZ - CROSS                                                    528

1    A.  Yes.

2    Q.  So, I can't really put them together, but this has five

3    people on it, and this other one, if we can take that down,

4    put it back on the document camera, has seven people on it,

5    correct?

6    A.  Yes, sir.

7    Q.  So you removed, excuse me, six people.

8    A.  Six.

9    Q.  So you removed a person from this exhibit?

10   A.  There are seven on this one.

11   Q.  Seven without pictures?

12   A.  Six without pictures.

13   Q.  Six with pictures and one without?

14   A.  That's correct.

15   Q.  Seven persons on 148A that you have replaced with 148

16   that has only five pictures?

17   A.  Yes, sir.

18   Q.  All right.

19        And that was a decision that you made based on the

20   things that you were doing?

21   A.  With the direction of the United States.

22   Q.  All right.

23   A.  Yes.

24   Q.  As you indicated to us earlier, you've been -- your

25   career, I think you spent 25 years with the Newport News

P. SWARTZ - CROSS                                                  529

1    Police?

2    A.   Yes, sir.

3    Q.   And then you have been consulting since 2008?

4    A.   That's correct.

5    Q.   And that's for state prosecution jurisdictions?

6    A.   Yes.

7    Q.   But also you're under contract to the United States

8    Attorney's Office in this area?

9    A.   Primarily, most of my work is the with United States

10   Attorney's Office.

11   Q.   And that's been since 2008?

12   A.   Yes, sir.

13   Q.   Okay.  And I think you said you were actually -- is it

14   independent contractor?

15   A.   That is correct.

16   Q.   And I assume that you're compensated for the work you do?

17   A.   I am.

18   Q.   And that is through the United States; they pay you for

19   that work?

20   A.   Yes, sir.

21   Q.   You're not a consultant for the defendant -- or defense

22   in criminal cases, are you?

23   A.   I am not.

24   Q.   All right.  Your career has been law enforcement and

25   consulting for law enforcement and prosecution?

P. SWARTZ - CROSS                                                    530

1    A.  That's correct.

2    Q.  And in this particular case, you are a part of the

3    prosecution team against these defendants?

4    A.  That's correct.

5    Q.  All right.  And you have been asked to prepare exhibits

6    in support of prosecution's position in this case?

7    A.  Yes, sir.

8    Q.  All right.

9         And, now, I know that Mr. Wallace is referred to as

10   Mark Wallace.  Some of the documents in the case, I don't

11   know that they've been up on the screen -- the indictment and

12   some of the other documents also refer to him as Mark

13   Grinage.  Have you seen that name?

14   A.  I have.

15   Q.  Do you know that that's his father's surname that he has?

16   A.  I knew it was an alias.  I didn't know how that came

17   about.

18   Q.  Is that a family name that is sometimes used by him?

19   A.  Yeah, Grinage.

20   Q.  Now, with respect to this Exhibit 148A, it's been pointed

21   out -- of course, I don't want to go through the same ground.

22        The number of calls that you accumulate -- I'm

23   looking at 14A.  I'm sorry, 148, apologize, Madam Clerk.

24   That's the one that's...yes, on 148 you've added up various

25   calls, but the time periods have been pointed out far precede

P. SWARTZ - CROSS                                              531

```
 1   and in many instances succeed the date of the alleged
 2   incident, March 13, 2009?
 3   A.  Yes, sir.
 4   Q.  And you do not have any personal knowledge of what the
 5   calls were for all of those times, before or after, between
 6   these individuals?
 7   A.  The content of the conversation?
 8   Q.  Yes, sir.
 9   A.  No, I do not.
10   Q.  Or what was discussed, or anything like that?
11   A.  Other than the intercepted calls between Bryan Brown and
12   Corey Odle.
13   Q.  Other than that, the hundreds of others, you have no
14   idea?
15   A.  That's correct.
16   Q.  And you selected the time periods to put on this exhibit?
17   A.  Based upon the records that we had.
18   Q.  Yes, sir, understood, all right.
19        And we can take that down, please.  Thank you.
20        Now, you mentioned a few times "prepaid phones."  You
21   talk about subscriber information where you can get it from a
22   carrier like Sprint, nTelos, and the other ones, actually
23   person whose name the phone is in, correct?
24   A.  Yes, sir.
25   Q.  And that is something you can track and trace and get
```

1   records on?

2   A.  Yes, sir.

3   Q.  Now, you mentioned prepaid phones, and there are -- some

4   people call them, I don't know, throw-away phones or

5   disposable phones, but there are phones you can buy, I don't

6   know, 7-11 maybe, some places like that?

7   A.  Walmart, yes.

8   Q.  So if someone wanted to, they could buy a phone of that

9   type and would not have to put subscriber information in it?

10  A.  That's correct.

11  Q.  So with respect to, at least Mark Wallace, who is my

12  client, we'll focus on him.

13          There is no evidence that he ever purchased a prepaid

14  phone in connection with March 13th, is there?

15  A.  There is none.

16  Q.  The phone that -- the activity that you have identified,

17  picked for that date, is a phone that was in the name of

18  Beverly Wallace?

19  A.  That's correct.

20  Q.  And you know to be his mother, correct?

21  A.  I do.

22  Q.  And it's not unusual for people, law-abiding citizens, to

23  have cell phones in the names of loved ones, mothers,

24  sisters, wives, but use that phone?

25  A.  That's correct.

P. SWARTZ - CROSS                                              533

1    Q.  All right.  So it's nothing unusual about that in and of

2    itself in this case?

3    A.  No.

4    Q.  All right.

5         Now, with respect to the phone calls that -- all the

6    different calls, you've talked about the charts that you've

7    shown and -- all you can say for sure, from your own personal

8    knowledge, is that one phone with a certain number connected

9    to another phone with a certain number, or vice versa?

10   A.  And what is this that you are referencing?

11   Q.  Well, when you talk about -- you have things on charts

12   with the names.  For example, I'll -- I mean, Exhibit 3

13   Hunter, you don't have to put it up, but it's the one that

14   was just put in.  It's got "from" name, and it's got various

15   names of people and "to" name and various names of people.

16   But you don't know who actually was talking on the phone?

17   A.  No, sir.

18   Q.  All you were doing is using -- you put in, for example,

19   in Exhibit 300, you used Mark Wallace's name but you don't --

20   that was the phone in his mother's name, right?

21   A.  That's correct.

22   Q.  And you don't know, even if the phone was near him or

23   close to him, whether someone else was actually talking on

24   that phone at the time you say it was Mark Wallace?

25   A.  Correct.

P. SWARTZ - CROSS                                                    534

1    Q.  All right.  You're using Mark Wallace as an identifier
2    because you associate his name with that phone, but can't say
3    in fact who was on it talking to whoever?
4    A.  Other than the fact that the activity on that day was he
5    was talking to many of the people that he talks to all the
6    time.
7    Q.  I understand, but you don't know for sure on that day
8    whether other people were talking to those people?
9    A.  That's correct.
10   Q.  All right.
11          The Sprint -- I just want to make sure I understand.
12   The ladies and gentlemen probably do, but I want to make sure
13   for my benefit and maybe theirs, too.
14          You said there are different carriers here.  There
15   was Sprint, nTelos.  What were the other ones?
16   A.  Verizon Wireless, T-Mobile, and AT&T.  Those are the
17   major carriers --
18   Q.  All right.
19   A.  -- and then there are some other resellers that basically
20   ride on those large networks.
21   Q.  Yes, sir.
22          Did you have to access records from all of those
23   different places that we just talked about?
24   A.  In relation to this case?
25   Q.  To this case, yes, sir.

P. SWARTZ - CROSS                                                       535

1    A.  There were other phones involved in this case with the
2    other companies, yes.
3    Q.  Now, each company has a little bit different way of
4    operating, I guess, in keeping their records, correct?
5    A.  That's correct.
6    Q.  You told us, for example, so as not to be confusing, that
7    Sprint, their phone record, the time on their records is
8    actually one hour earlier than our time because it's in
9    Kansas City time, I think you said?
10   A.  As it relates to the text messages, yes.
11   Q.  Text messages.
12   A.  But the calls are where the physical phone is located.
13   Q.  But text, you have got to add an hour?
14   A.  That's correct.
15   Q.  Now, the coverage area that the -- this 19, that's called
16   the Norfolk market?
17   A.  Yes, sir.
18   Q.  But as pointed out, and I won't pull it up, that -- it's
19   called "Norfolk," but it actually spans everywhere from the
20   northern part of the Eastern Shore to the Outer Banks, up the
21   Peninsula, into the Southside of Hampton Roads.  So it's a
22   pretty considerably large geographic area?
23   A.  That is correct.
24   Q.  Now, as we talked, some of these carriers have little
25   idiosyncrasies, different ways of doing things in keeping

P. SWARTZ - CROSS                                                    536

 1   records.
 2          nTelos, you told us, only have -- you can get the
 3   tower location where a specific tower is, correct?
 4   A.  That's correct.
 5   Q.  But you cannot get the sector that would enable you to
 6   focus on which sector of that tower is being -- the call
 7   being routed to, correct?
 8   A.  For historical records, yes.
 9   Q.  And that can be important; can it not be?
10   A.  Absolutely.
11   Q.  Now, let's talk about it for a minute.
12          Most of these towers have three sectors, correct?
13   A.  That's correct.
14   Q.  1, 2, and 3?
15   A.  Yes, sir.
16   Q.  And the sector is important for what reason?
17   A.  To narrow down the location of a potential cell phone.
18   Q.  And how does it do that, how does it help you narrow it
19   down?
20   A.  Each of those -- each of those sectors basically has a
21   120-degree coverage extending out from the base of the tower.
22   And so instead of looking or directing resource -- law
23   enforcement resources to one area, you could -- or two -- two
24   unknown areas, you can send them in one direction.
25   Q.  So knowing the sector number could give you a much more

1    precise location, direction, and so forth, of the phone

2    itself?

3    A.  Yes, sir.

4    Q.  In the absence of that, it's not as specific, you just

5    can't tell?

6    A.  It's difficult without the sectors.  One of the

7    advantages that you do get, which was demonstrated on a

8    couple of those slides is where, when you take the 2-mile

9    circles and they overlap, you can feel kind of confident that

10   they're --

11   Q.  Right.

12   A.  That you're narrowing down the area.

13   Q.  But you can't be precise?

14   A.  That's correct.

15   Q.  If you had your druthers as an analyst in this, you would

16   like to see nTelos have all their sector information like the

17   other folks?

18   A.  Fortunately we don't have to deal with that anymore.

19   They are gone.

20   Q.  I understand that.  But for purposes of this case, we

21   did.

22   A.  Yes, sir.

23   Q.  The records back at that time?

24   A.  Yes, sir.

25   Q.  And that's Mr. Wallace -- Beverly Wallace, Mark's mother,

P. SWARTZ - CROSS                                               538

1    had nTelos?

2    A.   That's correct.

3    Q.   Now, your analysis of the objective data, I guess the

4    records that were produced, did you tell us there were ten

5    calls from Mr. Joseph, the deceased in this case, the night

6    before the date of March 13th --

7    A.   Yes.

8    Q.   -- that were connecting to, and you called it the tower

9    341, either Sectors 3 or 2, except for, I think, one call

10   that was pushed over to Tower 305, Sector 3?

11   A.   Yes, sir.

12   Q.   And 3 -- I'm sorry, with just so many numbers, and I'm

13   not criticizing you, but just to get this clear.  341, where

14   is that tower?

15   A.   Excuse me, 341 is the tower that is located at 393

16   Denbigh Boulevard in Newport News.

17   Q.   And 305 is?

18   A.   Just south of that location.  That's located at 13629

19   Warwick Boulevard in Newport News.

20   Q.   And do you have readily available the time period from --

21   not every time, but just -- the time from the first of the

22   tenth call to the last of the tenth, what time frame it

23   spans?

24   A.   4:48 p.m. until 11 p.m.

25   Q.   All right.

P. SWARTZ - CROSS                                                     539

1          And, again, your expertise and your research -- I'm
2   sorry what was that last time again, by the way?
3   A.   11 p.m.
4   Q.   Your research does not reflect -- you have no personal
5   knowledge of who he called, what was discussed, the purpose
6   of it, or anything of that sort?
7   A.   That's correct.
8   Q.   All right.  It's just that they happened -- there were
9   ten of them during that time just the night before these
10  things occurred?
11  A.   Yes, sir.
12  Q.   All right.
13          Now, if you -- we have a number of exhibits that
14  you've created that focussed in on March 11, 12, 13, that
15  time frame.  Remember that?
16  A.   Yes, sir.
17  Q.   Some glossy things and photographs -- aerial photographs,
18  summaries, things like that.
19  A.   Yes, sir.
20  Q.   You did not prepare similar such summaries for any other
21  particular time frame, did you, in this case?
22  A.   I don't believe so.
23  Q.   All right.  So if we -- and I'm not going to put it back
24  up.
25          But if we looked at that Exhibit 148, or using 148A,

P. SWARTZ - CROSS                                                      540

1    in all of those just hundreds of calls over a long period of
2    time that you put up there, you just have no exhibits that
3    show us where they were from or the duration, or anything of
4    that sort?
5    A.   For the -- those telephones on 148A?
6    Q.   Yes, sir.
7    A.   The only cell site information that we have would be for
8    the Wallace telephone, and it's for a finite period of time.
9    Q.   All right.
10   A.   And then in terms of location information, the
11   Kindell phone.  But it's not cell site information, it's that
12   market information.
13   Q.   Understood.
14        And so really, all we can -- the only thing we can
15   really look at in this case with any specificity are those
16   three days that you picked, March 11, 12, 13, 2009?
17   A.   Yes, sir.
18   Q.   Notwithstanding there is a substantial call history
19   preceding and subsequent to those dates?
20   A.   Yes, sir.
21   Q.   All right.
22        And, for example, you mentioned the Waller Mill
23   tower.  With that -- I think you would call that the "home
24   tower?"
25   A.   Yes, sir.

1    Q.   And, again, that doesn't necessarily mean the person

2    lives there, does it?

3    A.   No.

4    Q.   It's a term of art in your field for a tower that seems

5    to be the most frequent, or one of the most frequently used

6    towers where calls get switched through?

7    A.   But narrowing it to where that person is sleeping at

8    night.  You know, obviously if somebody was working the

9    midnight shift, you know, the hours might change in that

10   analysis.

11        But you look at the lifestyle and you're trying to

12   find where is that person laying their head at night.  So

13   that would be the designation of the "home tower."

14   Q.   But that's more sort of an anecdotal view as opposed to

15   scientific?

16   A.   That's correct.

17   Q.   All right.  Someone might be using that tower because

18   they are visiting their girlfriend often?

19   A.   Spending a lot of time there.

20   Q.   I'm sorry, sir?

21   A.   Spending a lot of time there.

22   Q.   Yes, sir, okay.

23        And you said, I think, the Waller Mill tower was the

24   most frequently used one in the Beverly Wallace, Mark Wallace

25   phone?

P. SWARTZ - CROSS                                                    542

1    A.  Yes, sir.

2    Q.  And I think you said 2,273 actions during the time period

3    in question?

4            THE COURT:  Let's not repeat what he's already said.

5            MR. SACKS:  Yes, sir, yes, sir.  I just wanted to

6    specify the time frame, Your Honor, that's all I was really

7    trying to get to.

8            THE WITNESS:  At 2,273?

9    BY MR. SACKS:

10   Q.  Yes, sir.

11   A.  Yes, sir.

12   Q.  What time period was that 2,273 actions, over what period

13   of time?

14   A.  January 1, 2009, to April 22nd of 2009.

15   Q.  All right.  And certainly those -- you don't have

16   information suggesting those are all calls being made in the

17   vicinity of Clipper Street?

18   A.  No, they were not.

19   Q.  All right, sir.  And the same thing with Mr. Wallace, the

20   second most, the Williamsburg tower, 1,044 actions.  That was

21   during the same time period?

22   A.  Yes, sir.

23   Q.  And, again, the same answer, no suggestion that they are

24   all from the Clipper area?

25   A.  These were from the Williamsburg tower.

P. SWARTZ - CROSS                                                543

1    Q.   Clipper is in Newport News?

2    A.   That's correct.

3    Q.   And Waller Mill tower is where?

4    A.   Williamsburg, as well.

5    Q.   Williamsburg, all right.

6          On the day -- the day that you charted the

7    March 13th, the various -- the Wallace phone as it traveled,

8    you did not do any independent investigation, did you, of the

9    condition of traffic that day at any period of time during

10   the route?

11   A.   No.  That would have been kind of difficult.  I didn't

12   get involved in the case until --

13   Q.   I understand.

14   A.   -- sometime later.

15   Q.   You didn't attempt to get information from VDOT or

16   anybody that monitors those highways?

17   A.   No, sir.

18   Q.   Whether there were any unusual accidents, delays, that

19   sort of thing?

20   A.   No, sir.

21   Q.   And I thought I heard you say a number of these places

22   where these towers were that were charted were located in

23   busy commercial areas such as malls, places with lots of

24   restaurants, stores, things of that nature, correct?

25   A.   Yes.  Once the phone travelled to the Newport

P. SWARTZ - CROSS                                          544

```
 1   News/Hampton area, it's far more congested.
 2   Q.  All right.
 3        And, now, Exhibits 127 and -- could we look at those
 4   for a minute, just put that up, 127 on the screen?
 5   A.  Which --
 6   Q.  Is that loaded in?  I'm sorry, maybe I --
 7   A.  Is this back in the beginning of the presentation?
 8   Q.  It's Exhibit 127, that's what my number is.
 9        I'm not going to take up -- if it --
10        MR. WOODWARD:  Your Honor, may I consult with
11   Mr. Sacks for a second?
12        THE COURT:  Excuse me?
13        (Counsellors Woodward and Sacks confer.)
14   BY MR. SACKS:
15   Q.  Never mind, I think that's the number.
16        Certain of these charts that you showed us where
17   there were calls back and forth, you couldn't tell us how
18   long the calls lasted.  Some of them didn't show that, right?
19   A.  I believe it was durations.
20   Q.  On all of them, or are you sure?
21   A.  The ones that did not have a duration would be text
22   messages.
23   Q.  Okay, all right.
24        Now, there was a call, I believe you indicated, from
25   the Wallace phone from the Newport News shipyard area or
```

P. SWARTZ - CROSS                                                    545

1   tower?

2   A.  Yes, sir.

3   Q.  And that's, of course, downtown Newport News, basically?

4   A.  Yes, sir.

5   Q.  And Skipper -- Skipper Avenue, the location of the events

6   in this case, or Skipper Drive?

7   A.  Clipper Drive.

8   Q.  Clipper Drive, excuse me, sir.

9   A.  Yes, sir.

10  Q.  That's in a completely different area of Newport News; is

11  it not?

12  A.  That would be in the Denbigh, northern section of the

13  city.

14  Q.  And you've driven from Newport News Ship to Denbigh,

15  haven't you, in average traffic?

16  A.  Yes, sir.

17  Q.  It's probably 30-, 40-minute drive, isn't it?

18  A.  20 minutes and, you know, depending upon peak travel

19  times --

20  Q.  Sure.

21  A.  -- it might take 30 minutes.

22  Q.  Just a few more, sir.  Thank you for your time.

23  A.  Yeah.

24  Q.  It's been mentioned, but the distance between where a

25  phone is being activated and the tower that it's going

P. SWARTZ - CROSS                                              546

 1   through, depending on where you are could be miles; could it
 2   not?
 3   A.  Yes.
 4   Q.  All right.  There's no way for you to determine the
 5   distance between the phone that's being activated and the
 6   tower that it is switching through?
 7   A.  Not with these historical cell site records.
 8   Q.  Yes, sir.
 9           And just with respect to the Wallace phone, and you
10   had it, I think at one point, in a tower that was in the
11   vicinity of the Clipper Drive area?
12   A.  Yes, sir.
13   Q.  And that was on which date, again?
14   A.  March 13th, 2009.
15   Q.  Now, you don't have any other charts or exhibits that
16   show whether that phone was in the same vicinity of that
17   address on other days before or after this event?
18   A.  I do not have any charts of that.
19   Q.  All right, sir.
20           MR. SACKS:  I think that is -- let me just check.  I
21   think that's all I have, sir.  Thank you very much.
22           Thank you, Your Honor.
23           THE WITNESS:  Thank you.
24           THE COURT:  All right, Mr. Rasberry.
25           MR. RASBERRY:  Thank you.

P. SWARTZ - CROSS                                                          547

1            If I could ask to retrieve Exhibit 300 and 148A.

2                      CROSS-EXAMINATION

3    BY MR. RASBERRY:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   I'm Jamison Rasberry and I'm here for Mr. Kindell.  Good

7    morning again.

8            I put up Defense 300.  This is something you

9    prepared, correct?

10   A.   This should be 148A.

11   Q.   Oh, I apologize.

12           300, this is something you prepared?

13   A.   Yes, sir.

14   Q.   And we've gone over it, but it's a call log between Mark

15   Wallace on the date of Louis Joseph death, correct?

16   A.   That's correct.

17   Q.   And there are lots of calls from other people on here

18   between Mark Wallace and various individuals that have been

19   covered by previous counsel.

20   A.   Yes, sir.

21   Q.   And the only call between my client -- I'm turning now to

22   Page 3.  The only call between Mark Wallace and my client,

23   Mr. Rosuan Kindell, is a 37-second phone call?

24   A.   On March 13th, yes.

25   Q.   And what time is that?

P. SWARTZ - CROSS                                                    548

1    A.  3:18 p.m.

2    Q.  And, again, it's a 37-second phone call.

3          In your training and experience, that might have been

4    a phone call that was completed?

5    A.  Might have been.

6    Q.  Might have been -- it wasn't routed to voicemail but it

7    could have possibly gone to voicemail and been a hang up?

8    A.  Right.

9    Q.  You have no knowledge of the content of that call?

10   A.  I do not.

11   Q.  Okay.

12         Turning to 148A.  Again, you prepared this for the

13   government?

14   A.  Yes, sir.

15   Q.  And then you have seen 148, the companion exhibit where

16   the two individuals were removed, Angel Alliers and Brandon

17   Douglas?

18   A.  Yes, sir.

19   Q.  There's 67 calls I see between Mr. Kindell and

20   Mr. Wallace; is that correct?

21   A.  Yes, sir.

22   Q.  But that's during the time frame of December 3rd of '08

23   and May 28 of 2009?

24   A.  Yes.

25   Q.  About a six-month period?

1    A.  Yes, sir.

2    Q.  And during that period, there's lots of other calls

3    between my client and various other people, correct?

4    A.  There are, yes, sir.

5    Q.  And that was not included on this chart?

6    A.  That's correct.

7    Q.  And of course, likewise, there's lots of phone calls

8    between my client, 321, and Joseph Benson during the period

9    of February 11th to May 27, 2009?

10   A.  Yes, sir.

11   Q.  Okay.  And you don't have any idea of the content of any

12   of the phone calls between my client, any of these people?

13   A.  Between your client and any --

14   Q.  And anyone?

15   A.  Yes, that's correct.

16   Q.  You have no content of my client's phone calls?

17   A.  That's correct.

18   Q.  And there was never any phone calls between Mr. Kindell

19   and the Louis Joseph phone number, correct?

20   A.  There were not.

21   Q.  So between my client's phone number, what you attribute

22   to my client, and Louis Joseph, no phone calls?

23   A.  That's correct.

24   Q.  And that's not just on the date of March 13th, 2009, but

25   ever?

P. SWARTZ - CROSS                                              550

1    A.  For all of the records that we have.

2    Q.  All of them.  Thank you.

3         MR. RASBERRY:  Your Honor, if I could pass these

4    back and ask that we change systems.  I would like to pull up

5    Page 16 of Government Exhibit 141.

6         THE WITNESS:  Could you please tell me what the

7    header is on that?

8    BY MR. RASBERRY:

9    Q.  This is the trip down to -- from Boston on March 11th to

10   Norfolk on March 12th.  Does that help you?

11   A.  Yes.

12   Q.  And it's the 16th exhibit, Repoll 19.

13   A.  Is this it?

14   Q.  That looks like it, yeah.  Thank you, sir.

15   A.  Uh-huh.

16   Q.  And, again, this is the Norfolk Repoll.  That's

17   another -- we've used different terms for that, but "Repoll"

18   is the same thing as a switch?

19   A.  That's correct.

20   Q.  Same thing as market data?

21   A.  Yes, sir.

22   Q.  Refers to a large geographical area?

23   A.  That's correct.

24   Q.  Basically when you place a phone call on a cell phone, it

25   hooks to a tower?

P. SWARTZ - CROSS                                              551

1   A.  That's correct.

2   Q.  And all of these yellow dots that you see are individual

3   towers?

4   A.  Yes, sir.

5   Q.  So at that point, the tower then speaks through the

6   network to the home office?

7   A.  Yes, sir.

8   Q.  These yellow dots that we see on the screen, those are

9   all individual towers in that large market area?

10  A.  Yes, sir.

11  Q.  So this slide that we have before us, all it really shows

12  is that my client's phone was used somewhere in that large

13  area?

14  A.  That's correct.

15  Q.  Just as likely could have been up here north of what's

16  labeled as Chincoteague Island?

17  A.  Chincoteague.

18  Q.  Thank you for your help with that pronunciation.

19          Just as likely, it could have been up in the Eastern

20  Shore during that time frame?

21  A.  Yes, sir.

22  Q.  Just as likely if he was down in Nags Head, North

23  Carolina?

24  A.  Yes, sir.

25  Q.  Or even close to Richmond or Franklin area?

P. SWARTZ - CROSS                                                552

1   A.  Yeah, the line is basically the New Kent, James City

2   County.

3   Q.  Okay.  Thank you.

4        If we were talking about cell towers and drawing

5   circles around a cell tower, you said it could be two miles

6   or more, even, depending?

7   A.  Yes, uh-huh.

8   Q.  What kind of circle are we drawing around this; a hundred

9   miles?

10  A.  At least.

11  Q.  At least.  Okay.

12       And just so there is no confusion, this doesn't mean

13  that my client may, or his phone, completed or made a call

14  from each one of these points?

15  A.  No.  This only represents the coverage area for Repoll

16  Number 19, the Norfolk switch.

17       THE COURT:  I think this area's been explored in

18  detail.

19       MR. RASBERRY:  Just wanted to clear up that one

20  point of confusion.  And I'll move along, Your Honor.

21  BY MR. RASBERRY:

22  Q.  If we could turn to Government's Exhibit 145.  It's the

23  first page, it's the calls with the Greyhound Bus March 13,

24  2009.

25  A.  Yes, yes.

Janet Collins, Official Court Reporter

P. SWARTZ - CROSS                                                        553

1    Q.  And you are familiar with this exhibit?

2    A.  I am.

3    Q.  It appears to be some red and yellow writing that

4    reference other phone calls made by Benson to Wallace,

5    Kindell to Wallace, and Benson to Kindell?

6    A.  Yes.

7    Q.  The phone calls in white specifically refer to the

8    heading, the calls from the Greyhound Bus, correct?

9    A.  That's correct.

10   Q.  They appear to be in three relative groups?

11   A.  Yes, sir.

12   Q.  The first group, between 12:25, 12:39, 12:41?

13   A.  Yes, sir.

14   Q.  Those are all outgoing phone calls from my client's phone

15   to Mr. Kindell's phone?

16   A.  They're from the Kindell phone to Greyhound.

17   Q.  To Greyhound?

18   A.  Yes.

19   Q.  What are they, about 15 minutes apart?

20   A.  Between the first one and the second one, yes.

21          The second and the third one are relatively close to

22   each other, within a minute or so.

23   Q.  I notice the first phone call is about three seconds,

24   correct?

25   A.  Yes, sir.

P. SWARTZ - CROSS                                                554

1    Q.  Not likely that that was a completed call?

2    A.  That's correct.

3    Q.  Second one, a minute and 44.

4         Your opinion would be likely a completed call?

5    A.  Yes, sir.

6    Q.  You say yes.

7         And the same with the 6 minutes and 11 seconds?

8    A.  Yes, sir.

9    Q.  But you have no independent knowledge or personal

10   knowledge of the Greyhound Bus system or what the phone, that

11   number -- who would have answered or how it would have gone?

12   A.  I don't have personal knowledge of it, no.

13   Q.  But everyone's aware that most large companies have

14   automated systems?

15   A.  That is correct.

16   Q.  Dialers, where you have to dial a certain number to get

17   through?

18   A.  Yes, sir.

19   Q.  You don't have any specific knowledge as to Greyhound, as

20   you've testified, though?

21   A.  Other than that this number is on their website, but I've

22   not called that phone number to find out what happens when

23   you call that number.

24   Q.  And you have no -- and, again, moving forward about three

25   hours later, about 3:17, there's another phone call from the

P. SWARTZ - CROSS                                                      555

1    Kindell phone to the Greyhound Bus at 3:17, 38 seconds?

2    A.   Yes, sir.

3    Q.   Another at 3:19 for 3 minutes and 51 seconds?

4    A.   Yes, sir.

5    Q.   3:24, Kindell to the Greyhound number for 2 minutes and

6    14 seconds?

7    A.   Yes, sir.

8    Q.   And I will quit reading them off, but those are all

9    another group that occurred between about 3:17 and 3:26 p.m.,

10   about a 15-minute period?

11   A.   Yes, sir.

12   Q.   Actually about a 9-minute period; is that accurate?

13   A.   Yes, sir, about 9 minutes.

14   Q.   Okay.  And then three hours later from then there's

15   several calls occurring between 6:23 and 6:26, a short

16   duration, 28 seconds, 13 seconds, and 2 minutes and

17   55 seconds.

18          THE COURT:  Mr. Rasberry, is there a question

19   anywhere in there, because this chart has been put up before

20   and it speaks for itself.

21          MR. RASBERRY:  Let me try to streamline, Your Honor.

22          THE COURT:  Let's get to the question.

23   BY MR. RASBERRY:

24   Q.   There are three different packets of phone calls, one

25   surrounding the 12:30 time period, correct?

P. SWARTZ - REDIRECT                                          556

1    A.   Yes, sir.

2    Q.   One around 3:00?

3    A.   Yes, sir.

4    Q.   Three around 6, and one around 7, correct?

5    A.   Yes, sir.

6    Q.   And I'll just ask you one final question.

7         You have no idea what the purpose of these phone

8    calls were, based on the information that you have?

9    A.   I do not know what the content of that conversation was.

10   Q.   I'm not asking about the content, but the purpose of why

11   these calls were dialed?

12   A.   I have an assumption of what that --

13   Q.   Not asking your assumption.  You don't know the purpose?

14        MR. ZLOTNICK:  I'm going to object.

15        THE COURT:  Objection sustained, but he's not going

16   to speculate on it.

17        MR. RASBERRY:  I have nothing further, Your Honor.

18   Thank you.

19        THE COURT:  Not going to speculate on the purpose

20   nor anything else.

21        MR. RASBERRY:  Thank you.

22        THE COURT:  All right, thank you.

23        Let's make it narrow, Mr. Zlotnick.

24        MR. ZLOTNICK:  Yes, sir.

25                        REDIRECT EXAMINATION

P. SWARTZ - REDIRECT                                            557

```
 1   BY MR. ZLOTNICK:
 2   Q.  Mr. Swartz, you were asked questions about working for
 3   the prosecution in a number of cases and being compensated by
 4   the United States; were you not?
 5   A.  Yes, sir.
 6   Q.  Can you tell us, in this particular case, have you made
 7   yourself available for interviews by defense counsel?
 8   A.  Yes, sir.
 9   Q.  In fact, have some of them availed themselves of your
10   help in this case?
11   A.  Yes, sir.
12   Q.  And you prepared charts in this case and there was
13   discussion of the Exhibit 148 and 140A.  Do you remember that
14   on cross-examination?
15   A.  Yes, sir.
16   Q.  And those were provided -- those were prepared by you;
17   were they not?
18   A.  They were.
19   Q.  And they were provided to all parties?
20          MR. KELLETER:  Your Honor, I would object to the
21   leading questions.
22          THE COURT:  Sustained.  He's still your witness.
23          MR. ZLOTNICK:  I'm sorry, Your Honor.
24          THE COURT:  So ask non-leading questions.
25   BY MR. ZLOTNICK:
```

P. SWARTZ - REDIRECT                                              558

1   Q.  When these exhibits were prepared, who, if anyone, were

2   they provided to?

3   A.  Initially to the United States Attorney's Office.

4   Q.  Then what happened to them?

5   A.  And then they were provided to defense counsel.

6   Q.  Under timelines, correct?

7   A.  Yes.

8   Q.  And additionally, the Exhibit 300 prepared by you, who

9   was that provided to, in addition to the United States

10  Attorney's Office?

11  A.  Defense counsel.

12  Q.  Well in advance of trial?

13  A.  Yes, sir.

14  Q.  Now, if we were to -- you were asked questions -- a great

15  deal of time regarding your analysis, I believe, of -- on

16  Exhibit 144 and the movement of the Wallace cell phone.

17  A.  Yes, sir.

18  Q.  And you were asked questions about the -- I'm sorry, the

19  nTelos records and that they don't have sector information?

20  A.  That's correct.

21  Q.  Although the nTelos records don't have any sector

22  information, are you confident in your analysis of the times

23  that the phone moved and hit the various towers?

24  A.  Yes.

25  Q.  And in particular, you testified regarding the time frame

P. SWARTZ - REDIRECT                                              559

1    on March 13th, 2009, between 10:15 a.m. and 10:35 a.m. when

2    the Wallace phone was in the area of the Newport News Airport

3    tower, in the vicinity of Clipper Drive; did you not?

4    A.   I did.

5    Q.   And you've testified --

6           THE COURT:  Wait a minute, Mr. Zlotnick.  You are

7    repeating what he said and he's saying yes, he did.  But I

8    don't hear a new question in there anywhere.

9           MR. ZLOTNICK:  Very well, Your Honor.

10          THE COURT:  Unless there's a new question, just let

11   it go.

12          MR. ZLOTNICK:  Ask a new question.

13   BY MR. ZLOTNICK:

14   Q.   The jury will have Exhibit 300.  Can they take

15   Exhibit 300 and look at your Exhibit 144 and determine at

16   various times what other calls were made from the various

17   locations?

18   A.   Yes, sir.

19   Q.   Now, you were asked questions regarding the trip between

20   the Kindell phone from -- by counsel and the Repoll data,

21   correct?

22   A.   Yes, sir.

23   Q.   In your analysis, did you consider other information

24   other than the Repoll data to describe the route of travel?

25   A.   The Greyhound Bus records.

P. SWARTZ - REDIRECT                                    560

```
 1   Q.  And are you comfortable with using Repoll data to show
 2   direction of travel?
 3   A.  When a person travels out of their home market, yes.  It
 4   doesn't do us any good if they're in their home market.
 5   Q.  But in this particular case, were you comfortable with
 6   the analysis you conducted?
 7   A.  Yes, with the trip from Boston to the Norfolk market, and
 8   then back to the Boston market.
 9           MR. ZLOTNICK:  I have no other questions, Your
10   Honor.
11           THE COURT:  Gentlemen, ladies, may this witness be
12   excused permanently -- oh, no, I mean in testifying?
13           MR. WOODWARD:  Yes, sir.
14           (All counsel respond in the affirmative.)
15           THE COURT:  The next witness.
16           MR. ZLOTNICK:  United States calls Brandon Douglas.
17           MR. WOODWARD:  May we approach just briefly to a
18   sidebar?
19           (At the sidebar:)
20           MR. WOODWARD:  Judge, a couple of things I wanted to
21   raise.  One of them is that we still have the corroboration
22   issue; and, secondly, whenever and to whatever Mr. Douglas
23   testifies to on an administrative issue, the only person that
24   talked to him was Mr. Kelleter's client, and we would like,
25   there for, for Mr. Kelleter to lead off since he only alleges
```

P. SWARTZ - REDIRECT                                              561

```
 1   he talked to Mr. Kelleter's client.  I've talked to
 2   Mr. Kelleter about that, and he -- the rest of us can --
 3   because he never spoke to my client.
 4            THE COURT:  All right.  The Court will permit that.
 5            MR. WOODWARD:  I have the issue, Your Honor, on
 6   behalf of Benson, I don't think that the phone data proved
 7   anything about him.  I mean, they don't have anything in
 8   terms of corroboration issue.
 9            THE COURT:  I think you gentlemen are free to argue
10   that to the jury.
11            I think that's an argument you need to raise to the
12   jury about whether the phone data really proves anything with
13   respect to your clients, so I just leave that to your
14   experience.
15            MR. WOODWARD:  I understand, but Your Honor, but the
16   point I'm making to Your Honor is that in terms of the whole
17   hearsay issue.  One of the things was, you know, we started
18   this morning, we were partway through Mr. Swartz's direct,
19   and the Court relied on that prong of the hearsay rule.
20            You're correct.  And the next thing the Court is
21   concerned about, I have some concerns about the reliability
22   of that prong of the hearsay rule.
23            THE COURT:  You're correct.  And that was -- and the
24   Court's other thing concern is that, looking at the case law
25   to get around that 804(b)(3) exception, we have to have three
```

P. SWARTZ - REDIRECT                                    562

1   components there:  Unavailability, sufficient in culpability,

2   and corroboration.

3           I don't know, based on this record, Mr. Zlotnick,

4   there's a lot in here.  The only thing you happen to have,

5   Mr. Benson's fingerprint, I think, at the scene.  You have

6   him traveling south.

7           MR. WOODWARD:  Well, no, his phone -- they don't

8   have Repoll data.

9           THE COURT:  Oh, okay.  So the thing is sufficient

10  corroboration to allow that informant testimony to come in or

11  not under 804(b)(3), and that's what the Court is concerned

12  about.

13          I don't know whether you had anything else to put in

14  the record or not.

15          MR. ZLOTNICK:  But we will, Judge, before the trial

16  is over.

17          THE COURT:  Well, maybe you need to reconsider

18  calling this witness, because that's the problem the Court

19  sees in cases that we're in, take it -- the Court of Appeals

20  takes it in full context whether there's enough to establish

21  sufficient trustworthiness, reliability in what that

22  informant is going to say when he drags one of these other

23  people in here.

24          MR. WOODWARD:  Well, Your Honor, actually they don't

25  have Mr. Benson travelling south, they don't have his phone,

P. SWARTZ - REDIRECT                                                        563

1    they don't have Repoll data.

2         THE COURT:  So the thing is sufficient corroboration

3    here, to allow that informant testimony to come in under

4    804(b)(3), and that's what the Court is concerned about.  I

5    don't know whether you had anything else to put in the record

6    on that.

7         MR. ZLOTNICK:  Well, we will before the trial is

8    over.

9         THE COURT:  Well, maybe you need to reconsider

10   calling this witness, because that's the problem the Court

11   sees in the cases it read.  The Court of Appeals takes it in

12   full context whether there's enough there to establish

13   sufficient trustworthiness and reliability in what that

14   informant said, that he dragged one of these other people in

15   here, what's in the record.  Other than that --

16        MR. WOODWARD:  And, if, Your Honor --

17        MR. ZLOTNICK:  Here's my -- the government's

18   position on the corroboration.

19        As you know, the Brandon Douglas statement says that

20   this transaction with the victim was originally going to be a

21   burglary, and then it was originally with Alliers and with

22   Douglas.  And we have in the record already calls between

23   Wallace and him.

24        Additionally in there, we have the fact that two

25   people from Boston came in and, you know, went in too

P. SWARTZ - REDIRECT                                            564

1    aggressively.

2         We have testimony showing that two people from

3    Boston, namely Benson, with the way the records show it, came

4    down here.  We can show that Kindell's phone travelled down

5    here.  We have the Greyhound tickets bringing them both down

6    here.

7         And, furthermore, we have at the scene of the crime

8    at the critical time when the murder occurred, from the

9    evidence, and, again, it's almost like a Rule 29(a).  If

10   there's enough there -- it's just a threshold matter for you

11   to allow the evidence in.

12        We have evidence that the Wallace phone is in the

13   vicinity for that critical period of time when the murder is

14   going.  And they can argue both ways as to the limitations

15   on -- of cell site data.  We have him at the scene of the

16   crime.

17        I can represent to the Court that he's made a

18   statement to one of the detectives where he indicated that he

19   was at the scene of the crime.

20        THE COURT:  The Court has been trying to deal with

21   the evidentiary problems its having and you say you have it,

22   the Court would have known, then the Court has less problem

23   putting informant testimony in.

24        MR. ZLOTNICK:  I understand.  I don't have any

25   witness here to put on.

```
 1              THE COURT:  And with respect to all of these

 2    defendants, if you have information more directly tying them

 3    to this crime before you put this informant up here, do it.

 4    Okay?

 5              MR. SACKS:  And, Your Honor, at some point, just for

 6    the record, and I'm not arguing with you at all, I have an

 7    obligation as a part of 2255, and many other, Sixth

 8    Amendment, there are certain objections I want to make sure I

 9    put on the record before that witness actually testifies in

10    addition to.  So at some point I just need to take care of

11    that, for my obligations.

12              THE COURT:  Well, we'll just have to take a break

13    and entertain those objections.

14              MR. SACKS:  All right, I appreciate that.

15              THE COURT:  All right, do you need a break to

16    reorder the witness?

17              MR. SACKS:  We don't object to that.

18              THE COURT:  Thank you.

19              MR. SACKS:  Thank you.

20              (In open court:)

21              THE COURT:  I think you want this witness to step

22    down for the time being?

23              MR. ZLOTNICK:  That's correct, sir.

24              THE COURT:  If you will step down, sir.  They will

25    recall you later.
```

P. WEAVER-SANCHIZ - DIRECT                                    566

```
 1              MR. ZLOTNICK:  Your Honor, the other witness is not
 2     here yet.
 3              THE COURT:  Ladies and gentlemen, we're going to
 4     take about a ten-minute break.  All rise.
 5              (Jury out, 12:16 p.m.)
 6              THE COURT:  In ten minutes if that witness is not
 7     here, have somebody in here ready to go.
 8              Recess ten minutes.
 9              (Off the record, 12:17 p.m., jury out.)
10              (On the record, 12:28 p.m., jury in.)
11              THE COURT:  You may be seated.
12              The record reflect that all jurors have returned to
13     the courtroom.  Does counsel agree?
14              (All counsel respond in the affirmative.)
15              THE COURT:  Thank you.
16              You may call your next witness.
17              MR. ZLOTNICK:  Thank you, Your Honor.
18              United States calls Penny Weaver-Sanchiz.
19              PENNY WEAVER-SANCHIZ, called by the Government,
20     having been first duly sworn, was examined and testified as
21     follows:
22                          DIRECT EXAMINATION
23     BY MR. ZLOTNICK
24     Q.  Please state your name and spell it for the court
25     reporter.
```

P. WEAVER-SANCHIZ - DIRECT                                        567

1    A.   Penny Weaver-Sanchiz.  P-E-N-N-Y.  Weaver is W-E-A-V-E-R

2    - S-A-N-C-H-I-Z.

3    Q.   Ms. Sanchiz, what city and state do you live in?

4    A.   In Dallas, Texas.

5    Q.   How are you currently employed?

6    A.   I work for Greyhound Lines, Inc.

7    Q.   What's your job at Greyhound Lines, Inc.?

8    A.   I'm the Compliance and Systems Administrator.

9    Q.   Can you tell us, how long have you been employed there?

10   A.   Almost 20 years.

11   Q.   Were you asked to provide Greyhound records related to

12   travel from Boston, Massachusetts to Williamsburg, Virginia.

13   And then from Virginia to Boston, Massachusetts related to

14   two passengers?

15   A.   Yes, I was.

16   Q.   Do you know what their names were?

17   A.   One of them was Rosuan Kindell, and the other one was

18   Joe -- I can't -- it started with a "B."

19   Q.   All right.

20        Let me have the witness shown Exhibit 102, if we

21   could.  And let's go to the next page, on 102, where the

22   tickets are.

23   A.   Joe Benson.

24   Q.   That refreshes your memory?

25   A.   Yes, sir.

P. WEAVER-SANCHIZ - DIRECT                                        568

1   Q.  All right.

2          Are you familiar with what are called "trip reports"

3   or "ticket selection envelopes?"

4   A.  Yes.

5   Q.  I want to show you, first, Exhibit 1 of Exhibit 102.  Can

6   you tell us, what is that?

7   A.  That's the front of the trip envelopes that our drivers

8   use to track their travel as they go through on their

9   particular leg of a trip.

10  Q.  So who prepares those?

11  A.  It's prepared by the driver.

12  Q.  Does it show when the trip leaves?

13  A.  Yes, it does.

14  Q.  Does it show the date of the departure and the time?

15  A.  Yes, it does.

16  Q.  Does it tell where the bus is leaving from?

17  A.  Yes.

18  Q.  And does it tell where the bus is arriving?

19  A.  Yes.

20  Q.  And on this particular -- this is a ticket dated what

21  date?

22  A.  3-11-2009.

23  Q.  And leaving from what city?

24  A.  Boston.

25  Q.  Now, let's bring up Page 2 of Exhibit 102.

P. WEAVER-SANCHIZ - DIRECT                                          569

```
 1        Can you tell us what Page 2 of Exhibit 102 is, what

 2  kind of information -- is that the back side of the envelope?

 3  A.  That's the back side of the envelope, and it's strictly

 4  for the driver to utilize to assist them when they are

 5  logging into the computer and reporting certain statistics of

 6  their trip.

 7        In this particular case, the driver wrote "Boston"

 8  and then he wrote "New York" on it, stating that that was his

 9  part of the leg, and that he had 41 passengers on his bus at

10  the time that he departed from Boston.

11  Q.  So the information on the back side of the envelope, is

12  it the same or does it vary?

13  A.  It varies from driver to driver.  It's strictly there as

14  a tool for them.

15  Q.  And the information on the front and back is filled out

16  by who?

17  A.  By the driver.

18  Q.  Regarding the departure time, is this -- is this the

19  scheduled departure time or the actual departure time?

20  A.  This is the actual departure time.

21  Q.  I want to next show you what's Page 3 of Exhibit 102.

22        What is shown there on Page 3?

23  A.  Okay, this is a coupon 1 of 7 coupons for Joe Benson.

24  It's the -- it's what we call a "trips ticket," and it's

25  printed from -- directly from our trip system.
```

P. WEAVER-SANCHIZ - DIRECT                                           570

1           It provides you with -- on the re-board pass, it

2    provides you with the name of the passenger, the date of the

3    trip that they're supposed to be taking, the time of their

4    departure, schedule number.

5           If it belongs to a different bus company, provides

6    you with coupon origin, coupon destination, ticket

7    destination, ticket origin confirmation number of when it was

8    purchased, which relates to our system.

9    Q.  Let me back you up a little bit.

10          Can you tell us -- looking at that, can you tell us

11   if this is a one-way or a round trip?

12   A.  It's a round trip.

13   Q.  And how can you tell that?

14   A.  If you look at the larger section of the ticket, you will

15   find from the top of it, about a third of the way down, you

16   will see where it says "RO" and then "adult" next to that.

17   That's telling you that that RO stands for a round trip.

18   Q.  You can draw on that exhibit if you want.  Can you show

19   us where it says that?

20   A.  It's right here (indicating.)

21   Q.  Perfect, thank you.

22          Can you tell us, does that document, this coupon,

23   tell you how much the ticket costs?

24   A.  Yes.  It shows it right here (indicating.)

25   Q.  And how much was it?

P. WEAVER-SANCHIZ - DIRECT                                            571

1    A.   It was 166.40.

2    Q.   And does this coupon show the scheduled departure date

3    and time?

4    A.   Yes, it does, in two places.  Right here at the top, and

5    over here (indicating).

6    Q.   Can you tell us, what was the scheduled departure date

7    and time?

8    A.   It was March 11th of 2009, at 7:30 p.m.

9    Q.   Does this coupon also -- can you tell us, will this

10   coupon take Joe Benson from where to what ultimate

11   destination?

12   A.   This is from the Boston to New York piece, the total

13   trip, and the total trip is listed in the lower right corner.

14   Q.   What's the ultimate destination, though?

15   A.   Boston to Williamsburg, Virginia.

16   Q.   And how many places is that on the ticket?

17   A.   Pardon me?

18   Q.   The ultimate destination, is it in a second place on the

19   ticket as well, on the left side, lower left?

20   A.   Yes, it is.  It's over here (indicating).

21   Q.   And this coupon just covers which leg?

22   A.   It covers the Boston to New York piece.

23   Q.   And we say "piece" or "leg," what are we referring to?

24   A.   We're referring to a trip can go a great distance and so

25   what -- what we do is we have breaks in between there where

P. WEAVER-SANCHIZ - DIRECT                                          572

1    you could have a driver change, a bus change, a schedule

2    change.  And so we break those legs up -- and we call them

3    "legs" of a trip, and so you can have -- in this particular

4    case, there are seven legs to this particular person's trip.

5    Q.  Now, let's go to Page 4 of Exhibit 102.

6         Does this -- does this coupon relate to Rosuan

7    Kindell?

8    A.  Yes, it does.

9    Q.  Now, this is coupon what of what?

10   A.  This is coupon 1 of 8.

11   Q.  What does that mean, "1 of 8?"

12   A.  It means it's the first coupon and/or the first leg of

13   this person's trip.

14   Q.  Can you tell us what the purchase date of this ticket

15   was?

16   A.  The purchase date was March 11th of 2009.  Purchased it

17   at 6:34 p.m.

18   Q.  And where is that on the ticket?

19   A.  It's in two places.  It's right here on the stub, and

20   then over here in the main body of the ticket (indicating).

21   Q.  And what's the departure time?

22   A.  Departure time is 7:30 p.m. on March 11th.

23   Q.  And what's the trip is a -- is it one-way, or is it round

24   trip?

25   A.  It's also a round trip.

P. WEAVER-SANCHIZ - DIRECT                                    573

1    Q.   And can you tell us, where it is going to, from Boston to

2    where?

3    A.   It is going from Boston to Williamsburg, Virginia.

4    Q.   And where -- this first coupon covers from what leg, from

5    where to where?

6    A.   Boston to New York.

7    Q.   Now, these two coupons we've discussed on this exhibit,

8    are they contained -- why are they together?  Are they in the

9    same envelope?

10   A.   Yes.

11   Q.   And does the last page of the document show a manifest?

12        Can we pull up the last page of it?  And what is

13   that?

14   A.   This is a passenger manifest.

15   Q.   What does this tell us?

16   A.   This tells us -- it provides you with the coupon origin

17   and destination.  It provides you with the ticket -- the

18   total tickets, origin/destination for the coupon.  It tells

19   you if it was paid by cash, check, credit card, other.

20        It tells you if it's one-way or a round trip.  It

21   tells you carrier, ticket number, whether it was bought on

22   line or if it was a manual ticket.  What the schedule number

23   is, the bus number, the section number, schedule dates, start

24   time.  Driver's name, driver number, which is their ID

25   number.

P. WEAVER-SANCHIZ - DIRECT                                    574

1    Q.   Yeah.
2         Ma'am, can you tell us, does the -- does this
3    manifest also show who's on the bus and from where to where?
4    A.   Yes, it does.
5    Q.   And does it indicate whether or not Kindell and Benson
6    were on that bus?
7    A.   Yes, sir.
8    Q.   And they're going from Boston to Williamsburg?
9    A.   Yes, sir.
10   Q.   Now, Exhibit 102 itself, just takes them from Boston to
11   New York, correct?
12   A.   Correct.
13   Q.   Now, I'm next going to show you Page 1 of Exhibit 3,
14   which is another envelope.
15        I'm sorry, 103.  This shows the second leg?
16   A.   Yes, it does.
17   Q.   And what's the second leg, from where to where?
18   A.   It goes from New York to Washington, DC.
19   Q.   What's the departure date and time, according to that
20   record?
21   A.   3-12-2009, at 1:45 a.m.
22   Q.   I next want to show you Page 3 of Exhibit 103, which is
23   coupon 2 of 7 for Joe Benson.  Do you recognize that?
24   A.   Yes, I do.
25   Q.   And this shows travel for Joe Benson from where to where?

P. WEAVER-SANCHIZ - DIRECT                                    575

1    A.  New York, New York, to Washington, DC.

2    Q.  And what's the scheduled departure date?

3    A.  March 12th, 2009, at 1:45 a.m.

4    Q.  I'm next going to show you Page 4 of Exhibit 103.

5            You recognize -- does that relate to coupon 2 of 8

6    for Rosuan Kindell?

7    A.  Yes, it does.

8    Q.  And what does that show, as far as departure date and

9    time from New York?

10   A.  March 12th, 2009 at 1:45 a.m., leaving New York going to

11   Washington, DC.

12   Q.  And let's go to the next page.  That's the manifest

13   again?

14   A.  Yes, sir.

15   Q.  And would that show that both Kindell and Brown(sic)

16   travelled?

17   A.  Yes, sir.

18   Q.  All right.

19            MR. KELLETER:  Your Honor, I need to clarify.

20            THE WITNESS:  Did you say Brown?

21            MR. ZLOTNICK:  I'm sorry, I misstated.  Kindell and

22   Benson.  That was my mistake, my apologies.

23   BY MR. ZLOTNICK:

24   Q.  Let's go to the next exhibit, which I believe is 104.

25   And can you tell us, does this show the third leg of the

P. WEAVER-SANCHIZ - DIRECT                                      576

1   trip?

2   A.  Yes, it does.

3   Q.  And this is travel from where to where?

4   A.  Washington, DC to Richmond, Virginia.

5   Q.  What's the departure date?

6   A.  3-12-09 at 7:15 a.m.

7   Q.  I next want to go to Page 3 of Exhibit 104.

8        Is that coupon 3 of 7 for Mr. Benson?

9   A.  Yes, it is.

10  Q.  And that shows travel from where to where?

11  A.  Going from Washington, DC to Richmond, Virginia.

12  Q.  What's the scheduled departure time and date?

13  A.  March 12th, 2009, at 7:15 a.m.

14  Q.  I now want to show you Page 4 of Exhibit 104, which

15  relates to coupon 3 of 8 for Mr. Kindell.

16       Does that show the same departure date as Exhibit 3?

17  A.  Yes, it does.

18  Q.  And, again, the departure date is going from Washington

19  to Richmond?

20  A.  Correct.

21  Q.  I now want to show you Page 1 of Exhibit 105.

22       This is an envelope for leg four?

23  A.  Yes, sir.

24  Q.  And it shows travel from Richmond to where?

25  A.  Well, these are initials, and I'm not always good with

P. WEAVER-SANCHIZ - DIRECT                                          577

1   how they abbreviate certain things.  I'd have to look at the
2   actual coupons or the back of the envelope to know what UBH
3   stands for.
4   Q.  All right.  Is there a departure date?
5   A.  March 12th, 2009, at 12:01 p.m.
6   Q.  Let me next show you Page 3 of Exhibit 105.  Is that
7   coupon 4 of 8 for Rosuan Kindell?
8   A.  Yes, it is.
9   Q.  It reflects travel from Richmond to where?
10  A.  Williamsburg, Virginia.
11  Q.  And the scheduled departure is March 12th, 2009?
12  A.  Yes, it is.
13  Q.  At what time?
14  A.  12:01 p.m.
15  Q.  I next show you Page 4 of Exhibit 5.
16          Does that relate to coupon 4 of 7 for Mr. Benson?
17  A.  Yes, it does.
18  Q.  And does that show the same departure date and time for
19  Richmond, Virginia to Williamsburg, Virginia?
20  A.  Yes, it does.
21  Q.  Now that we've covered the trip from Boston to
22  Williamsburg, are there records related to the return trip?
23  A.  Yes, there were.
24  Q.  You earlier described these as round trip tickets.  Do
25  coupons reflect the date and time of the originally scheduled

P. WEAVER-SANCHIZ - DIRECT                                         578

1    trip on the coupons themselves?

2    A.   The coupons, yes.

3    Q.   And can a person abbreviate or go earlier at that time?

4    A.   Yes, they can.

5    Q.   Can they now?

6    A.   No.  Now they have to get a -- their tickets reissued to

7    be able to go at a different time other than what they

8    originally had purchased.

9    Q.   But at that time you could use your original ticket?

10   A.   You could take your original ticket, yes.

11   Q.   I'd like to show you Page 3 of Exhibit 106.

12        Can you tell us, what was Mr. Benson's original

13   itinerary?

14   A.   His original itinerary was to leave -- go from

15   Williamsburg to Richmond, Virginia on March 20th, 2009, at

16   12:01 a.m.

17   Q.   For the first leg?

18   A.   Yes.

19   Q.   Let me now show you Page 4 of Exhibit 106.

20        Does it reflect the date and time of the originally

21   scheduled trip for Mr. Kindell?

22   A.   Yes, it does.  His original date and time was supposed to

23   be March 14th, 2009, at 8:15 p.m.  Leaving Williamsburg,

24   going to Richmond, Virginia.

25   Q.   Do the records show if they actually travelled on those

P. WEAVER-SANCHIZ - DIRECT                                579

1    later dates?

2    A.  The envelope would show what date they actually traveled

3    on.

4    Q.  In this case, do the envelopes show they actually

5    traveled on a different date?

6    A.  I believe it did, yes.

7    Q.  Let's look at Page 1 of Exhibit 106.

8            On Page 1 of Exhibit 106, were the coupons for Benson

9    and Kindell -- are there coupons for Benson and Kindell

10   associated with that envelope?

11   A.  Yes, it is.

12   Q.  And can you tell us on those coupons what date they

13   travelled back?

14   A.  This envelope shows that they traveled back on 3-15-2009

15   at 5:00 p.m.

16   Q.  But were there coupons that might -- that can show an

17   error in that date?

18   A.  Yes.

19   Q.  And do you remember that being the case?

20   A.  Yes.

21   Q.  Okay.  So -- looking at those records, can you see if

22   there was an error in that from other coupons?

23   A.  Yes, you can.

24   Q.  Now, back to this envelope.

25           What's the origination location of that -- of the

P. WEAVER-SANCHIZ - DIRECT                                           580

1   trip back?

2   A.   This is Norfolk, Virginia, going back to Richmond.

3   Q.   Now, in the tickets for Kindell and Benson, was it an

4   origination of Norfolk or was the origination in

5   Williamsburg?

6   A.   The origination was Williamsburg for both of them.

7   Q.   And is the Williamsburg bus stop on the route for

8   Norfolk?

9   A.   Yes, it is.

10  Q.   Now, did you determine if there was a Greyhound Bus

11  driver error on the envelope?

12  A.   Yes, I did.

13         MR. WOODWARD:  Your Honor, I'm going to object to

14  what -- what the error was.  She can certainly testify that

15  the records reflect different dates and times, but if she

16  didn't create the records, she can't opine as to which one is

17  an error.

18         MR. ZLOTNICK:  Your Honor, she's the one that

19  created the records themselves and produced them and studied

20  them.

21         THE COURT:  The Court's going to overrule the

22  objection.

23         MR. SACKS:  Just for the record, Your Honor, we join

24  in.  Thank you.

25  BY MR. ZLOTNICK:

P. WEAVER-SANCHIZ - DIRECT                                        581

1    Q.  Have you seen Greyhound bus driver errors for the date on

2    envelopes?

3    A.  Yes, I have.

4    Q.  And is there a way that you can determine if there was an

5    error from other records, based on the other records in the

6    envelope?

7    A.  Yes.

8    Q.  Did you do that in this case?

9    A.  Yes, I did.

10   Q.  I want to have you take a look at Exhibit 107.

11          And is there an envelope for leg two of the return

12   trip for the departure date?

13   A.  Yes, there is.

14   Q.  And that's on there?  What's the departure date on that

15   leg?

16   A.  March 13th, 2009.

17   Q.  And what's the departure time?

18   A.  10:20 p.m.

19   Q.  From where to where?

20   A.  Richmond, Virginia to New York, New York.

21   Q.  How many coupons did Rosuan Kindell have to use to

22   complete this segment of the trip?

23   A.  I believe he had two.

24   Q.  All right, let's -- and let's go to Page 3 and 4 of

25   Exhibit 107.

1          What do those show?

2   A.  This shows coupon 6 of 8, and 7 of 8 for Rosuan Kindell,

3   going from Richmond to Washington, DC on coupon six, and

4   Washington, DC to New York on coupon seven.

5   Q.  In your experience, how do these errors happen on these

6   envelopes?

7   A.  Drivers sometimes do not have all of their envelopes

8   filled out at a time that they --

9          MR. SACKS:  Objection, objection --

10         THE COURT:  Wait a minute, wait a minute.

11         MR. SACKS:  Due to speculation as to how that

12  happens.

13         THE COURT:  I think I'm going to sustain that,

14  Mr. Zlotnick.

15         MR. ZLOTNICK:  Very well, Your Honor.

16         THE COURT:  She has no specific information how this

17  error occurred.  One thing to know it's an error, another

18  thing is to know how it occurred.

19         MR. ZLOTNICK:  Fair enough.

20  BY MR. ZLOTNICK:

21  Q.  So we've got these two coupons up here and you indicated

22  that on Pages 3 and 4 of Exhibit 107, you've got two coupons

23  and these are, what, 6 and 7 of 8?

24  A.  Correct.

25  Q.  And they are contained in that original envelope?

P. WEAVER-SANCHIZ - DIRECT                                    583

1    A.   Yes, sir.

2    Q.   What was the original schedule for Rosuan Kindell?

3    A.   His original schedule was to depart Richmond, Virginia on

4    March 14th, 2009, at 10:20 p.m., going to Washington, DC.

5              And then depart Washington, DC, New York -- going to

6    New York on March 15th, 2009, at 1:10 a.m.

7    Q.   Now, Page 1 shows that the trip was from where to where?

8    A.   It showed that it was from Norfolk to New York -- or

9    Richmond to New York, excuse me.

10   Q.   Now, how many coupons did Joe Benson need to get from

11   Richmond, Virginia to New York, New York?

12   A.   He only needed one.

13   Q.   And is that -- is this 1 of 6 of 7 because he was

14   originally scheduled to return on a different date?

15   A.   I believe so.

16   Q.   Is that shown by that record?

17   A.   Yes, it is.  It was shown that he was supposed to depart

18   on March 20th, 2009, at 2:15 a.m. leaving Richmond, Virginia

19   and going to New York, New York.

20   Q.   Now, let's take a look at Exhibit 108, if we could.

21             Does Exhibit 108 on the first page, is that an

22   envelope?  Can you tell us what that shows as a departure

23   date?

24   A.   Departure date was March 14th, 2009, at 7:00 a.m.

25   Q.   What's the departure location?

P. WEAVER-SANCHIZ - DIRECT                                        584

1    A.   New York, New York, going to -- I can't read some of this

2    writing.  Can't really make out what that said.

3    Q.   Can you look at the last two on the state?  Can you read

4    the abbreviation?

5    A.   No.

6    Q.   You can't?

7         Do you remember testifying about this earlier in the

8    federal Grand Jury?

9    A.   Yes, I do.

10   Q.   And you were shown the same records in the Grand Jury?

11   A.   Yes, I was.

12   Q.   Could I have her -- show something that might help

13   refresh her memory, Your Honor?

14        MR. WOODWARD:  Your Honor, I'm going to object.  She

15   doesn't say she has a bad memory.  She said she couldn't read

16   the exhibit.

17        THE COURT:  There is a difference.

18   BY MR. ZLOTNICK:

19   Q.   Let me ask it a different way.

20        Was there a time that you were able to read the

21   exhibit when you testified in the Grand Jury?

22   A.   Yes, there was.

23   Q.   And you testified about that?

24   A.   Yes, I did.

25        THE COURT:  The Court is going to allow it.  Mark

P. WEAVER-SANCHIZ - DIRECT                                    585

1    the exhibit for identification.  You can't admit it, but you

2    can mark it to refresh her recollection.

3            MR. ZLOTNICK:  This will be Grand Jury transcript.

4    It's Page 28 and it's Line 15 to Line 17.  She can take a

5    look at that to refresh her memory.

6            THE CLERK:  200.

7            THE COURT:  Just read it silently and wait for his

8    question.

9            (The document was marked as Government's Exhibit No.

10   200.)

11   BY MR. ZLOTNICK:

12   Q.  Does that refresh your memory?

13   A.  Yes, it does.

14   Q.  All right, we will take the exhibit back.

15           Having had your memory refreshed, can you tell us

16   where it was going?

17   A.  It was going from New York, New York to Boston,

18   Massachusetts.

19   Q.  Now, is there also a manifest on there?

20   A.  I believe there was.

21   Q.  Can we go to the manifest?

22           Does the manifest also show where it went?

23   A.  Yes.  The coupon was going New York to Boston, and so was

24   the ticket, Boston to New York.

25   Q.  With Kindell --

P. WEAVER-SANCHIZ - DIRECT                                    586

1   A.  Their particular case, it was Boston to Williamsburg for

2   the ticket portion.

3   Q.  And it shows the travellers were Kindell and Benson?

4   A.  Yes.

5           MR. ZLOTNICK:  I have no other questions.

6           THE COURT:  Well, I tell you what, you got three

7   minutes to 1.  We're going to take the break, ladies and

8   gentlemen, and we will come back and finish the cross.  I

9   suspect it will be more cross after lunch.  All rise.

10          (Jury out, 12:57 p.m.)

11          THE COURT:  On this cross-examination, I'm fully

12  expecting only Mr. Woodward and Mr. Rasberry to be

13  cross-examining this witness.

14          MR. WOODWARD:  I'm sorry, Your Honor, you're

15  expecting me to do what?  I wanted to meet your expectations.

16          THE COURT:  You will meet my expectations.

17          I said I was fully expecting only the counsel of the

18  defendants who travelled to be cross-examining this witness.

19          MR. WOODWARD:  I understand.

20          MR. SACKS:  Your Honor, I had an hour's worth of

21  notes.

22          THE COURT:  Well, you won't be using them today.

23          Bring the jury in.

24          (On the record, 2:29 p.m., jury in.)

25          THE COURT:  You may be seated.

P. WEAVER-SANCHIZ - CROSS                                        587

```
 1            Record reflect that all jurors have returned from
 2    the lunch break.  Do you agree?
 3            (All counsel respond in the affirmative.)
 4            THE COURT:  Mr. Woodward.
 5            MR. WOODWARD:  Yes, sir.
 6                        CROSS-EXAMINATION
 7    BY MR. WOODWARD:
 8    Q.  Hi, ma'am, how are you?  I'm Larry Woodward.
 9            I just want to have a few questions for you.
10            You were shown the exhibits that showed the front and
11    back of your company's envelopes that you keep tickets in at
12    the end of each leg of a trip.  Do you recall that?
13    A.  Yes, sir.
14    Q.  And just so it's clear to me and to all the ladies and
15    gentlemen of the jury, when that envelope is turned in, what
16    happens to it in terms of storing it and keeping the
17    information?
18    A.  That documentation is sent in to the corporate office and
19    we have a department that we call Imaging, and that envelope
20    is broken down into segments and linked together with a
21    special number, a bar code number that's assigned to all the
22    different types.  And then it is scanned in and the system,
23    the software that we use, which is called WinOcular, pulls
24    all of that back together and assigns it even a more unique
25    number, that it can't be repeated, to make sure that all of
```

P. WEAVER-SANCHIZ - CROSS                                          588

1    the pieces are put back together.

2          And once that's done and verified, then we destroy

3    the physical copy and keep those images and that becomes the

4    original.

5    Q.  And was that the same storage system that would have been

6    in place back in 2009?

7    A.  Yes, sir.

8    Q.  So that answers, I think, my next question.

9          When this information was requested from your

10   company, you didn't have -- I'm holding up a manilla

11   envelope.  You didn't have like a physical envelope?

12   A.  No, sir.

13   Q.  You went into your system and printed off whatever it was

14   they requested?

15   A.  Yes, sir.

16   Q.  Got it.  Okay, can we turn on the document camera.  And I

17   just have one question about the trip.

18         If I could, this is Page 3 of Exhibit 102, and right

19   here, this is Mr. Benson's.  I think it's the first leg of

20   the ticket?

21   A.  It is.

22   Q.  Boston to New York, and it shows that he paid $166.40 for

23   the ticket.

24   A.  Yes.

25   Q.  Does it mean that he walked up and paid that, I guess at

P. WEAVER-SANCHIZ - CROSS                                    589

1    the Boston bus station, or can you tell from the ticket?
2    A.  He paid cash.  You can tell it by this right here
3    (indicating).  And it shows that he purchased it on March
4    the 11th, 2009 at 6:39 p.m., sold at 00406.  And if you look
5    over here (indicating), that 00406 is the Boston location.
6    Q.  Okay.  So he walked up to a ticket window, paid cash, and
7    that's how he got his ticket?
8    A.  Yes, sir.
9    Q.  And then Mr. Kindell's ticket shows that his fare is 0.
10           And what I'm trying to determine is what does that
11   tell you about how Mr. Kindell's ticket was purchased?
12           When -- I now see over here, I guess it was purchased
13   at 6:34 p.m.  But how was that ticket purchased?
14   A.  Okay, that ticket was purchased, it says right here that
15   it was purchased by cash.  I can't speak to why the location
16   does not have a dollar amount on there.
17   Q.  So, again, you're the person that's been proffered as
18   knowing how all of these records work.
19           Do you have any explanation as to why the records
20   your company keeps that's supposed to accurately reflect what
21   happened would show that Mr. Kindell didn't pay anything for
22   his ticket?
23   A.  I don't have an explanation for that, out of the fact
24   that I would have to go and do further research to try to
25   explain that.

P. WEAVER-SANCHIZ - CROSS                                    590

1   Q.  When preparing for today, had you noticed that before I
2   just showed it to you?
3   A.  I saw that it was showing a 0 fare on it, but I was not
4   asked to try to give further information on that.
5   Q.  But you would agree with me that -- and you only know
6   what the records say, that it doesn't show that he paid
7   anything.  So either somebody gave him a free ticket or your
8   records don't accurately reflect --
9   A.  He could have had a voucher.  I don't know.
10  Q.  I'm not asking you to speculate.  You don't know?
11  A.  Right.
12  Q.  Now, let me also -- my next area of inquiry is 106-01.
13          And this is the thing where Mr. Zlotnick showed you
14  up there 3-15.  This is the beginning of the return trip?
15  A.  Yes, sir.
16  Q.  And you went through some testimony and you said that's a
17  mistake?
18  A.  Yes, sir.
19  Q.  That was your testimony?
20  A.  Yes, sir.
21  Q.  Okay, now, the manifest would have been maintained for
22  that?
23  A.  Yes, sir.
24  Q.  And you told me earlier that all of your records are
25  maintained digitally and you have to -- when you get a

P. WEAVER-SANCHIZ - CROSS                                          591

1    request, you print them out?

2    A.   Yes, sir.

3    Q.   Okay.  Let me show you what has been -- what is Page 5 of

4    106.  You see this?

5    A.   Yes, sir.

6    Q.   Okay.  And this up here at the top looks like Ms. Liza

7    Ludovico, who's an FBI agent.  You don't know her personally,

8    I assume?

9    A.   I have met her.

10   Q.   You have, okay.  Fair enough.

11          And it says, in the notes, the images for backup to

12   be manually created manifest, unable to pull the automated

13   passenger manifest?

14   A.   Correct.  And that was actually typed by me.

15   Q.   Can I -- let me ask you a question.  So, you know, are

16   you telling me when you went in to look for this record that

17   you said was a mistake, it wasn't in your automated system?

18   A.   It was not where I could pull it because the documents

19   had already been pushed over and archived onto CD.  And once

20   it goes into the CD process, I'm not able to pull that

21   particular -- I can't pull an electronic manifest for it.

22   Q.   Well, let me ask you this.  Were there any other -- this

23   was pushed over to CD.  Were there any of the other records,

24   other than the one you say is a mistake, that had been pushed

25   over to CD?  I didn't see that on any of the other -- I'm not

P. WEAVER-SANCHIZ - CROSS                                         592

1   trying to trick you.

2   A.   No, they had not been pushed over to CD at that point in

3   time.

4   Q.   Okay.  Who decides when to push something over to CD, and

5   what does that mean?

6   A.   It's supposed to follow the retention process.  So

7   whenever -- as it's going through its period of being active,

8   it goes from active to being listed as non-active.  In other

9   words, no one's -- it's already been pushed -- the data has

10  already been separated out and pushed over to accounting and

11  statistics and those kinds of areas.

12          And once that happens, it moves into a non-active

13  and it sits there for -- it can sit up to a year in that

14  category before it moves over to CD.  And -- but I can tell

15  you at this particular point in time, they were not following

16  that process, and so -- to the full extent, and so only this

17  one had been pushed over to CD and the others had not been

18  totally pulled at that point in time and pushed over.  So

19  they were still sitting in the non-active where I could pull

20  an electronic manifest for it.

21  Q.   Is that another way of saying that, at that point in

22  time, Greyhound wasn't consistently following their own rules

23  about document retention?

24  A.   Yes, sir.

25  Q.   And you weren't -- you weren't on this trip and you

P. WEAVER-SANCHIZ - CROSS                                          593

1    weren't driving the bus?

2    A.   No.

3    Q.   So your testimony that this is a mistake is just based on

4    your general knowledge, correct?

5    A.   It's based on my general knowledge of how Greyhound

6    operates their schedule.

7    Q.   And then when you went to pull the manifest for the time

8    you say it was a mistake, that was the document in this case

9    that the policy about document-keeping hadn't been followed?

10   A.   Yes, sir.

11   Q.   Okay.  And you certainly don't understand or know enough

12   about the case to know what the significance really of any of

13   the dates are?

14   A.   No, sir.

15   Q.   Okay.

16        When you found out that this -- that the policy on

17   this had not been followed, you went back and manually

18   created a manifest.  I thought you told me earlier and,

19   again, I'm not trying to -- that once -- once you put the

20   stuff in the digital system, you destroy the paperwork?

21   A.   Yes.

22   Q.   So if the paperwork is destroyed and you can't pull it

23   over, what did you use to create this manifest?

24   A.   I used the physical document, the imaged documents,

25   because that is a representation of the physical documents

P. WEAVER-SANCHIZ - CROSS                                594

1    that were sent in, the envelope front and back, and all the

2    coupons inside it.  And I used that to create the manifest,

3    and that's the reason that the date on it says 3-15, because

4    I pulled it directly from what the front of the envelope

5    said.

6    Q.  Okay.  So let me make sure I understand, then.

7         These dates where you say 3-15, you're just --

8    A.  I took exactly what was on the front of the envelope.

9    Q.  So you didn't have any individual -- you just went by the

10   envelope, put down 3-15.  You didn't go look at -- just so to

11   show you, you didn't go look at 37 individual tickets and see

12   if they were all on the 15th, you just relied on the

13   envelope?

14   A.  Yes, sir.

15   Q.  Because you would agree with me that the ticket that

16   Mr. Benson had said March 20th?

17   A.  Yes, sir.

18         MR. WOODWARD:  All right, thank you, Your Honor.

19   That's the only questions I have for this witness.

20         THE COURT:  Mr. Rasberry?

21         MR. RASBERRY:  I don't have anything further.

22         THE COURT:  May this witness be permanently excused,

23   counsel?

24         (All counsel respond in the affirmative.)

25         THE COURT:  You are excused ma'am.  Thank you for

E. KEMPF - DIRECT                                                    595

1    coming.

2            MS. MCKEEL:  Call Detective Erik Kempf.

3            ERIK KEMPF, called by the Government, having been

4    first duly sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MS. MCKEEL:

7    Q.  Would you tell us your name, please, sir?

8    A.  Erik J. Kempf.

9    Q.  And would you spell it for our court reporter?

10   A.  Yes, ma'am.  K-E-M-P-F.

11   Q.  How do you spell Erik?

12   A.  E-R-I-K.

13   Q.  Where are you employed, sir?

14   A.  Newport News Police Department.

15   Q.  And how long have you been employed there?

16   A.  Since March 30th of 1995.

17   Q.  And what are you currently -- what are your

18   responsibilities?

19   A.  I work for the Mid-Level Narcotics Unit.

20   Q.  Okay.  During your time period of working at the Newport

21   News Police Department, were you also a task force agent with

22   various federal agencies?

23   A.  Yes, ma'am.

24   Q.  Do you know Mark Wallace?

25   A.  I do.

E. KEMPF - DIRECT                                                    596

1   Q.  Do you see him in the courtroom today?

2   A.  To the right of Mr. Sacks, leaning back behind him.

3            THE COURT:  Record reflect that the witness has

4   identified the Defendant Wallace.

5   BY MS. MCKEEL:

6   Q.  Now, I'm going to take you back to a time period in March

7   of 2012.  Did you receive a phone call from Jahnel Bocus?

8   A.  I did.

9   Q.  Okay.  After you received a phone call from Jahnel Bocus,

10  did you receive a series of phone calls from Mark Wallace?

11  A.  Yes, ma'am.

12  Q.  If you could, please tell us what the first call you

13  received from Mr. Wallace was?

14  A.  The day following speaking to Ms. Bocus, I received a

15  call from Mr. Wallace.  I was off duty at that time so I told

16  him to call me back at a different time.

17            MR. SACKS:  Your Honor, I object unless there's some

18  foundation as to recognition of who he is or his voice laid

19  for that.

20  BY MS. MCKEEL:

21  Q.  How do you --

22            MS. MCKEEL:  Can I consult counsel, Your Honor?

23            THE COURT:  Yes.

24            (Government and Wallace counsel confer.)

25            MS. MCKEEL:  I think we agree on the foundation,

E. KEMPF - DIRECT                                                    597

```
 1   Your Honor.
 2          THE COURT:  All right, we will continue.
 3          MS. MCKEEL:  Thank you, Judge.
 4   BY MS. MCKEEL:
 5   Q.  That was the extent of the first call?
 6   A.  Yes, ma'am.
 7   Q.  And what date was that?
 8   A.  That was on March 16th.
 9   Q.  What year?
10   A.  Oh, I'm sorry, 2012.
11   Q.  Okay.
12   A.  I apologize.
13   Q.  And you may have, I apologize.
14          Did you receive a second call?
15   A.  I did.  That was on March 20th of the same year.
16   Q.  And what did Mark Wallace say to you?
17   A.  We were speaking about this particular incident, this
18   homicide.  Mr. Wallace stated that he was just a thief and
19   that this particular incident was supposed to be a burglary.
20          Went into it a little more and he stated that the
21   other suspect shot at him.
22   Q.  Now, after that phone call on March the 20th, did you
23   receive another phone call from Mark Wallace?
24   A.  I did.
25   Q.  And what date was that?
```

E. KEMPF - DIRECT                                                       598

1   A.  April 11th of this same year.

2   Q.  And what did Mark Wallace say to you then?

3   A.  Once again, we were speaking about this particular

4   incident.

5           I told him that I couldn't make any promises to him

6   and I asked him which vehicle they, meaning he and others,

7   took to this incident.

8           He stated they took Bryan Brown's truck.

9   Q.  When you say "this incident," what were you talking

10  about?

11  A.  The homicide.

12          MR. KELLETER:  Objection, Your Honor.  May we have a

13  sidebar?

14          THE COURT:  Yes, but I think we've already covered

15  this issue, Mr. Kelleter.  Sidebar.

16          (At the sidebar:)

17          THE COURT:  The Court talks first.

18          This issue has been in effect, now you have a police

19  officer saying what one of the co-defendants said about

20  another co-defendant.

21          We've already gone over this.  This is

22  non-testimonial, okay, and I think based on what we he's

23  putting in here, what I already know about the case, the

24  Court's going to find it admissible, Mr. Kelleter.

25          MR. KELLETER:  Well, Your Honor, I'm objecting at

E. KEMPF - DIRECT                                                599

```
 1   this moment because we have never heard a proffer that
 2   Mr. Kempf was going to say anything like this.  And we've
 3   been -- we've been --
 4             THE COURT:  Wait a minute.
 5             MR. KELLETER:  -- we've been talking about two
 6   snitches making these comments and now all of a sudden --
 7             MS. MCKEEL:  You had the 302.
 8             MR. KELLETER:  I understand the 302.
 9             THE COURT:  But, Mr. Kelleter, where have you been?
10   I think two times in the case, Mr. Zlotnick has mentioned
11   that he had a detective who was going to say something about
12   Wallace being involved.
13             MR. KELLETER:  About Mr. Wallace being involved, not
14   Mr. Brown being involved.  He's never mentioned Mr. Brown
15   being involved.
16             THE COURT:  He never mentioned Mr. Brown.
17             MR. KELLETER:  He never mentioned that part.
18             THE COURT:  But you are saying that you have not
19   received any information from the government that this
20   detective would say anything about Mr. Brown?
21             MR. KELLETER:  There's a 302, but we had prior
22   discussions about --
23             THE COURT:  Did you get this 302?
24             MR. KELLETER:  Your Honor, I have the 302, but we've
25   had multiple discussions leading up to the trial and would
```

E. KEMPF - DIRECT                                                600

```
 1   narrow issues, and this has never come up that the statements
 2   about Brown would involve Kempf, it's always been these two
 3   snitches.
 4            THE COURT:  Is it in this 302?
 5            MR. KELLETER:  It's in the 302.
 6            THE COURT:  Well, then, it's not a surprise.  The
 7   government is not bound to tell you every question they are
 8   going to ask, they give you the information.
 9            So this is not a surprise to the defendant that this
10   detective has information here that would say something about
11   your client.
12            MR. KELLETER:  Then I would ask for a limiting
13   instruction because it's going to be admissible against my
14   client.  But, Your Honor, at this point I'm objecting, but
15   I'm asking for a limiting instruction.
16            THE COURT:  Well, we will deal with any witness in
17   the limiting instruction at the end of the case if it's
18   necessary.
19            MR. KELLETER:  Yes, Your Honor.
20            THE COURT:  Anything else?
21            MR. SACKS:  I need your guidance, I just want to
22   make sure.
23            When I cross-examine -- I've had the 302, I know all
24   about this.
25            When this witness is cross-examined, the calls that
```

```
 1     were made by Mr. Wallace to him came from a federal

 2     penitentiary and I don't -- I need a little guidance.  I

 3     don't want to disclose that he's in jail but, at the same

 4     time, the issue about the calls being recorded.  See, the

 5     calls were supposed to be recorded but were wiped from the

 6     system, so I'm entitled to show that.

 7            I don't know if I should just say that he was in a

 8     place where calls were recorded and just leave it at that,

 9     not get into the locale and all that.  But it's necessary for

10     me to do that, so I just wanted to bring that up now so I

11     wouldn't be opening any doors or anything.

12            MS. MCKEEL:  Judge, if that is asked, I'm going to

13     ask, What did he do.  But if Mr. Sacks is going to ask

14     whether those calls were recorded, yes they were.  I'm going

15     to ask for the right to find the call, other than the call

16     being wiped from the system.

17            MR. SACKS:  Well, the problem is, Your Honor, this

18     is not something I created.  They have an opportunity to

19     record calls.  They swiped them from the system.  I think

20     that the jury is entitled to know that.  It goes to the

21     weight of the testimony, the accuracy, but we do this all the

22     time, we redact out so we don't --

23            THE COURT:  But you can't redact it in such a way

24     that you totally distort what the reality is.

25            MR. SACKS:  Well, I'm not trying to do that.
```

E. KEMPF - DIRECT                                              602

1          THE COURT:  I'm not talking about trying, but that

2    is going to be a part of the reality here.

3          MR. SACKS:  How far would they be allowed to go?

4    I'm just trying to get some -- this is like a motion in

5    limine on cross to limit the government, how far they can go

6    into where he was or what he was doing.

7          I'm just going to talk about he was at a place where

8    the calls were recorded, they had access to them and they

9    were wiped from the system.

10         THE COURT:  I'm not -- you don't need to ask him

11   where he was.  You can simply refer to the fact that the

12   calls were recorded or they were wiped.  They just have to

13   figure out where he was.  Don't tell us where he was.

14         MR. SACKS:  That's all I'm going to do, Your Honor.

15         THE COURT:  But you can still call him.

16         (In open court:)

17   BY MS. MCKEEL:

18   Q.  Detective Kempf, who is Jahnel Bocus?

19   A.  That was --

20         MR. SACKS:  Objection, Your Honor.  That is hearsay.

21   Somebody has to tell him who she was.

22   BY MS. MCKEEL:

23   Q.  Did you assist in the course of this investigation?

24         THE COURT:  Hold on a second, let me rule on this.

25         MR. SACKS:  Judge --

E. KEMPF - CROSS                                                    603

1                THE COURT:  Wait a minute, let me finish.

2                MR. SACKS:  Yes, sir.

3                THE COURT:  You may ask the witness whether he knows

4    who she is, what his basis of knowledge is that he knows who

5    she is, and proceed.

6                MS. MCKEEL:  Yes, sir.

7    BY MS. MCKEEL:

8    Q.  Did you assist in the course of the investigation of the

9    Louis Joseph homicide?

10   A.  I did.

11   Q.  And during the course of that investigation, your

12   knowledge of Mr. Wallace, did you find out who Jahnel Bocus

13   was?

14   A.  Yes.

15   Q.  And do you know who that is?

16               MR. SACKS:  Same objection, hearsay.

17               THE COURT:  Objection is overruled.

18   A.  I'm sorry, ma'am?

19   BY MS. MCKEEL:

20   Q.  And do you know who that is?

21   A.  She was in a relationship with Mr. Wallace.

22               MS. MCKEEL:  That's all I have, Your Honor.

23               MR. WOODWARD:  Mr. Benson has no questions for this

24   witness, Your Honor.

25               THE COURT:  Cross-examination.

E. KEMPF - CROSS                                                    604

```
 1              MR. SACKS:  Thank you very much, sir.
 2                      CROSS-EXAMINATION
 3    BY MR. SACKS:
 4    Q.  Good afternoon, sir.  Andrew Sacks here for Mr. Wallace.
 5          You told us that Ms. Bocus contacted you, I believe
 6    it was?
 7    A.  Yes, sir.
 8    Q.  And I think you said March of 2012?
 9    A.  Yes, sir.
10    Q.  Now, the date of the indictment in this case, I think we
11    can all agree, is in April of 2017.  So that would be a
12    little over five years before the indictment in this case?
13    A.  Yes, sir.
14    Q.  Do you have a date, a specific date in March that she
15    contacted you?
16    A.  I do.
17    Q.  And what is that date, sir?
18    A.  I documented it.  Give me one second, sir.
19    Q.  Sure, take your time.  If you have notes, whatever,
20    that's fine.
21    A.  There was a message left on April 12th for me.  I
22    contacted her on April 15th.
23    Q.  I'm sorry, you say April?
24    A.  Excuse me.  Thank you for correcting me.
25    Q.  That's all right.
```

E. KEMPF - CROSS                                                        605

1    A.    On March.

2    Q.    March.

3    A.    Thank you.

4    Q.    She called you on March?

5    A.    A message was left for me on March 12th, and I contacted

6    her on March 15th.

7    Q.    Okay.  Thank you, sir.

8    A.    Yes, sir.

9    Q.    Now, the -- there were three calls placed to you by

10   Mr. Wallace during a period of time, correct?

11   A.    Yes, sir.

12   Q.    The first call was placed on what date?

13   A.    March 16th, 2012.

14   Q.    And the last call was placed when?

15   A.    April 11th, 2012.

16   Q.    All right.

17         In the first call, did you actually speak with him?

18   A.    I did.

19   Q.    And did you tell him anything at that time as far as

20   contacting you further or what instructions you would give

21   him?

22   A.    I was off duty at that particular time, told him to

23   contact me at a later time.

24   Q.    All right.

25         And at the time that he called you, did -- other than

E. KEMPF - CROSS                                                      606

1    that discussion, was anything else said between the two of
2    you?
3    A.  Not that I recall, sir.
4    Q.  All right.
5    A.  Nothing documented.
6    Q.  Understand, sir.
7          Now, on the second call, that was what date again?
8    A.  March 20th.
9    Q.  And were you on duty at that time?
10   A.  Yes, sir.
11   Q.  And the number that's being called, is it the same number
12   each time?
13   A.  I believe so, but I'm not a hundred percent sure.
14   Q.  Do you know where you were when you received the second
15   call?
16   A.  Yes, sir.
17   Q.  Physically, where was that?
18   A.  I was at the FBI office.
19   Q.  Okay.
20         And at that time, Mr. Wallace contacted you and
21   advised you that he was a thief, that's what he was saying,
22   that's all he was, was a thief, right?
23   A.  That was part of the conversation, yes.
24   Q.  And of course your conversation -- I'm looking at
25   something the jury can see.  You prepared a document that

E. KEMPF - CROSS                                                    607

1    memorialized certain key points at the time that this

2    conversation was had, correct?

3    A.   That's correct, sir.

4    Q.   And this was actually drafted January 31, 2013, correct?

5    A.   This particular -- I'll have to look at the date on that.

6    Q.   Take your time, sir.

7            THE COURT:  Well, now, Mr. Sacks, before you start

8    using that document --

9            MR. SACKS:  I just want to establish the date, Your

10   Honor.

11           THE COURT:  I know, yeah, but if you are going to

12   refresh his recollection or impeach him, then you know what

13   we have to do.  Otherwise, you may proceed.

14           MR. SACKS:  All right, sir.

15           May I ask him if he can look at his own file first?

16           THE COURT:  Well, first, what's the question?

17           MR. SACKS:  Here's the question.

18           THE COURT:  Wait a minute.  You can consult your

19   records or any document and refresh your recollection, but

20   we're not going to need to go to documents if you are able to

21   answer the question without going to the documents.

22           So let's ask the question.

23           MR. SACKS:  Yes, sir.

24   BY MR. SACKS:

25   Q.   The question is this:  On what date did you make a

E. KEMPF - CROSS                                                608

1   memorandum of points that were discussed between you and

2   Mr. Wallace on March 20, 2012?

3   A.  I believe there are two documents, sir.

4   Q.  All right.  When did you make the first one?

5   A.  Is it okay to look at my notes?

6            THE COURT:  Sure.

7   A.  This one is dated 4-11 of 2012.

8   BY MR. SACKS:

9   Q.  All right.  And then you made a second memorandum with

10  some information about this.  And what was the date of that?

11  A.  January 31st, 2013.

12  Q.  All right.

13           Now, just in looking at that first document, and as

14  you look at it with me, whether you need to, in the first

15  call we talked about what was discussed.  Isn't it a fact

16  that at that time that you had been notified by another agent

17  that Mr. Wallace had called stating he wanted to wish to --

18  he wished to speak to agents?

19  A.  Can you rephrase that?

20  Q.  Before the first call that you got, was the only call you

21  got from Ms. Bocus?

22  A.  Ms. Bocus.

23  Q.  Yeah.  That's the only person that called you about

24  Mr. Wallace wanting to call you?

25  A.  Yes.

E. KEMPF - CROSS                                                    609

1    Q.  All right.

2         At some point did you talk to an FBI agent who said

3    that Mr. Wallace was stating that he still wished to speak

4    with law enforcement?

5    A.  I could've.  I don't remember, sir.

6    Q.  All right.  And, again, if you look at your 4-11-2012

7    document just to see if that refreshes your memory.

8    A.  Okay.

9         THE COURT:  Well, what I think he needs to do here

10   is use the document -- wait a minute.  Sir?

11        THE WITNESS:  Yes, I'm sorry.

12        THE COURT:  If you are going to refresh your

13   recollection, you need to tag whatever -- you have it over

14   there?

15        MR. SACKS:  I do.

16        THE COURT:  Mark it, let him take a look at it.

17        MR. SACKS:  Yes, sir.

18        THE CLERK:  It's 201.

19        THE COURT:  In the interest of time, why don't you

20   silently read the whole document, since he may ask you some

21   other questions about it.

22        (The document was received in evidence as Defendant

23   Wallace Exhibit No. 201.)

24   BY MR. SACKS:

25   Q.  Does that refresh your memory generally as to --

E. KEMPF - CROSS                                                    610

1    A.  That refreshes my memory, but can you ask the question,

2    because I think you have it backwards.

3    Q.  Okay.  I want to get the sequence right.

4    A.  Sure.

5    Q.  At some point, did another agent advise you that

6    Mr. Wallace was interested to -- that he wanted to continue

7    to speak with agents about information about this case?

8    A.  I advised another agent -- you have it backwards.

9    Q.  All right, then help us unravel it.

10   A.  Sure.  As it states in that particular letter, I advised

11   the case agent, Ms. Ludovico, that Mr. Wallace had contacted

12   me.

13   Q.  Okay.  Now, that was after the three phone calls?

14   A.  Let me see.  I believe it was -- she was present for the

15   March 20th one, I believe.

16           Can I -- I'm sorry, sir.

17           THE COURT:  Go on, take a look.

18   A.  Yes, sir, it's March 20th.  Ms. Ludovico was right next

19   to me during the conversation.

20   BY MR. SACKS:

21   Q.  And that was the second call from Mr. Wallace?

22   A.  Yes, sir.

23   Q.  All right.  And it was just before that call, or in

24   connection with that second call, that Ms. Ludovico said

25   Mr. Wallace was wishing to speak with agents?

E. KEMPF - CROSS                                                    611

1    A.   I told Agent Ludovico about the calls.  I was the one

2    receiving the calls.  I was not the case agent.

3    Q.   Okay.

4    A.   So following proper protocol, I notified Agent Ludovico

5    and the other task force officer that were working through

6    the course of these phone calls.

7    Q.   That he wanted to still speak to agents?

8    A.   Yes, sir.

9    Q.   Okay.  So that's after his first call?

10   A.   Yes, sir.

11   Q.   Then, as of the second call, you've advised the case

12   agents of this?

13   A.   Yes.

14   Q.   And one of them is there, present?

15   A.   They were notified even after the Ms. Bocus call.

16   Q.   Okay.

17   A.   Because I'd received the note and I gave that to one of

18   them.

19   Q.   Now, in this second call -- of course, the first one is

20   the one you just told him that you're off duty and to call

21   back?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes, sir.  I'm sorry.

25   Q.   That's all right.

E. KEMPF - CROSS                                                    612

1          The second call of March 20th is when he says he's
2     basically -- he says, look, I'm just a thief and that this
3     was only supposed to be a burglary.  And then he said that
4     the suspect shot at him, correct?
5     A.  When you say "this," we were referring to this murder.
6     Q.  Yes, sir, I understand.  But he said that it was supposed
7     to be a burglary, the event itself?
8     A.  Yes, sir.
9     Q.  A burglary is when somebody goes into somebody else's
10    home and takes something?
11    A.  Yes, sir.
12    Q.  A home invasion is when you go in and the people are
13    present, right?
14    A.  Yes.
15    Q.  A robbery?
16    A.  Yes, sir.  I was just waiting for a question, I'm sorry.
17    Q.  I'm sorry.
18         So the question is, just for our understanding, when
19    he says this was only supposed to be a burglary, that's as
20    opposed to a home invasion where people are present and are
21    robbed?
22    A.  He stated "burglary," sir.
23    Q.  And you understand what a home invasion robbery is,
24    correct?
25    A.  I do.

E. KEMPF - CROSS                                                       613

1    Q.   It's different from a burglary?

2    A.   Yes, sir.

3    Q.   And that's not what he said was supposed to happen?

4    A.   He stated exactly what I testified to, sir.

5    Q.   Burglary?

6    A.   Yes.

7    Q.   Okay.

8         And then during this conversation, Mr. Wallace,

9    according to your records and recollection, indicated he

10   wanted to cooperate with the authorities, correct?

11   A.   That's correct.

12   Q.   "Cooperate" means give information that would assist in

13   determining what happened?

14   A.   There are many different forms of cooperation.

15   Q.   But generally speaking, because I don't know how much all

16   of the ladies and gentlemen of the jury know or don't know,

17   in law enforcement when you talk about somebody cooperating,

18   you talk about them assisting you with information, however

19   much they can give in a prosecution.

20         MS. MCKEEL:   Your Honor, I think it's been asked and

21   answered.

22         THE COURT:   Sustained.

23   BY MR. SACKS:

24   Q.   Now, you told him that -- and he asked you if he could be

25   used as a witness, correct?

E. KEMPF - CROSS                                                    614

1    A.  Correct.

2    Q.  In the case for the prosecution?

3    A.  Correct.

4    Q.  All right.

5         And he -- you told him you couldn't make any promises

6    but that you would advise the prosecution about the

7    conversation, correct?

8    A.  Yes, sir.

9    Q.  And, again, this is now March 20th, 2012?

10   A.  Uh-huh.

11   Q.  All right.

12        And then finally there was a third call of

13   April 11th, the very last call that he made to you, again,

14   correct?

15   A.  Yes, sir.

16   Q.  And you recall where you were then?

17   A.  I do.

18   Q.  And where was that, sir?

19        Just physically, where were you located?  I don't

20   need to know if you were at Walmart or something, at a store,

21   at your office?

22   A.  I was located in Chuckatuck.

23   Q.  Okay.  And at that time, he told you he wanted to speak

24   with you again, right?

25   A.  That's correct.

E. KEMPF - CROSS                                                      615

1   Q.  And you asked him which vehicle they took to the scene,

2   correct?

3   A.  "They," including Mr. Wallace, that was the reference.

4   Q.  And he said that they took Bryan Brown's truck, correct?

5   A.  Yes, sir.

6   Q.  All right.  That was the extent of the conversation,

7   correct?

8   A.  There may have been some other portions.  That was the

9   general summary of it, yes, sir.

10  Q.  As far as you can recall the high points of what he told

11  you, you have told us?

12  A.  Yes, sir, I have.

13  Q.  Therefore, he never told you that he went inside any

14  house, did he?

15  A.  No, he did not.

16  Q.  Never told you he had a firearm, did he?

17  A.  No, he did not.

18  Q.  Never told you that he discharged a firearm, did he?

19  A.  No, sir.

20  Q.  All right.

21          And as of April 11th, he continued to express his

22  willingness to cooperate with the authorities?

23  A.  That was my last contact with him, sir.

24  Q.  I'm sorry, I couldn't hear you.

25  A.  That was my last contact with him, sir.

E. KEMPF - CROSS                                                    616

1   Q.  As of that contact, he had expressed that?

2   A.  Yes, sir.

3   Q.  Now, just a few more, Detective.

4        These calls -- at this time in 2012, Mr. Wallace made

5   these calls from a location where the calls were recorded, as

6   a matter of routine practice, correct?

7   A.  Yes, sir.

8   Q.  And, therefore, if we wanted to, we could go back and get

9   those calls and get a verbatim reproduction of the discussion

10  you and he had so that we know exactly what was said, as

11  opposed to your recollection or some notes from five years

12  ago, right?

13  A.  That's not a simple answer to that particular one, sir.

14  Q.  I understand.  But typically, law enforcement can get

15  recordings where recordings are made at places?

16  A.  Within a certain period of time, yes.

17  Q.  And in this particular case, did you make an effort to

18  get the recordings?

19  A.  Me?  No, sir.

20  Q.  Do you know if anybody did?

21  A.  I wasn't working the case, sir, I couldn't answer for

22  that.

23  Q.  But in the course of your investigation, did you learn

24  that apparently the recordings had been wiped from the system

25  by someone other than Mr. Wallace before they were recovered?

E. KEMPF - CROSS                                                617

1    A.  Yes, sir.

2    Q.  All right.  So we have no recordings of what was

3    supposedly said?

4    A.  That's correct, sir, to my knowledge.

5    Q.  Now, even though we had no recordings, of course you

6    took -- you went and visited Mr. Wallace wherever you could

7    locate him, took some paper and tried to get him to write out

8    a statement, didn't you?

9    A.  No, sir.

10   Q.  You never tried that?

11   A.  No, sir.

12   Q.  So what you have represented to us that he said has never

13   been reduced to writing, correct, what he said, and shown to

14   him to verify and sign or initial or correct or amend, or in

15   any way expand or somehow put it in that form?

16        In other words, there's been no -- to your knowledge,

17   no attempt was made to reduce this to writing and have him

18   sign a statement stating these things that you say he said

19   over the phone?

20   A.  I didn't need to have him sign a statement.  I heard it.

21   Q.  That was not my question, sir.

22        The question is, did you take a statement, go to have

23   it signed?

24        MS. MCKEEL:  Your Honor, I'm going to object.

25        THE COURT:  Sustained.

E. KEMPF - CROSS                                                  618

1    BY MR. SACKS:

2    Q.  Well, let me ask this:  Isn't it a fact that law

3    enforcement frequently asks witnesses or other persons of

4    interest to sign written statements?

5              MS. MCKEEL:  That's speculation, Your Honor.

6              THE COURT:  Sustained.  And I want a sidebar with

7    just the two of y'all, Ms. McKeel and Mr. Sacks.

8              (At the sidebar:)

9              THE COURT:  This appears to me to be a little

10   disingenuous, Mr. Sacks, because you are complaining about

11   them wiping clean the records, and of course we don't want

12   them to know that he's in jail, but you are nibbling all

13   around it.

14              And I thought you were trying to avoid letting them

15   know he was in jail, but when you say It's been wiped clean

16   and they didn't get a statement and this and that --

17              MR. SACKS:  All I'm trying to do is show for the

18   purposes -- you will be giving an instruction on

19   extrajudicial statements and there's a lot of different

20   factors the jury has to weigh in determining this officer --

21   that's all I'm doing.  I'm done, Your Honor.

22              THE COURT:  I know that, but, Mr. Sacks, I see you

23   running into problems with this line.

24              MR. SACKS:  Well, I'm going to stop it.

25              THE COURT:  I'm just telling you.

Janet Collins, Official Court Reporter

L. LUDOVICO - DIRECT                                                619

```
1            MR. SACKS:  If you tell me that, I'm going to stop
2    it.
3            MS. MCKEEL:  Judge, this officer was not the case
4    agent, Agent Ludovico was.  I'm going to put her on the
5    witness stand to say she attempted to get the call and it was
6    wiped clean 90 days after the call.
7            MR. SACKS:  That's fair enough.  I'll just leave it.
8            MS. MCKEEL:  I wasn't going to put her on, but given
9    that line of questioning --
10           THE COURT:  Just be careful, because I know what you
11   are trying to avoid.
12           MR. SACKS:  I understand, sir.
13           MS. MCKEEL:  Thank you.
14           (In open court:)
15           MR. SACKS:  Your Honor, I think I'm about finished,
16   if I can just confer with my client for just a moment.  Thank
17   you.
18           (Pause.)
19   BY MR. SACKS:
20   Q.  And finally this, Mr. Kempf.
21           You have told us about the dates -- there are two
22   memoranda that you made of these conversations, correct?
23   A.  Correct, sir.
24   Q.  April 11, 2012, and then January 31, 2013?
25   A.  Yes, sir.
```

L. LUDOVICO - DIRECT                                                    620

```
 1              MR. SACKS:  All right.  I think that's all I have,
 2    sir.  Thank you very much.
 3              THE WITNESS:  Thank you, sir.
 4              MR. SACKS:  Yes, sir.
 5              THE COURT:  Any redirect?
 6              MS. MCKEEL:  There's no redirect, Your Honor.
 7              THE COURT:  May the witness be permanently excused?
 8              (All counsel respond in the affirmative.)
 9              THE COURT:  All right, step down.
10              MS. MCKEEL:  Agent Liza Ludovico.
11              MR. KELLETER:  May I approach Ms. McKeel, if I may?
12              THE COURT:  You may.
13              (Counsellors confer.)
14              LIZA LUDOVICO, called by the Government, having been
15    first duly sworn, was examined and testified as follows:
16                          DIRECT EXAMINATION
17    BY MS. MCKEEL:
18    Q.  Would you tell us your name, please, and spell it for our
19    court reporter?
20    A.  Liza Ludovico, L-I-Z-A, L-U-D-O-V-I-C-O.
21    Q.  How are you employed, ma'am?
22    A.  I'm a Special Agent with the FBI in the Norfolk field
23    office.
24    Q.  And how long have you been with the FBI?
25    A.  Almost 16 years.
```

L. LUDOVICO - CROSS                                                    621

1    Q.   Okay.  And are you the case agent responsible for the

2    investigation of the Louis Joseph homicide?

3    A.   Yes, ma'am.

4    Q.   And regarding the questions that we just heard from Agent

5    Kempf and the encounter between Mr. Sacks, did you in fact

6    try to find the phone call between Agent Kempf and Mark

7    Wallace?

8    A.   Yes, ma'am.

9    Q.   And were you able to obtain the phone call --

10   A.   No, ma'am.

11   Q.   -- recording?

12        And where the recording was made, do they have a

13   policy of getting rid of phone calls?

14   A.   Yes, ma'am.

15   Q.   And what's the time period of retention for phone calls?

16   A.   I was advised it was 90 says.

17        MS. MCKEEL:  That's all the questions I have, Your

18   Honor.

19   BY MS. MCKEEL:

20   Q.   90 days from the day of the phone call?

21   A.   Yes.

22        MS. MCKEEL:  That's all I have, Your Honor.

23        MR. WOODWARD:  Mr. Benson has no questions for this

24   witness.

25        MR. SACKS:  Just one question, thank you very much.

L. LUDOVICO - CROSS                                                    622

```
 1                        CROSS-EXAMINATION
 2   BY MR. SACKS:
 3   Q.  You say you were the case agent assigned.  When were you
 4   assigned to the case, if you recall, or roughly the time
 5   frame?
 6   A.  Yes, sir.  I arrived in the Norfolk field office in June
 7   of 2010, and this was one of the first cases that I was
 8   assigned when I arrived.
 9           MR. SACKS:  Very good.  Thank you so much, Agent.
10   Good to see you again.
11           MR. KELLETER:  No questions, Your Honor.
12           MR. RASBERRY:  No questions, Your Honor.
13           THE COURT:  You may step down.  She's the case
14   agent.  Next witness.
15           MR. ZLOTNICK:  United States calls Brandon Douglas.
16           THE COURT:  All right.
17           MR. SACKS:  Your Honor, I don't know whether the
18   Court -- there are certain matters I need to take up, whether
19   I should just reserve those.  I don't want to waive anything.
20   I'm not sure, just want to be sure I protect the record.
21           THE COURT:  All right, then, what we will -- just
22   stand up in place, ladies and gentlemen, because we're not
23   ready to take a break.
24           So meet me at the sidebar here.
25           (At the sidebar:)
```

1          MR. SACKS:  Sorry, I may have to load up this

2    surface here.

3          May it please the Court, Your Honor, the Defendant

4    Wallace respectfully objects to the testimony of this

5    witness, Mr. Douglas, who is about to be called based on

6    discovery and other information we've been provided, unless

7    his testimony is redacted to exclude any references to the

8    Defendant Mark Wallace.

9          The reason for this is that we understand

10   Mr. Douglas is going to relay the conversation he had with a

11   third party, another defendant in this case but not

12   Mr. Wallace.  It's not a co-conspirator statement, there's no

13   conspiracy charged in this case.

14         So what the declarant told Mr. Douglas is hearsay.

15   Rule 801, as you well know, it defines hearsay.  Of course,

16   we don't have to get into that.  An out-of-court statement

17   made by the declarant for the truth of it, and that's what's

18   being offered.

19         They are going to offer him to say certain things

20   that he says about Mr. Wallace.  In addition, Your Honor --

21   so therefore, we believe it's just inadmissible hearsay.

22   It's a joint trial for convenience the Fourth Circuit has

23   talked all about the presumption of having a joint trial for

24   convenience and all of those reasons.  But that doesn't

25   dispense with the certainly, the Rules of Evidence.

1          The *Cardwell* case that I cited to you yesterday, I

2     think the significance with that is that the Court commented

3     on the problem that arises when you have this very situation.

4     It's not *Bruton*, but it's a defendant in the joint trial

5     who's testifying to something that would be inadmissible

6     against another defendant in a separate trial.

7          So in order to avoid a mistrial, I submit to the

8     Court that we would have to redact from this witness what he

9     says about Mr. Wallace.

10          Now, whatever he says about -- whatever this witness

11     says about another defendant saying something to him is

12     different.  But, as to client, my client -- there's no

13     statement that this witness is going to say he heard my

14     client tell him.  He's only going to relate things that he

15     heard on the street, or from third parties, or from other

16     persons that are simply hearsay.

17          THE COURT:  Okay.

18          MR. SACKS:  There's more to it.  I don't know if you

19     want to stop for a minute.

20          THE COURT:  No, I don't want to stop for a minute, I

21     want you to precisely get to the point.

22          MR. SACKS:  Now, if the Court doesn't redact it, I

23     say this very respectfully and I don't do this lightly, Your

24     Honor, but I would have to ask for a mistrial because it's so

25     prejudicial that there's no way to protect us subject to that

625

1   without waiving that objection.  The Court can mitigate the
2   prejudice by giving a limiting instruction and telling the
3   jury you cannot consider this evidence at all against
4   Mr. Wallace because he wasn't a party to the conversation
5   that's been related.
6        That, I don't believe cures the error, and I'm not
7   waiving anything, but I'm asking for that as a secondary
8   mitigating step in an effort to try to soften the blow of
9   this, even though I don't believe that that's sufficient.
10       THE COURT:  Let me --
11       MR. WOODWARD:  Your Honor, do you want all
12   defendants to put their objections in before you have the
13   government respond?
14       THE COURT:  Let me put it this way.  You stated your
15   objection, I think, comprehensively and concisely.  I'm
16   trying to get you to the end of it.
17       MR. SACKS:  I'm at the end of it.
18       There's some theories that -- for example, the Court
19   has talked about 804(b)(3) as being an exception.  But if you
20   look at the rule -- and I know you have, Your Honor, I'm not
21   telling you anything you don't already know.
22       THE COURT:  I don't need to go back and look at the
23   rule again.
24       MR. SACKS:  You do not?
25       THE COURT:  No, sir.

```
 1          MR. SACKS:  But I will tell you, the way I read this
 2   rule, this rule has to do with whether the statement against
 3   penal interest is sufficiently reliable to be admitted
 4   against the person who made the statement to the witness, not
 5   whether it's sufficiently reliable that things that other
 6   people may have said to him.  That has nothing to do with
 7   that.  It only has to do with whether the statement is
 8   reliable enough to implicate him.  That's the problem.
 9          So many people can make things up about what people
10   tell them but the rule says we have to have trustworthiness
11   so that we know that this is a true statement against a
12   declarant's interest and that it's made with knowledge that
13   it's against his interest, and that it's being offered
14   against him, not some third party.  So that's why I don't
15   think that applies.
16          MR. WOODWARD:  Your Honor, just on behalf of
17   Mr. Benson, I would adopt Mr. Sacks' argument.
18          Also, Mr. Benson did not speak to this individual.
19   I believe we would suffer the same prejudice and would ask
20   you, for the same reason, to exclude it.
21          THE COURT:  I don't recall anything in the
22   transcript about this witness with Mr. Benson.
23          MR. WOODWARD:  Let me say this, if he doesn't say
24   anything about Mr. Benson, I don't have an objection.  But if
25   he mentioned Mr. Benson by name or reference, I would join in
```

1    Mr. Sacks' objection.

2          MR. RASBERRY:  If I can go next, Your Honor.  I'm

3    also joining in that motion as to certain comments that may

4    come in about Mr. Kindell.  And if there's none, then I'm

5    okay with that, but there are some continuations about the

6    two men from Boston.

7          MR. SACKS:  And then I do have to add one other --

8    I'm sorry, did I interrupt?

9          In addition, Your Honor -- although this is not the

10   primary objection, there's an additional.  As you know,

11   Rule 403 says that even if you found that it was relevant and

12   admissible, which I respectfully urge it's not, the Court

13   makes, through the relevant evidence, if it s probative value

14   is substantially outweighed by a danger of one or more of the

15   following:

16         Unfair prejudice, confusing the issues, misleading

17   the jury, et cetera.

18         In this case, the problem is that it's coming from

19   some -- it's third- -- it's hearsay within hearsay.

20         THE COURT:  I understand that.  I understand your

21   reliance on 403 also.  So we don't need to argue it.

22         MR. SACKS:  Okay, I will not do it.

23         THE COURT:  Who else hasn't objected?

24         You haven't objected.

25         MR. KELLETER:  Your Honor, this is my position, I

628

1    mean, allegedly, so I understand it's a party statement for

2    him.

3                THE COURT:  All right, now --

4                MR. KELLETER:  I'll have the same objection on

5    another one.

6                THE COURT:  The United States understands the nature

7    of the objection, and your case will rise or fall on whether

8    the Court is right or wrong.  The Court believes it's right

9    in its ruling, but if you have a position, you need to state

10   it right here on the record now.

11               MR. KELLETER:  When he's done, I can do something to

12   speed it up.

13               MR. ZLOTNICK:  If I could retrieve some of my notes

14   on this issue.

15               THE COURT:  Get them quickly.

16               MR. ZLOTNICK:  The *Bruton* issue is because the

17   non-testimonial statements, and the Court has already

18   referenced the case law on that.

19               These statements that were being offered through the

20   testimony of Brandon Douglas, they were not made for the

21   primary purpose of creating evidence in a criminal

22   prosecution such as in a *Bruton* scenario.

23               Furthermore, the statement, to the extent that it

24   has reference to Mr. Wallace, this is -- this is part of the

25   statement that Brown, who is an opposing party, is making and

629

1    the Court can give a limiting instruction at the end of the

2    case or even now.  I have no problem with that, as it's only

3    admissible against Defendant Brown.

4            THE COURT:  Well, you know, one way you can deal

5    with that.  If it's already against Mr. Brown, the way you

6    can do that without a limiting instruction is to limit his

7    testimony to talking about Brown.

8            MR. SACKS:  And then I have no problem at all.

9            THE COURT:  You can do that.

10           MR. SACKS:  I have no objection.

11           MR. ZLOTNICK:  The difficulty being is that the way

12   the -- you saw the statement, the transcript, I'm going to

13   have to lead, and I think -- I mean, I can do it in a way

14   where we, you know, place, I use a substitute for Wallace by

15   saying, the person who was taken over from, I could do that,

16   but I'm afraid I'm going to get objections if I do that.

17           THE COURT:  You aren't going to get it from

18   Mr. Sacks.

19           MR. ZLOTNICK:  No, Your Honor.

20           MR. SACKS:  Your Honor --

21           MR. ZLOTNICK:  But the other part --

22           MR. KELLETER:  If we do that, there's going to be a

23   lot on me, because for me to effectively cross-examine

24   Douglas on the statement, it's so inconsistent, I'm going to

25   have to go into detail which then I would have to bring his

```
 1   stuff up.
 2          THE COURT:  We're going to go on, we're going to
 3   admit it.
 4          What the Court is going to do is the Court's going
 5   to look at a properly tailored limiting instruction at the
 6   end of this case.  I'm not going to go through all of this,
 7   but that's what the Court is going to do.
 8          MR. SACKS:  Could I say one last thing based on what
 9   Mr. Zlotnick said?
10          (Cross-talk.)
11          THE COURT:  No, look, look, look, look, look.  Let
12   me finish.
13          MR. SACKS:  Yes, sir, I -- yes, sir.
14          And I'd like to reply briefly, Your Honor.
15          MR. ZLOTNICK:  Even if this was a Bruton problem,
16   even if it was, as the Court notes, Gray versus Maryland, and
17   I think it's the other -- there's another one called Akinkoye
18   in the Fourth Circuit.
19          THE COURT:  You have a cite for that?
20          MR. ZLOTNICK:  I have Akinkoye at my desk, I can
21   find it.  Gray versus Maryland is a Supreme Court Case and
22   they indicate that where the statements are not facially
23   incriminating, even with the statements when linked with
24   other evidence would lead to the defendant, there is not a
25   problem.  I'm saying that in reference to Kindell and Benson.
```

631

1          There's a statement in there that, you know, the
2    guys that messed up a jam were the guys from Boston that
3    Wallace brought in.  It doesn't name them but it's linked
4    with other evidence.  The other evidence being the travel
5    here and the DNA that we have from Benson at the scene of the
6    crime and other evidence that we are going to have against
7    Kindell.
8          So I think the issue really is limited to the impact
9    on Mr. Wallace.  I just want to point out that even in a
10   *Bruton* scenario, that part of it would be admissible.
11         MR. SACKS:  And, Your Honor, here is what I would
12   like to say.  Mr. Zlotnick, for whom I have great respect and
13   we get along very well, even though we butt heads
14   professionally.  He's just said and he said it's only -- he
15   admits it's only admissible against Defendant Brown, so the
16   government acknowledges that what he's going to say is
17   inadmissible against Mr. Wallace.
18         The simple solution, and it will resolve the whole
19   problem for Wallace and it will take me no chance of any
20   error there, is if they simply don't ask him what Mr. Wallace
21   said and keep that out, then it cures it.  That's the
22   redaction, that's what the cases talk about.  And that's all
23   I'm asking for.
24         THE COURT:  All right, here's what we're going to
25   do.  It might take some evidentiary logistics on your part,

```
 1    but to avoid the problem, ask the witness about what

 2    Mr. Brown said about his role, and limit it to that.

 3              MR. WOODWARD:  Thank you, Your Honor.

 4              THE COURT:  I understand you said that's going to be

 5    a problem.  How is that a problem?

 6              MR. ZLOTNICK:  Because I think it takes -- it takes

 7    the statements so far out of context.  For instance, the

 8    witness said that he was there, the two guys from Boston were

 9    there, and he's not even a defendant in this case but his

10    name's come up.

11              Our view is he's part of this thing.  That's -- I

12    think that it makes it very difficult to navigate with a

13    statement.

14              MR. WOODWARD:  That's not admissible.

15              (Cross-talk.)

16              MR. SACKS:  Yeah, I don't care if he leads.

17              THE COURT:  Don't do that.

18              MR. SACKS:  All right.

19              THE COURT:  It's hard enough hearing from you.

20              MR. ZLOTNICK:  The Court also wants us to put the

21    corroboration in, and, if we put the corroboration in, I take

22    the view it's admissible both as a statement against interest

23    and as an opposing party statement.

24              I'm willing to say a limiting instruction will do it

25    out of an abundance of caution.
```

B. DOUGLAS - DIRECT                                                    633

```
1            THE COURT:  The Court has gone backward and forward,
2   here's the end of it.
3            MR. KELLETER:  Your Honor, I have a --
4            THE COURT:  Yes, sir.
5            MR. KELLETER:  May I add something?
6            My concern is if they redact it and all they say is
7   Brown did this, I can't cross-examine because part of my
8   cross is that he made so many inconsistent statements, I have
9   to be able to show the inconsistencies.
10           THE COURT:  The Court is going with the original
11  purpose.  If it comes in, I will let it come in, I will do a
12  limiting instruction.  But you better keep it as clean and
13  clear as you can.
14           MR. ZLOTNICK:  Yes, sir.
15           THE COURT:  That's where we're going.
16           MR. ZLOTNICK:  Thank you.
17           (In open court:)
18           BRANDON DOUGLAS, called by the Government, having
19  been first duly sworn, was examined and testified as follows:
20                       DIRECT EXAMINATION
21  BY MR. ZLOTNICK:
22  Q.  Please state your name and spell it for the court
23  reporter.
24  A.  Brandon Douglas, B-R-A-N-D-O-N, D-O-U-G-L-A-S.
25  Q.  Are you currently in federal or state custody?
```

B. DOUGLAS - DIRECT                                                    634

```
 1   A.   Federal.

 2   Q.   How long a sentence are you serving?

 3   A.   150, including my probation violation.

 4   Q.   What crime are you serving --

 5             MR. KELLETER:  I didn't hear what he said.

 6             THE COURT:  150 months?

 7             THE WITNESS:  Yeah, that's including my probation

 8   violation.

 9             THE COURT:  Translate for him, counsel.

10   BY MR. ZLOTNICK:

11   Q.   What crime are you serving the sentence for?

12   A.   Conspiracy charges, possession with intent to distribute

13   cocaine, marijuana.

14   Q.   What judge sentenced you?

15   A.   Judge Davis.

16   Q.   Is that here in this building?  Is that here in this

17   building?

18   A.   Ah, yeah.

19   Q.   Did you plead guilty or go to trial?

20   A.   I pleaded guilty.

21   Q.   I'd like to have the witness shown Government's

22   Exhibit 110.

23             Do you recognize Government's Exhibit's 110?

24   A.   Yes.

25   Q.   Let's go to the end of the document.  Wait, what do you
```

B. DOUGLAS - DIRECT                                                  635

```
 1   recognize it as, first?  What do you recognize that as?
 2   A.  I don't understand what you're saying.
 3           THE COURT:  You have to keep your voice up.
 4   BY MR. ZLOTNICK:
 5   Q.  What document is that?
 6   A.  My Plea Agreement.
 7   Q.  Your Plea Agreement?
 8   A.  Yes.
 9   Q.  Let's go to the last page, if we could.
10           Do you recognize your signature?
11   A.  Yes, I do.
12   Q.  And does it show the date that you signed it?
13   A.  Yes, it does.
14           MR. ZLOTNICK:  I'd offer Exhibit 110 into evidence.
15           THE COURT:  Any objection?
16           (No objection from defense.)
17           THE COURT:  Exhibit 110 will be admitted.
18           (The document was admitted as Government's Exhibit
19   No. 110.)
20   BY MR. ZLOTNICK:
21   Q.  Now, when you pled guilty, was this your first federal
22   drug conviction, or had you earlier been convicted of a prior
23   federal drug felony?
24   A.  This my second one.
25   Q.  Was your earlier drug felony used to increase your
```

B. DOUGLAS - DIRECT                                           636

1    sentence in this case that you're now serving a sentence?

2    A.  Yes, it was.

3    Q.  And is that set forth in your Plea Agreement?  Is that in

4    your Plea Agreement?

5    A.  Yeah.

6    Q.  Does your Plea Agreement have a requirement for you to

7    cooperate?

8    A.  Yes, it does.

9    Q.  What is your understanding of your obligation to

10   cooperate?

11   A.  That I got to be truthful in my statement.

12   Q.  What are you hoping will happen as a result of

13   cooperating?

14   A.  That I will get some type of reduction.

15   Q.  Have any promises been made to you that your sentence

16   will in fact be reduced?

17   A.  No.

18   Q.  I'm going to ask you a few questions about your

19   background.

20          How old are you?

21   A.  33.

22   Q.  How far have you gone in school?

23   A.  GED.

24   Q.  Can you tell us in what area did you grow up?

25   A.  Newport News, Virginia.

B. DOUGLAS - DIRECT                                              637

1    Q.  Do you know an individual by the name of Bryan Brown?

2    A.  Yes, I do.

3    Q.  If you see him, please point to him and identify him.

4    A.  Right there (indicating), bald-headed with the beard.

5           MR. ZLOTNICK:  Let the record reflect the

6    identification of the defendant.

7           THE COURT:  The record will so reflect.

8    BY MR. ZLOTNICK:

9    Q.  Can you tell us whether or not you knew him by a

10   nickname?

11   A.  Yes, Beezy.

12   Q.  Is that what you called him?

13   A.  Yeah.

14   Q.  Can you tell us how long you've known him?

15   A.  Since middle school.

16   Q.  Can you tell us what your relationship -- how would you

17   characterize your relationship with him, up 'til now?

18   A.  I mean, we had a good relationship.  Like a brother

19   relationship.

20   Q.  And when you say "like a brother," what do you mean?

21   A.  Just like we did a lot of stuff together.  We always hung

22   around each other.

23   Q.  Since when?  Since what part of your educational

24   background?

25   A.  Middle school.

B. DOUGLAS - DIRECT                                                 638

1    Q.  Did you ride the school bus together?

2    A.  Yes, we did.

3    Q.  Did you socialize together?

4    A.  Yes.

5    Q.  How did you socialize?

6    A.  Face-to-face.

7    Q.  I mean, what kind of things did you do together?

8    A.  I mean, hang out --

9           MR. KELLETER:  Your Honor, I have the objection to

10   the relevancy.

11          MR. ZLOTNICK:  I want to explain how they know each

12   other and why this defendant would talk to him.

13          THE COURT:  Objection overruled.

14   BY MR. ZLOTNICK:

15   Q.  Talk about some of the things you did together when you

16   were young.

17   A.  Hang out, play games, chase girls together.

18   Q.  Go to clubs together?

19   A.  Yeah.

20          THE COURT:  Don't lead him, Mr. Zlotnick.

21          MR. ZLOTNICK:  All right.

22   BY MR. ZLOTNICK:

23   Q.  Did you know his parents?

24   A.  Yes.

25   Q.  Did his -- did you spend time at his home?

B. DOUGLAS - DIRECT                                              639

1    A.   Yes, I did.

2    Q.   And did he spend time at your home?

3    A.   Yes, he did.

4    Q.   Can you describe that; in what situations?

5    A.   I mean, each other home is like a home away from home.

6    Q.   At the time, as far as your friends, where would you have

7    ranked him around 2009, how close were you?

8    A.   We were close.

9    Q.   Was he your best friend or not your best friend?

10   A.   I wouldn't say best friend, but he was a close friend

11   now.

12   Q.   Now, during the year 2009, did you see what if any

13   vehicle Mr. Brown drove?

14   A.   A blue Tahoe.

15   Q.   Did Mr. Brown ever, in your presence, have a name for the

16   blue Tahoe?

17   A.   Big blue.

18   Q.   Do you know how many people could fit into that car?

19   A.   Quite a few.  Probably about 5, 5 or more -- about 5

20   passengers.

21   Q.   Did you also know an individual by the name of Kenny

22   Jones?

23   A.   Yes.

24   Q.   Before I do that, let me show the witness Exhibit 121.

25        Do you recognize Exhibit 121?

B. DOUGLAS - DIRECT                                              640

1    A.  Yes, I do.

2    Q.  What do you recognize it as?

3    A.  The blue Tahoe.

4    Q.  Do you know whose?

5    A.  Belonged to Bryan Brown.

6    Q.  Does that picture truly and accurately depict Mr. Brown's

7    Tahoe?  Does it represent what it looked like?

8    A.  Yes.

9            MR. ZLOTNICK:  I offer 121 into evidence.

10           THE COURT:  Any objection?

11           (No objection from defense.)

12           THE COURT:  It will be admitted.

13           (The document was received in evidence as

14   Government's Exhibit No. 121.)

15   BY MR. ZLOTNICK:

16   Q.  Now, Kenny Jones.  I want to show the witness what I

17   think has been marked Exhibit 152.

18           Do you recognize the person in 152?

19   A.  Yes.

20   Q.  Who is that?

21   A.  Angel.

22   Q.  I'm sorry?

23   A.  Angel.

24   Q.  AU?

25   A.  Angel.

Janet Collins, Official Court Reporter

B. DOUGLAS - DIRECT                                                    641

1    Q.  Angel, I'm sorry.  What's his full name?

2    A.  Angel Alliers.

3    Q.  All right.  And does that picture truly and accurately

4    depict Angel Alliers?

5    A.  Yes.

6              MR. ZLOTNICK:  I offer that into evidence.

7              THE COURT:  Any objection?

8              (No objection from defense.)

9              THE COURT:  Exhibit 152 will be admitted.

10             (The document was received in evidence as

11   Government's Exhibit No. 152.)

12   BY MR. ZLOTNICK:

13   Q.  And I'd like to next show the witness, I believe, is it

14   120?

15            Let's go with Exhibit 151.  Do you recognize the

16   person in 151?

17   A.  Yes.

18   Q.  Who is that?

19   A.  Kenneth Jones.

20   Q.  Does he have a nickname?

21   A.  AU.

22   Q.  Does that picture truly and accurately depict what he

23   looked like?

24   A.  Yes.

25             MR. ZLOTNICK:  I'd offer 151 into evidence.

B. DOUGLAS - DIRECT                                                    642

```
 1              THE COURT:  Any objection?

 2              (No objection from defense.)

 3              THE COURT:  151 will be admitted.

 4              (The document was received in evidence as

 5   Government's Exhibit No. 151.)

 6   BY MR. ZLOTNICK:

 7   Q.  Do you also know Mark Wallace?

 8   A.  Yes.

 9   Q.  You see Mark Wallace sitting here in court?

10   A.  Yeah.

11   Q.  Can you identify him?  Right there with the Navy blue

12   vest on.

13              MR. ZLOTNICK:  Let the record reflect the

14   identification of Defendant Wallace.

15              THE COURT:  The record will so reflect.

16   BY MR. ZLOTNICK:

17   Q.  How long have you known him?

18              MR. SACKS:  Your Honor, may we approach?  I need

19   some guidance from the Court.

20              THE COURT:  Now, we are going to have to hold it to

21   the end, Mr. Sacks, we're not going to approach again.

22              MR. SACKS:  May I inquire of the Court the action

23   the Court was going to take at what point, because it may

24   affect my cross-examination.  I object to anything this

25   witness --
```

Janet Collins, Official Court Reporter

B. DOUGLAS - DIRECT                                                    643

```
 1              THE COURT:  Well, we've covered that, so your
 2    objection is overruled, we will take it up at the end of the
 3    break.
 4              MR. SACKS:  I just didn't want to waive anything.
 5              THE COURT:  Okay.
 6    BY MR. ZLOTNICK:
 7    Q.  So how long did you know Mr. Wallace?
 8    A.  Since I was, like, in elementary school.
 9    Q.  And I'd like to have the witness shown Exhibit 153.
10          Do you know that individual?
11    A.  Yeah.  Dwayne Douglas.
12    Q.  Does that truly and accurately depict what Wayne Douglas
13    looked like?
14    A.  Yes.
15              MR. ZLOTNICK:  I offer 153 in evidence.
16              THE COURT:  Any objection?
17              (No objection from defense.)
18              THE COURT:  Exhibit 153 will be admitted.
19          (The document was received in evidence as
20    Government's Exhibit No. 153.)
21    BY MR. ZLOTNICK:
22    Q.  Did there -- do you remember, Mr. Douglas, sometime after
23    the March 13th, 2009, death of Louis Joseph, speaking with
24    Bryan Brown?
25    A.  Yes.
```

B. DOUGLAS - DIRECT                                                    644

```
 1   Q.  Can you tell us how long it was after that
 2   incident -- after the March 13th death of Louis Joseph it
 3   was?
 4   A.  Not fully sure, but probably, like, maybe a week or more,
 5   give or take.
 6   Q.  Now, can you tell us, where did the conversation happen?
 7   A.  In my car.
 8   Q.  Did it happen in a particular area of Newport News?
 9   A.  Mariner's Landing.
10   Q.  And was it -- who was present for the conversation?
11   A.  Bryan Brown.
12   Q.  At the time, what were you doing in Mariner's Landing?
13   A.  Visiting my girlfriend.
14   Q.  And can you tell us, so the jury knows, what is Mariner's
15   Landing?
16   A.  Apartment complex.
17   Q.  And in what part of the City of Newport News is that
18   apartment complex?
19   A.  Denbigh.
20   Q.  And can you tell us, if you know, was Mr. Brown in
21   Mariner's Landing at that time?
22   A.  Yes, he was.
23   Q.  And can you tell us how the conversation between you and
24   Mr. Brown started, what prompted you to talk to him about
25   this matter?
```

B. DOUGLAS - DIRECT                                                645

1    A.   He proceeded to ask me for a ride.  I was just inquiring

2    or whatever --

3    Q.   "He," being who?

4    A.   Bryan Brown.

5    Q.   Was asking for who for a ride?

6    A.   Me.

7    Q.   And what did you say to that?

8    A.   I was just asking where was his truck at.

9    Q.   And why were you curious about where his truck was at?

10   A.   I mean, because if he had his truck, he wouldn't be

11   asking me for a ride.

12   Q.   How long had it been since you had seen his truck?

13   A.   I can't recall.

14   Q.   When you asked him where his truck was, did you refer to

15   his truck, or did you use its nickname?

16   A.   Big blue.

17   Q.   And after you said "where's your truck," what did the

18   defendant Brown say?

19   A.   That it was hot, meaning that the police was looking for

20   it.

21   Q.   What did he say was hot?

22   A.   The truck was.

23   Q.   Did he use -- did he give a name for the truck that was

24   hot?

25   A.   The big blue.

Janet Collins, Official Court Reporter

B. DOUGLAS - DIRECT                                          646

1    Q.  Now, at that point, did you and Brown begin to discuss an

2    incident?

3    A.  Yes, we did.

4    Q.  And did he explain why big blue was hot?

5    A.  Yes.

6    Q.  And did he say -- why did he say -- and I want to just

7    ask you this:  Did he say whether or not big blue was

8    involved in anything?

9    A.  Yes, he did.

10   Q.  What did he say big blue had been involved in?

11   A.  In a robbery.

12   Q.  Did he say whether -- did he say what happened with the

13   robbery, as far as whether it had gone as planned?

14   A.  That it didn't go as planned, that it went wrong.

15   Q.  Was there a word that he used for robbery?

16   A.  Lick, jam.

17   Q.  And what did he say about the lick or jam, Mr. Brown?

18   A.  That it didn't go as that he would like for it to went.

19   Q.  Did he indicate whether or not -- did he hold anyone

20   responsible for having messed up the jam?

21   A.  Yeah.  He proceeded to tell me that he was upset that

22   Mark Wallace brought some Boston dudes down there to mess the

23   lick up.

24           MR. SACKS:  Object to that last part.

25   BY MR. ZLOTNICK:

Janet Collins, Official Court Reporter

B. DOUGLAS - DIRECT                                                   647

1    Q.  Did he discuss how it was that -- let's back up for a

2    second.

3           He said these -- how did he refer to these people,

4    what did he call them?

5    A.  His Boston dudes is all I know.

6           THE COURT:  Wait a minute, now.  He didn't hear you,

7    your voice is going back down.

8           THE WITNESS:  Okay.

9    BY MR. ZLOTNICK:

10   Q.  He said Boston Boys, or what did he say?

11   A.  The Boston dudes, that's it.

12   Q.  Boston dudes.

13          And what did he say -- did he say how it was supposed

14   to be originally?

15   A.  Just a breaking and entering.

16   Q.  And did he say whose breaking and entering was it

17   originally?

18   A.  Him, Dwayne Douglas, and Angel Alliers.

19   Q.  "He," being who?

20   A.  Bryan Brown.

21   Q.  And did he indicate whether or not another person --

22   well, let me go back.

23          Did he indicate before this incident occurred if

24   anyone had been doing homework on the particular location?

25   A.  Yes.  Angel Alliers.

B. DOUGLAS - DIRECT                                        648

```
 1    Q.  Anybody else?

 2    A.  Dwayne Douglas.

 3    Q.  And who else was going to be involved originally, did he

 4    say?

 5    A.  Just those three.

 6    Q.  The three being who?

 7    A.  Bryan Brown, Angel Alliers, and Dwayne Douglas.

 8    Q.  And how much before had they been doing, in effect,

 9    homework on this?

10    A.  I can't recall.

11    Q.  Now, did Bryan Brown relate if another person learned of

12    the planned burglary?

13    A.  Yes.  Mark Wallace.

14    Q.  And did Bryan Brown tell you what happened after

15    Mr. Wallace learned about the burglary?

16    A.  That he feel like he just came in there and, like,

17    Bogarted his way inside the -- inside the robbery.

18    Q.  Well, can you tell us --

19            THE COURT:  Your voice is dropping as you speak, so

20    you got to keep your voice up.

21            THE WITNESS:  Okay.

22            THE COURT:  Answer again.  Repeat your last answer.

23            THE WITNESS:  Oh, he was just saying that Mark

24    Wallace just came and like, like, like took over the robbery

25    lick.
```

B. DOUGLAS - DIRECT                                                    649

1    Q.   Took it over from who?

2    A.   Bryan Brown, Dwayne Douglas, and Angel Alliers.

3    Q.   And did he -- did he indicate the reason Mark Wallace was

4    going to get involved or take it over?

5    A.   Yes.  Because he could execute it better.

6    Q.   Did Mr. Brown express any regret that he'd allowed

7    Wallace and others to get involved?

8    A.   Yes, he -- he stated that if he would've stayed with the

9    original people, meaning them, Angel Alliers and Duane

10   Douglas, that it wouldn't have resulted as it did.

11   Q.   He said if he had stayed with the original person, it

12   wouldn't have what?

13   A.   It wouldn't have transpired as it did.

14   Q.   I want to ask you if Brown described the way the Louis

15   Joseph home invasion happened.  I'm going to ask you some

16   questions about what Brown told you.

17   A.   Okay.

18   Q.   Did he tell you what car was involved in this home

19   invasion?

20   A.   The big blue, the Tahoe.

21   Q.   Did he tell you the names of the people who participated

22   in the home invasions?

23   A.   Yes.

24   Q.   Who were the people that participated in this home

25   invasion?

B. DOUGLAS - DIRECT                                                    650

1    A.   Mark Wallace, Bryan Brown, AU, and some Boston dude.

2    Q.   How many Boston dudes?

3    A.   I can't recall.

4    Q.   I'm sorry?

5    A.   I can't recall.

6    Q.   Did Brown describe if anyone approached the house?

7    A.   He said the two Boston dudes were leading, and him and AU

8    was behind him.

9    Q.   He said how many Boston dudes?

10   A.   He said two.

11   Q.   And he said who else approached?

12   A.   Him and AU.

13   Q.   Him and AU.  And what part of the house did Brown say

14   they went to?

15   A.   The front door.

16   Q.   How did Brown say he, AU, and the Boston individuals

17   position themselves?

18   A.   Um, um, like, they was in the front, they was behind him.

19   Q.   Who is behind who?

20   A.   The Boston dude was in the front, AU, and Bryan Brown was

21   behind them.

22   Q.   Did Brown tell you if a tool was used to get into the

23   house?

24   A.   A crowbar.

25   Q.   Did Brown tell you what happened with respect to the

B. DOUGLAS - DIRECT                                               651

1   door?

2   A.  That it was -- it was kicked in.

3   Q.  Did he say who kicked it in?

4   A.  The Boston dude.

5   Q.  Who did Brown say went into the house?

6   A.  The Boston dudes entered the house first.

7         THE COURT:  I think, out of caution, you may want to

8   start the question, "did he tell you."

9         MR. ZLOTNICK:  I'm sorry, I will do it again.

10  BY MR. ZLOTNICK:

11  Q.  Did he tell you who went in first?

12  A.  He told me that the Boston dudes went in first.

13  Q.  Did he tell you the way the Boston individuals went in?

14  A.  Gung ho.

15  Q.  Did he also compare it to a particular game?

16  A.  Like Call of Duty.

17  Q.  Did Brown indicate if he heard -- if he, Brown, heard any

18  sounds?

19  A.  Yeah, he -- he told me he heard gunfire.

20  Q.  After Brown heard gunfire, what did he, Brown, do?

21  A.  Ran back to the truck.

22  Q.  Did Defendant Brown indicate whether he had second

23  thoughts about having joined in this?

24  A.  Yes, he did.

25  Q.  What did he say?

B. DOUGLAS - CROSS                                         652

```
 1   A.   That he wished he would've -- basically he wish he would
 2   have stick with his original plan during the breaking and
 3   entering.
 4             MR. ZLOTNICK:  I have no other questions.
 5             THE COURT:  Cross?
 6                      CROSS-EXAMINATION
 7   BY MR. KELLETER:
 8   Q.   Mr. Douglas, this shooting was on March 13th of '09,
 9   correct?
10   A.   Um --
11   Q.   2009?
12   A.   I don't know the exact date.  I know --
13   Q.   So if I tell you it was March 13th of 2009, sounds about
14   right, no?  That year?
15   A.   Yeah, that year.
16   Q.   Okay.  And we saw a photograph of a guy named Dwayne
17   Douglas, right?
18   A.   Yes.
19   Q.   His name nickname is PeeWee?
20   A.   Yes.
21   Q.   That's your brother?
22   A.   Yes.
23   Q.   All right.  And the photograph of Angel Alliers.  He's
24   your best friend, basically, right?
25   A.   He's a close friend.
```

B. DOUGLAS - CROSS                                            653

1    Q.  Well, Mr. Zlotnick wanted you to kind of rank people.

2           MR. ZLOTNICK:  I'm going to object, Your Honor, to

3    what I wanted him to do.

4           THE COURT:  Sustained.  He was trying to determine

5    the relationship between the parties.

6    BY MR. KELLETER:

7    Q.  Literally, Mr. Zlotnick asked you to rank where somebody

8    stood in your friendship, right?  Mr. Alliers is your best

9    friend?

10   A.  No.

11   Q.  Well, you have been convicted twice now of federal

12   crimes, right?

13   A.  Yes.

14   Q.  And you've had to cooperate more than once, right?

15   A.  No.

16   Q.  Well, you've been -- you've spoken with agents to give

17   them information about other crimes multiple times, correct?

18   A.  Yes.

19   Q.  Okay.  And during some of those, what I'll call

20   "debriefs," those interviews, debriefs, you've declined to

21   give information about Angel Alliers, correct?

22   A.  I can't recall that.

23   Q.  Well --

24          THE COURT:  Can you keep your voice up, please?

25   A.  I can't recall that.

Janet Collins, Official Court Reporter

B. DOUGLAS - CROSS                                                654

1   BY MR. KELLETER:

2   Q.  Okay.  Then we will get to that in a moment.

3          But can you think of any other people that you've

4   declined to actually speak about in front of agents, other

5   than Angel Alliers?

6   A.  Them interviews been so long ago, sir, I really can't

7   recall.

8   Q.  But you agree that he ranks high on your list of friends

9   if he's actually someone you didn't want to cooperate

10  against, right?

11  A.  Like I said, I can't recall that.

12  Q.  Okay, well, if I were to hand you a document, and you

13  don't have to read it out loud, but it's just what's called

14  an FBI 302.

15         THE COURT:  This is to refresh his recollection?

16         MR. KELLETER:  Yes, this is just to refresh your

17  memory.

18         THE COURT:  Okay, mark it.

19         (The document was marked as Defendant Brown Exhibit

20  No. 301.)

21  BY MR. KELLETER:

22  Q.  If you can look at it, see the date on the bottom, see if

23  it says just what we were talking about.

24         Well, sir, you don't have to read the whole thing,

25  but does it just kind of refresh your memory of having that

Janet Collins, Official Court Reporter

B. DOUGLAS - CROSS                                                        655

```
 1    interview?

 2            THE COURT:  The question was, does he recall, does

 3    it refresh his recollection on the question you asked, not on

 4    whether the interview, whether it refreshes his recollection

 5    on the question that you asked.

 6            MR. KELLETER:  Your Honor, if I may clarify.

 7            I've asked him to look at it so that he can see the

 8    date on it and see if he recalls that particular

 9    conversation, not --

10            THE COURT:  No, the question is -- you put a

11    question to him and he said he couldn't recall, so it's got

12    to be a question, that's the only reason you have a

13    refreshing document there.  The date doesn't matter.

14            So what is the question?

15            MR. KELLETER:  Your Honor, my question is -- this is

16    what the question was.  My question to him was, does he

17    recall the conversation that has been memorialized in this

18    piece of paper.  Does he remember talking to the agents about

19    these topics.

20            THE COURT:  The Court doesn't recall that, but we

21    are going to move on.

22            Do you recall talking to agents?  Do you recall

23    talking to the agents on the date indicated on that document?

24            THE WITNESS:  Yes, I do.

25            THE COURT:  All right.  Now, what's the question?
```

B. DOUGLAS - CROSS                                              656

1    BY MR. KELLETER:

2    Q.  On that date, you talked to the agents about a number of

3    topics, correct?

4    A.  Correct.

5    Q.  In which you were giving information about other people

6    allegedly committing crimes, correct?

7    A.  Correct.

8    Q.  And this is on the day on which you had been arrested?

9    A.  Correct.

10   Q.  Okay.  And after a number of topics were brought up, they

11   asked you about Angel Alliers, remember?

12        If you can -- to refresh your memory, look on Page 2,

13   right?  And do you recall that when -- they asked about Angel

14   Alliers, you said that -- asked that if we could discuss that

15   subject later?

16   A.  I don't understand.

17   Q.  You see at the very top of the Page, Page 3.

18   A.  You said 2.

19   Q.  If you look at the bottom of Page 2, do you see a

20   reference to Angel Alliers?

21   A.  I see his name.

22   Q.  And then on Page 3, isn't it true that you then said that

23   you would prefer not to talk about Angel Alliers?

24   A.  No, I said I will discuss him later.

25   Q.  Okay.  But then you proceeded to discuss a whole bunch of

B. DOUGLAS - CROSS                                                      657

1    other topics involving people involved in alleged crimes?

2    A.  Also later I also discussed about Angel Alliers.

3    Q.  In this particular interview?

4    A.  I said "later on."

5    Q.  Okay.  But in this particular interview, you didn't talk

6    about Angel Alliers, right?

7    A.  Right.

8    Q.  And this interview was in October of 2011, right?

9    A.  Yes.

10   Q.  And that was a good two years after the Louis Joseph

11   homicide?

12   A.  Yes.

13           THE COURT:  What was the answer?

14           THE WITNESS:  Yes.

15           MR. KELLETER:  I'm done with that document, Your

16   Honor.

17   BY MR. KELLETER:

18   Q.  Well, right after the homicide, it's been your testimony

19   that you spoke within a week or so with Mr. Brown, right?

20   A.  Right.

21   Q.  You also spoke with your brother PeeWee about that, about

22   that homicide, right?

23   A.  I can't recall.

24   Q.  Well, let me give you another document and see if it

25   refreshes your memory.

B. DOUGLAS - CROSS                                                    658

```
 1          Well, let me ask you first:  Do you recall that right
 2   after the Joseph homicide, everybody was talking about it,
 3   including you and your brother?
 4   A.  I mean, I don't recall us talking like detail about it.
 5   I probably only to the extent of like it made the area hot,
 6   buzzing with police.  But I really can't recall like having a
 7   full discussion about it.
 8   Q.  If I could pass up another document that will help
 9   refresh your memory of whether or not you discussed the
10   homicide with your brother PeeWee.
11          THE COURT:  Could you direct him to the paragraph?
12          MR. KELLETER:  Yes, Your Honor.
13          THE CLERK:  302.
14          (The document was marked as Defendant Brown Exhibit
15   No. 302.)
16   BY MR. KELLETER:
17   Q.  And --
18          THE COURT:  Could you direct him to the paragraph?
19          MR. KELLETER:  Yes, Your Honor.
20   BY MR. KELLETER:
21   Q.  On Page 3, the first full paragraph.  I will only give
22   the first two words.  It says "Douglas spoke."
23   A.  What Page?
24   Q.  On Page 3, Page 3.
25          Do you see the paragraph that says "Douglas spoke?"
```

Janet Collins, Official Court Reporter

B. DOUGLAS - CROSS                                           659

1    A.   Yeah.

2    Q.   Okay.  I'm not asking you to read that out loud, I'm just

3    asking does that refresh your memory that soon after the

4    homicide, you spoke with your brother, among others, about

5    the homicide?

6              THE COURT:  Mr. Douglas, you have to answer the

7    question.

8              THE WITNESS:  Yes.

9              THE COURT:  Does it refresh your recollection?

10             THE WITNESS:  Yes, it does.

11   BY MR. KELLETER:

12   Q.   Okay.

13   A.   I was just reading it.

14   Q.   Okay.

15             So, in fact, your brother, PeeWee, told you about the

16   homicide very soon after the homicide of Louis Joseph; he

17   talked to you about it, right?

18   A.   Yeah, we talked to the extent that it was making the area

19   hot.  Nothing in detail.

20   Q.   Well, in fact, you learned from him at that time that he

21   and Angel had actually driven by Louis Joseph's house that

22   morning.  He told you that, right?

23   A.   I can't recall that.

24   Q.   Well, I think it was your own testimony today that at

25   some point -- well, that Mr. Brown told you that both Angel

B. DOUGLAS - CROSS                                                    660

1    and PeeWee had been doing homework on Louis Joseph, right?

2    A.  Right.

3    Q.  Well, you know that Angel, your friend Angel, sold

4    marijuana to Lou Joseph, right?  You know that?

5    A.  I can't recall that either.

6    Q.  Well, in fact, you learned that your friend Angel and

7    PeeWee had done homework from them, that they had been

8    surveilling Lou Joseph; do you know that?

9    A.  I learned that from who?

10   Q.  You learned that information from your brother and from

11   Angel.

12   A.  That they were doing surveillance?

13   Q.  Are you surprised by that?

14   A.  No, I'm asking.  I don't understand the question.

15          THE COURT:  Let's get something straight.  You

16   cannot ask him questions.

17          THE WITNESS:  Okay.

18          THE COURT:  The only thing you can say is "I do not

19   understand the question," and he will repeat.

20          Now, where are we?

21   BY MR. KELLETER:

22   Q.  Here's my question:  You have heard that your brother and

23   Angel did homework on Lou Joseph's house, right?

24   A.  Yeah, this is Bryan Brown.

25   Q.  And you are saying today it was from Bryan Brown?

B. DOUGLAS - CROSS                                                   661

```
 1              MR. ZLOTNICK:  He won't let him finish his answer.
 2              MR. KELLETER:  He just answered.
 3              THE COURT:  No, no, no, just slow it down, let him
 4    finish.
 5              I'm going to let you go another ten minutes, we are
 6    going to take a break, then we are going to continue.
 7              MR. KELLETER:  Yes, Your Honor.
 8    BY MR. KELLETER:
 9    Q.  It's your testimony today that you heard it from Bryan
10    Brown?
11    A.  Yes.
12    Q.  But you were also talking about this murder with your
13    brother and Angel in the same time period, correct?
14    A.  We wasn't discussing the murder, we were stating that the
15    incident that transpired has made our area hot.
16    Q.  And you were aware that -- that your friend, Angel, did
17    burglaries, right?
18    A.  Yes.
19    Q.  And you're aware that your brother --
20              MR. ZLOTNICK:  I object to the relevance, of his
21    friend Angel doing burglaries.  We're here about the matter
22    on that date, March 13th.
23              THE COURT:  Objection sustained.  Rephrase it.
24              MR. KELLETER:  Yes, Your Honor.
25              THE COURT:  Sustained.
```

B. DOUGLAS - CROSS                                                    662

1   BY MR. KELLETER:

2   Q.  So at the time, at the time that you spoke with

3   detectives on -- the first one we spoke about in 2011 when

4   you were asked to give information about other crimes, you

5   were already aware that your brother and Angel could have

6   been implicated in this crime, right?  You already knew that

7   they had been surveilling Lou Joseph's house?

8   A.  Yeah, from Bryan Brown.

9   Q.  Well, if that's your testimony, so be it.

10          But you supposedly knew it, but when the agents asked

11  you about Angel Alliers, you didn't want to talk about it,

12  right?

13  A.  I stated to them I'll get to them later.

14  Q.  Excuse me?

15  A.  I stated to them that I would discuss it later, and we

16  discussed him later.

17  Q.  Okay.  So you wanted to wait to discuss it?

18          MR. ZLOTNICK:  Objection.  Asked and answered.

19          THE COURT:  Sustained.

20  BY MR. KELLETER:

21  Q.  I'm asking, why would you need to wait?

22          MR. ZLOTNICK:  Objection.

23          THE COURT:  Well, now, he didn't ask that question,

24  why he wanted to wait.  He said he wanted to do it later, but

25  he didn't say why he wanted to wait.  Why did you want to

B. DOUGLAS - CROSS                                                    663

1   wait?

2           THE WITNESS:  When we was in there, we was -- we was

3   going through -- we was going through the interview and we --

4   and we been in there for so long and they asked me, like, is

5   it -- is it some guy that you wait to discuss later.

6           And I was like, Nah, and I said those two.

7   BY MR. KELLETER:

8   Q.  Well, you had been in there for so long, that's one of

9   the reasons you needed to wait?

10  A.  I mean, meaning for them to -- they was waiting because I

11  was -- they arrested me, and my probation officer, and we was

12  waiting to get processed in the system.

13  Q.  Well, after you declined to talk about Mr. Alliers at

14  that moment, you then spoke about Michael Scales and James

15  LeGrande supplying marijuana, correct?

16          You then talked about Lamar Douglas, right?  You then

17  talked about a cocaine --

18          THE COURT:  Do you want him to answer any of those,

19  Mr. Kelleter?

20          MR. KELLETER:  You spoke about Michael Scales.

21          THE COURT:  Mr. Kelleter.

22          MR. KELLETER:  I'm asking --

23          THE COURT:  No, no, no, no, you need to answer me

24  first.  My question was, did you want him to answer any of

25  those questions?  He never responded to any of those

B. DOUGLAS - CROSS                                                    664

1    questions you were asking.

2            MR. KELLETER:  I understand, Your Honor, that's why

3    I was going back to the first one, to put that first one in

4    front of him.

5            THE COURT:  Let's take them one at a time.

6    BY MR. KELLETER:

7    Q.  The first, Michael Scales and James LeGrande.  You talked

8    about them after you declined to talk about Angel, right?

9    A.  I did not decline to talk about Angel, I just said we

10   would discuss him later, and we discussed him later.

11   Q.  The question was, did you then talk about Michael Scales

12   and James LeGrande?

13   A.  I talked about them.

14   Q.  Did you then talk to them about the topic of marijuana

15   and how often you got shipments of marijuana?

16   A.  Yes.

17   Q.  Did you then talk about the topic of cocaine and heroin

18   that had been found in the search warrant?

19           Would you like to see this to refresh your memory?

20   A.  I mean, I can't recall talking about it, but during my

21   sentencing it was marked out of my Presentence Report.

22   Q.  The question was, did you speak about those topics?

23   A.  I can't recall.

24   Q.  Excuse me?

25   A.  I said I can't recall.

B. DOUGLAS - CROSS                                                665

1   Q.   Okay.

2        So it was in October of 2011 that you had a chance to

3   speak about Angel Alliers and you said you would talk about

4   him later.  I'm not sure I got an answer.

5        Was there a particular reason why you couldn't talk

6   about him then?

7        THE COURT:  I think it's been asked and answered and

8   you need to move from this Angel Alliers topic.

9        It's been asked and answered.

10  BY MR. KELLETER:

11  Q.   You then had a debrief in January of 2012, so maybe about

12  four months after that one.  Do you recall speaking to the

13  agents again?

14  A.   Pertaining to who?

15  Q.   May have been pertaining to a lot of people, but do you

16  recall meeting with them about four months later and flipping

17  through a book and talking about people?

18  A.   I can't recall the date, it's been so long ago.

19  Q.   If I could pass up a document to help him refresh his

20  memory?

21        THE CLERK:  303.

22        (The document was marked as Defendant Brown Exhibit

23  No. 303.)

24  BY MR. KELLETER:

25  Q.   Well, first, to orient yourself, do you see on the first

B. DOUGLAS - CROSS                                              666

1    page that there's a date at the bottom and it says

2    "investigation on?"

3    A.   Yeah.

4    Q.   Okay.  And if you just -- this is a 9-page document,

5    correct?

6    A.   Correct.

7    Q.   Okay.  And you see it covers a lot of topics, right?

8    A.   Correct.

9    Q.   And do you see the manner in which you spoke about

10   topics?

11   A.   Yeah.

12   Q.   Okay.  So does that refresh your memory that you actually

13   had a session where you talked about a lot of different

14   people?

15   A.   Yes.

16   Q.   Okay.

17        Now, that was a debrief in which the agents give you

18   the opportunity to provide information about other people

19   that they suspect might have committed crimes, right?

20   A.   Right.

21   Q.   Right, they actually have a little book with photographs?

22   A.   Right.

23   Q.   And on that date you kind of flipped through the book and

24   you just looked at somebody and you say, hey, I know him, and

25   you tell the agents about him, right?

B. DOUGLAS - CROSS                                                    667

1    A.   Right.

2    Q.   So it was at that point that you talked about -- you

3    talked about a lot of different people that day, correct?

4    A.   Correct.

5    Q.   And among many people, you talked about Bryan Brown,

6    correct?

7    A.   Correct.

8    Q.   Okay.  And that was the first time you mentioned that

9    you'd claim that you got this information about the Louis

10   Joseph murder from Bryan Brown, correct?

11   A.   I didn't understand --

12   Q.   It was at this interview --

13           MR. ZLOTNICK:  Objection.

14           THE COURT:  Let him finish, Mr. Kelleter.

15           MR. KELLETER:  Oh, I'm sorry.

16           THE COURT:  Let him finish his answer, then you.

17           THE WITNESS:  I didn't understand the question.

18   BY MR. KELLETER:

19   Q.   It was at this interview that you first told the agents

20   that you claimed that Bryan Brown had confessed to you?

21   A.   Correct.

22   Q.   And this was a good four months after you didn't want to

23   talk about Angel Alliers, correct?

24   A.   I never said I didn't want to talk about him, I said I'd

25   discuss him later.

B. DOUGLAS - CROSS                                                668

```
1    Q.  Which is about four months after you declined to talk
2    about him that time, correct?
3    A.  Correct.
4    Q.  All right.  And in that time, you had an opportunity to
5    decide who you would say confessed to you, correct?
6    A.  Repeat the question again.
7    Q.  In that time period, between the period when you declined
8    to speak about Angel Alliers, and this time when you finally
9    said that Bryan Brown confessed to you, you had an
10   opportunity to think about who you would say confessed to
11   you?
12   A.  Correct.
13   Q.  So -- and then at that time, that's when you said you got
14   this information from Bryan Brown.
15          Did you, at this session, also say that, Hey, my
16   friend Angel was helping to surveil the Louis Joseph house on
17   the day he was murdered?
18   A.  In that session, they got pictures in there, there's one
19   in here about the individual in the picture.
20   Q.  Angel's picture wasn't in that book.
21   A.  Not that book.
22   Q.  Okay.
23          So the only reason you didn't tell them about his
24   role in surveilling Lou Joseph's house was his picture wasn't
25   if the book?
```

Janet Collins, Official Court Reporter

B. DOUGLAS - CROSS                                                    669

1    A.  No, it was specifically asking about the dude, the

2    pictures that were in the book.

3    Q.  Well, but you used that picture of Bryan Brown to use

4    that as an opportunity to talk about the Lou Joseph murder?

5    A.  Yeah, they asked me what did I -- what do I know about

6    this individual.

7    Q.  Well, he wasn't the only person you mentioned when

8    talking about this -- what happened with Lou Joseph, right?

9    A.  I'm not following what you saying.

10   Q.  When you had an opportunity to talk about Bryan Brown in

11   the Lou Joseph homicide, did you mention your brother PeeWee?

12   A.  We talked about him.

13   Q.  Well, you're aware that your brother PeeWee drove by Lou

14   Joseph's house on the day of the murder, right?

15   A.  No, I'm not aware of that.

16        THE COURT:  We're going to stop right here and you

17   continue after the break, Mr. Kelleter.  We will take a

18   15-minute break.

19        (Off the record, 4:14 p.m., jury out.)

20        MR. WOODWARD:  Your Honor, before we --

21        THE COURT:  Have a seat.

22        MR. WOODWARD:  Either before we break or before the

23   jury comes back, I have a question.  It will take about

24   30 seconds reference how I proceed with this witness that I

25   need an answer from.

1              THE COURT:  Well, now I think is as good a time as

2    any.

3              MR. WOODWARD:  My understanding is, as I understand

4    the law, if I cross-examine this person, I have waived my

5    appellate issue if you are going to give a limiting

6    instruction.

7              In other words, if you tell the jury that this

8    evidence is being admitted only against the speaker,

9    Mr. Brown, and not admitted against Mr. Benson or the other

10   defendants, then I need to know if you are going to do that.

11   Because I think if you are going to do that and I

12   cross-examine him and put stuff in the record, then I may

13   have waived my objection, as I understand appellate law.

14             That's my -- that's simply my question, Your Honor.

15   I understand we can talk about the language or the terms of

16   the limit, but limiting instructions aren't that complicated,

17   it's admissible against this person and not, so I just simply

18   would like to know if you are planning to give a limiting

19   instruction.

20             I prefer it be done when the witness testifies;

21   that's obviously Your Honor's decision.  But I think out of

22   fairness, we would need to know if you plan to do that.

23             We've talked about it a hundred times, I don't want

24   to replow it, I just need to know.  Because if you are going

25   to give one, I'm not going to cross-examine the witness.

```
1              THE COURT:  All right, I will answer you when I come
2    back.
3              MR. SACKS:  May I just -- I don't want to prolong
4    this, that was my exact question.  I just wanted to point out
5    to the Court I agree with Mr. Woodward's analysis legally,
6    that if you give a limiting instruction and we cross-examine,
7    we have waived it, and there's case law that talks about, you
8    know, if the defendant can't complain on appeal, the
9    prejudicial testimony by a government witness, which the
10   defense counsel elicited on cross-examination.
11             Now, if you limit -- if you are going to tell the
12   jury that this testimony is only admissible against this
13   defendant and not the others, then there is no need to
14   cross-examine, number one, because there's nothing against my
15   client, and I don't want to waive anything.
16             THE COURT:  You are repeating the same thing he
17   said.  It applies to all defendants.
18             Now, what's the next thing you were going to say?
19             MR. SACKS:  I just wanted to point out that Federal
20   Rule of Evidence 103(d) says that, To the extent practicable,
21   the Court must conduct a jury trial so that inadmissible
22   evidence is not suggested to the jury by any means.
23             THE COURT:  Don't you think I know that?
24             MR. SACKS:  Oh, I know you know that, but I just
25   wanted to point out that -- and I know you know that, Your
```

672

1    Honor, but I'm just --

2        THE COURT:  You are reading that rule to me,

3    Mr. Sacks?

4        MR. SACKS:  But the other Rule is 105.  Says, If the

5    Court admits evidence that is admissible against a party and

6    or for a purpose, but not against another party or for

7    another purpose, the Court, on timely request, must restrict

8    the evidence to its proper scope and instruct the jury

9    accordingly.

10       That just goes to Mr. Woodward's point about the

11   timing to the limiting instruction being sooner rather than

12   later, and that's all I'm asking His Honor.

13       THE COURT:  Thank you.

14       MR. SACKS:  I appreciate your time, Your Honor.

15       (Off the record, 4:18 p.m.)

16       (On the record, 4:40 p.m.)

17       THE COURT:  What the Court's decided to do, when

18   Mr. Kelleter finishes his examination, the Court will give a

19   limiting instruction, and the Court will give the following

20   limiting instruction:

21       Ladies and gentlemen of the jury, you have heard

22   testimony from the witness, Brandon Douglas, about what the

23   Defendant Brown said about -- what Defendant Brown said about

24   the co-defendants Wallace and the Boston Boys, allegedly.

25       I could not even make a reference to the Boston Boys

1    because they did not call the names of Kindell and Benson in

2    this case.  So I'm just going to say the co-defendants,

3    period, leave it at that.

4            You are instructed that you may not -- you may only

5    consider the evidence about what Mr. Brown said about his

6    role in committing the offense.  You may not consider any

7    statements of Mr. Brown made about a co-defendant against a

8    co-defendant, period.

9            That's about it.

10           MR. WOODWARD:  Understand, Your Honor.

11           MR. SACKS:  Subject to our previous objection, I

12   thank you.

13           THE COURT:  Mr. Sacks.

14           MR. SACKS:  I have waiver aversion.  But, thank you,

15   sir.

16           THE COURT:  Yes, sir.

17           MR. KELLETER:  Your Honor.

18           THE COURT:  Yes, sir.

19           MR. KELLETER:  Before the jury comes back.  I'm not

20   asking that the limiting instruction be read at the same time

21   as that one, but there will be -- when it gets in front of

22   the jury, I'm going to ask for that same sort of instruction

23   for what Detective Kempf said Mr. Wallace said about

24   Mr. Brown.

25           So since the issue is fresh right now, I feel like

```
 1    that sort of wording is appropriate, as well for saying that

 2    what Mr. Wallace said, allegedly, about Mr. Brown, and the

 3    use of his SUV cannot be used against Mr. Brown.

 4            THE COURT:  The Court will have to think about that

 5    one.

 6            MR. KELLETER:  Yes.

 7            THE COURT:  The Court is going to have to think

 8    about that one.  You know, there's a way we can avoid a lot

 9    of this.

10            Now, Mr. Zlotnick, Ms. McKeel, one thing the case

11    law said is kind of a double approach.  Plus, the limiting

12    instruction I can't go back and redact now.  So you can look

13    at what you're getting out of these next witnesses and

14    redaction is one of the remedies suggested, plus a limiting

15    instruction.

16            And so let's be most cautious about this.  I don't

17    want to do the same thing three times here.

18            MR. ZLOTNICK:  I understand.

19            THE COURT:  So take a look at it over the weekend, I

20    guess.  Okay, we're going to go for another half hour then we

21    are going to have to end.  Whether we finish this witness or

22    not, he's going to have to come back on Monday.

23            MR. WOODWARD:  Well, Your Honor, based on your

24    limiting instruction, I anticipate we will finish this

25    witness before a half hour.  I mean, it's up to Mr. Kelleter.
```

B. DOUGLAS - CONT'D. CROSS                                    675

```
1            MR. KELLETER:  I expect, if I'm allowed to ask my

2    questions, it will take ten minutes, if that.

3            THE COURT:  No, the Court's not going to give you

4    carte blanche, Mr. Kelleter.

5            MR. KELLETER:  Well, I'm only saying it will only be

6    10 minutes.

7            MR. SACKS:  And I intend no cross-examination, Your

8    Honor.

9            MR. RASBERRY:  Same here, Your Honor.

10           THE COURT:  We may finish this week.

11           (Jurors in, 4:45 p.m.)

12           THE COURT:  Let the record reflect that all jurors

13   are in the courtroom.  Does counsel agree?

14           (All counsel answer in the affirmative.)

15           THE COURT:  Okay, you may resume your

16   cross-examination.

17                      CROSS-EXAMINATION

18   BY MR. KELLETER:

19   Q.  All right, Mr. Douglas, you've testified today about what

20   you allege Mr. Brown said about the homicide on that day,

21   correct?

22   A.  Correct.

23   Q.  And you also testified about this in front of a Grand

24   Jury, right?

25   A.  Yes.
```

B. DOUGLAS - CONT'D. CROSS                                    676

1    Q.  So to clarify your testimony, you indicate he says that

2    four of them went up to the door?

3    A.  I didn't hear the last part of what you said.

4    Q.  Four of them went up to Mr. Lou Joseph's door, right?

5    A.  Yeah.

6    Q.  And your -- you claim that Mr. Brown said all four of

7    them went inside, correct?

8    A.  No.

9    Q.  Do you recall testifying to that effect in front of the

10   Grand Jury?

11   A.  I can't recall.

12          MR. KELLETER:  If I may have a moment?

13          (Pause.)

14   BY MR. KELLETER:

15   Q.  If I could hand up to the witness a transcript, Your

16   Honor, just to refresh his --

17          THE COURT:  Did we mark it?

18          THE CLERK:  304.

19          (The document was marked as Defendant Brown Exhibit

20   No. 304.)

21   BY MR. KELLETER:

22   Q.  You recognize -- well, take a moment to look at that.

23          If you could turn to Page 23?  Sir, are you on

24   Page 23?

25   A.  Yeah.

B. DOUGLAS - CONT'D. CROSS                                      677

```
 1   Q.  Oh, okay, I'm sorry.  If you look at Line 6, does that
 2   refresh your memory of what you said to the Grand Jury?
 3   A.  Yes.
 4   Q.  That, in fact, you claim he said that four of them went
 5   into the house, correct?
 6   A.  Four?  I don't see four.
 7           THE COURT:  Direct him to what line you want him --
 8   Q.  Well, I'm looking at Line Number 6, it's on Page 23.
 9           THE COURT:  Okay, Page 23, Line 6.
10   BY MR. KELLETER:
11   Q.  And you referred to Bryan Brown?
12   A.  Uh-huh.
13   Q.  That's one person.
14   A.  Uh-huh.
15   Q.  You referred to Kenneth Jones.  That's a second person,
16   right?
17           You referred to "two dudes," right?
18   A.  Uh-huh.
19   Q.  That's four people.  And you told the Grand Jury, under
20   oath, that they proceeded to go into the house, right?
21   A.  Correct.
22   Q.  And you were under oath?
23   A.  Correct.
24   Q.  All right.  So you do agree that that's what you said to
25   the Grand Jury?
```

Janet Collins, Official Court Reporter

B. DOUGLAS - CONT'D. CROSS                              678

1    A.   Correct.

2    Q.   All right.  But today you are saying that he didn't say

3    that they went in the house.

4         Your testimony today is that Mr. Brown didn't say

5    that they went inside the house, that they just went to the

6    front door?

7              THE COURT:  Do you understand the question?

8              THE WITNESS:  No, sir.

9              THE COURT:  Repeat the question one more time.

10   BY MR. KELLETER:

11   Q.   You've testified today about what Mr. Brown says

12   happened, right?

13   A.   Yes.

14   Q.   And your testimony today was that four people went up to

15   the door, but not all four of them went in.

16   A.   Right.

17   Q.   Okay.  So which is it, that he said all four went in, or

18   he said four of them went to the door and only two of them

19   went in?

20   A.   I stated that -- that four went to the door, the two

21   Boston dudes in the front, him and Angel was in the back when

22   they -- that the two Boston dudes went in there first and he

23   heard gunfire and he ran back to the truck.

24   Q.   Okay.  Does that mean that he said to you that he went

25   in?

Janet Collins, Official Court Reporter

B. DOUGLAS - CONT'D. CROSS                                    679

1    A.   No, he didn't go in.

2    Q.   So can I ask why did you tell the Grand Jury that he said

3    that he proceeded to go in?

4    A.   He proceeded to go in.  I didn't say that he went in.

5    Q.   May I ask, your testimony was that he proceeded to go in,

6    correct?

7    A.   Correct.

8    Q.   That means he went in, correct?

9    A.   I don't think that's the meaning of proceeding.

10             THE COURT:  Mr. Douglas, what does proceed mean to

11   you?

12             THE WITNESS:  Attempt to do something.

13             THE COURT:  Okay.

14   BY MR. KELLETER:

15   Q.   May I ask a question, in all seriousness?  Are you under

16   the influence of anything right now?

17             MR. ZLOTNICK:  Objection.

18             THE COURT:  Sustained.

19             Mr. Kelleter, get back to your questions.

20   BY MR. KELLETER:

21   Q.   All right.

22             Now, when you testified in front of the Grand Jury,

23   you said -- this is all coming, supposedly, from Mr. Brown,

24   so we will skip, but, "That they broke in there, seen Lou, or

25   Lou seen them, and that's when all the plans and stuff went

Janet Collins, Official Court Reporter

B. DOUGLAS - CONT'D. CROSS                                              680

1    out of whack."

2          Do you remember saying that to the Grand Jury?

3    A.  What page is that?  I can't recall.

4    Q.  Page 25.

5    A.  25.

6    Q.  Line 5.

7          THE COURT:  I think before you go to that

8    transcript, Mr. Douglas, you need to indicate whether you

9    don't recall or don't know.

10          THE WITNESS:  Okay.

11    A.  Correct.

12    BY MR. KELLETER:

13    Q.  All right.  And then you indicated that "One of the

14    Boston dudes started firing off, it ended up in gun play,

15    that's when he, Mr. Brown, scattered?"

16    A.  Correct.

17    Q.  That's what you told the Grand Jury, correct?

18    A.  Correct.

19    Q.  That would indicate that they were in the house and then

20    he scattered, correct?

21    A.  I say he proceeded to go in the house.  The two Boston

22    dudes was in the house.

23          MR. ZLOTNICK:  Objection, Your Honor, the statement

24    speaks for itself.

25          THE COURT:  Wait a minute.

B. DOUGLAS - CONT'D. CROSS                                    681

```
 1            Mr. Kelleter, sustained.
 2            MR. KELLETER:  Your Honor, I believe it's a
 3   legitimate question to determine if he's saying that they
 4   were inside the house when he scattered or not.
 5   A.  I said Mr. Brown told me that the two Boston dudes were
 6   in the house and he proceeded to go in the house.  And when
 7   he heard gunfire, he didn't go in the house, he just ran back
 8   to the truck.
 9            THE COURT:  That's been asked and answered.
10   BY MR. KELLETER:
11   Q.  Was it your testimony that they went in there like
12   commandos?
13   A.  Yes, sir.
14   Q.  But it's your testimony that he said that two of the
15   commandos just stayed outside?
16   A.  Stayed outside?
17   Q.  Well, you indicated that he didn't proceed inside the
18   house.
19   A.  Yeah, when he heard the gunfire, he didn't go in.
20   Q.  Did he tell you that the gunfire was immediate upon
21   breaking in?
22   A.  I can't recall.
23   Q.  But it's your testimony that he said that he waited
24   outside and then heard gunshots, and then scattered?
25   A.  He told me that when they was -- when they was -- when
```

Janet Collins, Official Court Reporter

B. DOUGLAS - CONT'D. CROSS                                  682

1    they was proceeding to go in the house, the two Boston dudes

2    went in there and he heard gunfire and he ran back.

3              THE COURT:  That's about the fourth time on that

4    line.  And we moving past it.

5    BY MR. KELLETER:

6    Q.  How did he say that they stood outside the door?

7    A.  Um, the Boston dudes that was in front, him and AU was

8    behind 'em.

9    Q.  Were they standing up against the wall or anything?

10   A.  Yeah, like, like, like sideways like.  Like on each side

11   of, like, the door frame.

12   Q.  Okay.

13             If I can put up a document, Your Honor.

14             This is Government's Exhibit 4.  Would you agree that

15   this door opens on the right-hand side?

16             MR. ZLOTNICK:  I'm going to object as to whether or

17   not he's familiar with the residence even, Your Honor.

18             THE COURT:  Objection sustained.

19             MR. KELLETER:  Well, I'm asking about the door.

20             I'll move on.

21             THE COURT:  The first question is can he determine

22   which way that door swings.

23             MR. KELLETER:  Excuse me, Your Honor?

24             THE COURT:  Can he determine which way that door

25   swings?  Can the witness determine which way the door swings?

B. DOUGLAS - CONT'D. CROSS                                            683

1   BY MR. KELLETER:

2   Q.  Can you determine which way that door swings?

3           I'll move on, Your Honor.

4           MR. KELLETER:  If I may have a moment, Your Honor.

5           (Pause.)

6   BY MR. KELLETER:

7   Q.  Now, you've indicated that you pled guilty pursuant to a

8   Plea Agreement, right?

9   A.  Right.

10  Q.  And this is your second go around, correct?

11  A.  Correct.

12  Q.  So you are familiar with the system and how it works?

13  A.  Correct.

14  Q.  And what it takes to get a cut in your prison sentence,

15  right?

16  A.  Correct.

17  Q.  And you've already received one cut?

18  A.  Correct.

19  Q.  And you want another cut, correct?

20  A.  Correct.

21  Q.  And, in fact, you've even written to the Court asking the

22  Court for another cut, correct?

23  A.  Correct.

24  Q.  Now, your Plea Agreement -- if you were to look at

25  Exhibit 110, your Plea Agreement on Page 7, Paragraph 13.

B. DOUGLAS - CONT'D. CROSS                                    684

1            You've read this, correct?

2    A.   Correct.

3    Q.   Those are your initials down at the bottom, correct?

4    A.   Correct.

5    Q.   All right.  And this indicates that you agree that the

6    United States reserves the right to seek any departure from

7    the Sentencing Guidelines, right, pursuant Section 5K1.1, and

8    there's a lot of other language, but it says, and Rule 35(b),

9    right?

10   A.   Right.

11   Q.   And you're familiar with what a 35(b) motion is, right?

12   A.   Right.

13   Q.   Okay, that's the motion that the government makes to cut

14   your time.  They ask the Court to cut your time, right?

15   A.   Correct.

16   Q.   And as this notes, it's in the sole discretion of the

17   United States to make that cut, right?  No one else can

18   decide.  If they don't make that motion, you don't get a cut?

19   A.   I didn't hear the last part.

20   Q.   You're well aware that unless the government makes that

21   motion, you cannot get your prison time cut, no matter what?

22   A.   Right.

23   Q.   So you're well aware of what the government thinks

24   happened in this case, correct?

25            MR. ZLOTNICK:  I would object to the form of the

Janet Collins, Official Court Reporter

B. DOUGLAS - CONT'D. CROSS                                    685

1    question, Your Honor.

2          THE COURT:  Objection sustained.

3          MR. KELLETER:  Your Honor, I think this goes to his

4    mental state.

5          THE COURT:  No, but that's a broad question, "you're

6    aware of what the government thinks."

7    BY MR. KELLETER:

8    Q.  You are aware of who the government believes is culpable

9    for the murder of Mr. Joseph?

10   A.  I'm not aware.

11         MR. ZLOTNICK:  Objection as to his knowledge of the

12   government's knowledge.

13         MR. KELLETER:  Your Honor, it goes to his mental

14   state and what his motive is to lie.

15         THE COURT:  Well, I think you can simply rephrase

16   the question.  Think about it and rephrase the question.

17   BY MR. KELLETER:

18   Q.  Sir, you're aware that you're told, through this Plea

19   Agreement, that you have to tell the truth, correct?

20   A.  Correct.

21   Q.  You're also aware that the only people who decide what

22   the truth is for this motion is the government, right?

23   A.  No, that's the jury and the judge.

24   Q.  So you're telling me that if the jury finds these men not

25   guilty, you can't get a cut?  That's your understanding?

B. DOUGLAS - CONT'D. CROSS                                          686

1   A.  What's that?

2   Q.  Is it your understanding that if these men and women find

3   them not guilty, that you cannot get a prison cut?

4   A.  A prison cut?  I'm not following what you're asking me.

5   Q.  Okay.  Sir, we just looked at Paragraph 13 --

6   A.  Uh-huh.

7   Q.  -- of your Plea Agreement, and it clearly states that,

8   Any departure from the guidelines or any motion under 35(b),

9   which is the motion to cut your sentence, correct?

10  A.  Correct.

11  Q.  That is -- it's in its sole discretion, it belongs to the

12  United States, the prosecution, right?

13  A.  Correct.

14  Q.  So you know that only they decide if you deserve a cut,

15  right?

16  A.  Correct.

17  Q.  You're aware that it's not the jury here who decides if

18  you get a cut, it's the government who decides if you get a

19  cut?

20  A.  Correct.

21  Q.  Okay.  So you're aware that, even if -- the jury could

22  find them guilty, the jury could find them not guilty, that's

23  not going to decide your cut, right?

24  A.  Right.

25  Q.  What's going to decide your cut is whether or not the

B. DOUGLAS - CONT'D. CROSS                                        687

1   government believes that you told the truth.

2   A.  Right.

3   Q.  Okay.  And so when you have to figure out what you think

4   the government thinks the truth is, you want to make sure

5   that what you say conforms with what the government thinks

6   the truth is, correct?

7   A.  I'm just obligated to do what I stipulate in my Plea

8   Agreement.

9   Q.  Uh-huh.

10  A.  Be truthful about all criminal activity.

11  Q.  Well, let me ask you this, in terms of your mental state.

12          If you found that the truth wouldn't help the

13  government's case, you are saying that you would -- you

14  wouldn't want your prison cut, you are saying that you would

15  instead tell the truth?

16          MR. ZLOTNICK:  Objection, that's not what the Plea

17  Agreement says.

18          THE COURT:  Sustained and argumentive, and that's

19  the end of this line of inquiry.

20  BY MR. KELLETER:

21  Q.  But you are hoping that the prosecutor will file a motion

22  seeking to reduce your sentence, correct?

23  A.  Correct.

24          MR. KELLETER:  I have no more questions.

25          THE COURT:  Any cross-examination?

B. DOUGLAS - REDIRECT                                                688

```
 1              MR. RASBERRY:  No, Your Honor.

 2              THE COURT:  Any redirect?

 3              MR. ZLOTNICK:  Yes, Your Honor.

 4                      REDIRECT EXAMINATION

 5   BY MR. ZLOTNICK:

 6   Q.  I would like to have Exhibit 110 put up if I could, Your

 7   Honor.

 8              And let's go to Paragraph 12.

 9              Mr. Douglas, can you see Paragraph 12?

10   A.  Yes, I can.

11   Q.  Can you read the Paragraph 12 for us?

12   A.  This Plea Agreement -- hold up.

13          This Plea Agreement is not conditioned upon charges

14   being brought against any other individual.

15          This Plea Agreement is not conditioned upon any

16   outcome in any pending investigation.

17          This Plea Agreement is not conditioned upon any

18   further prosecution which may occur based on the defendant

19   cooperation.

20          This Plea Agreement is conditioned upon any results

21   or any further Grand Jury presentation or trial of all

22   charges resulting from this investigation.

23          This Plea Agreement is not conditioned upon

24   defendant providing full, complete and truthful cooperation.

25   Q.  Now, what's the one directive instruction you have been
```

B. DOUGLAS - REDIRECT                                         689

1    given every time you've met with prosecutors and agents in

2    this case?

3    A.  Always be truthful.

4    Q.  Now, from reading that, does what happens, as far as what

5    the jury does, have any role in whether you get a sentence

6    reduction, or is telling the truth required?

7    A.  Telling the truth required.

8    Q.  Now, you were asked questions about going in like

9    commandos coming from Mr. Brown.  Who was Mr. Brown talking

10   about when he said "going in like commandos?"

11   A.  The Boston -- the Boston dudes.

12   Q.  Now, you were asked questions about your first interviews

13   with law enforcement, and I think the first interview you got

14   involved in was on, I think it was on October 26th, 2011; is

15   that right?  Do you remember that time?

16   A.  Yes.

17   Q.  Is that when you were arrested?

18   A.  Yes.

19   Q.  Were you given Miranda warnings, if you recall?

20   A.  Yeah.

21   Q.  And at that time, did you have a lawyer?

22   A.  No.

23   Q.  And at that time, you made statements to law enforcement?

24   A.  Correct.

25   Q.  And when the topic of Angel Alliers came up, you decided

B. DOUGLAS - REDIRECT                                              690

1    to defer it to later?

2    A.  Correct.

3    Q.  Then you were asked questions about another interview

4    where you talked about this incident.  And I believe that

5    interview --

6            MR. KELLETER:  Your Honor, I object to any leading

7    questions.

8            THE COURT:  Objection sustained on leading

9    questions.

10           MR. ZLOTNICK:  Yes, Hour Honor, I'll slow it down a

11   little bit.

12   BY MR. ZLOTNICK:

13   Q.  Do you remember being asked about an interview that

14   occurred on January 27th, 2012, with Carucci and Jamie Goode,

15   two task force agents?

16           You don't remember being in the the interview, being

17   asked about it?

18   A.  Asked about what?

19   Q.  I'm sorry?

20   A.  You asked about what?

21   Q.  Do you remember being asked about an interview with the

22   FBI on January 27th?

23   A.  Yeah.

24   Q.  All right.

25           Now, your Plea Agreement was signed -- can you take a

Janet Collins, Official Court Reporter

B. DOUGLAS - REDIRECT                                                 691

1    look -- let's show him Page 9 of his Plea Agreement.  And

2    let's go to Page 11, I'm sorry.

3            What date was your Plea Agreement signed?

4    A.  January 19th, 2012.

5    Q.  All right.  Then you were represented by a lawyer?

6    A.  Correct.

7    Q.  And then you and your lawyer met with agents on

8    January 27th, after that date, correct?

9    A.  Correct.

10   Q.  And at that time, with your lawyer there, you provided

11   information about Mr. Brown?

12   A.  Correct.

13   Q.  And this incident?

14   A.  Correct.

15   Q.  Now, you were also questioned about that information.

16           Who set the topics and the order of the interview,

17   you or the agents?

18   A.  They just flipped the pages and then I'd give them

19   information on the people I could identify in the photos.

20   Q.  Now, you were questioned as well about your testimony in

21   the Grand Jury regarding who went into the house.

22           And you indicated that, in one portion of the

23   transcript, you had said that Brown, Kenneth Jones, and two

24   dudes proceeded to go in the house.

25           Do you remember testifying to that?

B. DOUGLAS - REDIRECT                                              692

```
 1   A.  Yes.
 2   Q.  And then later in the same transcript, do you remember
 3   this question being asked and this answer being given by you?
 4   This is on Page 27.
 5             MR. KELLETER:  Your Honor, I object to the leading.
 6             MR. ZLOTNICK:  Your Honor, I'm impeaching, I'm
 7   trying to --
 8             THE COURT:  No, but you are still -- you still have
 9   him on direct, because he's your witness.
10             MR. ZLOTNICK:  I understand, but I wanted to show --
11   I wanted to use the prior inconsistent statement in the form
12   of a question, answer, question, answer from the transcript.
13             THE COURT:  As long as you are setting up the
14   question and not leading.
15             MR. ZLOTNICK:  Yes.
16   BY MR. ZLOTNICK:
17   Q.  So do you remember this question -- these questions being
18   asked and your answers?
19             Question:  Then Brown and Jones, as a result of
20   gunshots, retreat?
21             Your answer:  Yes, sir.
22             Question:  They don't go in?
23             Your answer:  No, sir.
24             Do you remember those questions being asked and you
25   giving those answers?
```

B. DOUGLAS - REDIRECT                                                    693

1   A.   Yes.

2   Q.   And what was your understanding of whether or not they

3   actually were inside the house, AU and the defendant, from

4   what the defendant told you?

5   A.   That they ain't go in the house.

6   Q.   But what was your -- what did the defendant say as to

7   whether or not AU and the defendant were at the door

8   before -- who was at the door?

9   A.   Two Boston dudes, and AU, and Bryan Brown.

10  Q.   And that's coming from who?

11  A.   Bryan Brown.

12          MR. ZLOTNICK:  I have no other questions, thank you.

13          THE COURT:  All right, ladies and gentlemen, may

14  this witness be excused?

15          MR. ZLOTNICK:  Yes, sir.

16          MR. WOODWARD:  Yes, sir.

17          MR. SACKS:  Yes, sir.

18          MR. KELLETER:  May I just have one moment?

19          (Pause.)

20          MR. RASBERRY:  Yes, Your Honor.

21          THE COURT:  All right, you may be excused.

22          We are going to terminate here in about four

23  minutes, but, ladies and gentlemen, you have just heard

24  testimony from this witness, Brandon Douglas, about what the

25  Defendant Brown said what his involvement and co-defendant's

1    involvement was in this offense of March 13th, 2009.

2         You are instructed, you are instructed, that you may

3    only consider his testimony about what Brown said against

4    Brown.  You may not consider any testimony he provided about

5    what Brown said other co-defendants did against another

6    co-defendant, only against Brown, not against another

7    co-defendant.

8         Now, ladies and gentlemen, I want you to relax this

9    weekend, put this case out of your mind, don't let anybody

10   pressure you into talking about it, keep them in suspense.

11        Be safe, be back here Monday morning, we're going to

12   kick off at 9:30 in this case.  Leave your notes with the

13   Court Security Officer.  You may return to the jury room.

14        (Jury out, 5:11 p.m.)

15        THE COURT:  I want the United States to look at

16   trying to seriously figure out how to redact those two

17   transcripts.  I know it's difficult because I read them, but

18   it's doable.

19        MR. ZLOTNICK:  I'm sorry, I didn't catch all you

20   said, Your Honor.

21        THE COURT:  I said I know it's difficult to redact

22   those transcripts, but I read them and it's doable.

23        MR. ZLOTNICK:  I understand.

24        THE COURT:  Okay.

25        MR. ZLOTNICK:  I'll tell you just one issue, just

Page 695 is not considered in the page count for billing          695

```
 1    one of difficulty -- I mean, it can be done, but one of the

 2    challenges --

 3              THE COURT:  Have a seat, everybody.

 4              MR. ZLOTNICK:  One of the challenges is the nature

 5    of the witnesses, and to avoid getting a witness in that type

 6    of a situation from inadvertently making the incorrect

 7    statement, but I certainly understand the Court's position.

 8              THE COURT:  Well, you might want to, once you do

 9    your redactions, go visit your witness before they get on the

10    stand.

11              MR. ZLOTNICK:  I understand.

12              THE COURT:  All right, see you Monday.

13

14                   *****     *****     *****

15    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
16
            /S/                              9/20/2018
17    -------------------------------    ------------
            Janet A. Collins, RMR, CRR, CRI          DATE
18

19

20

21

22

23

24

25
```

Janet Collins, Official Court Reporter